**This order is SIGNED.**

**Dated: April 24, 2025**





—————————————————————
**JOEL T. MARKER**
**U.S. Bankruptcy Judge**

*Order Prepared and Submitted By:*

Michael R. Johnson (7070)
Jeffrey W. Shields (2948)
David H. Leigh (9433)
Austin C. Nate (17789)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah 84111
Tel: (801) 532-1500
Email: mjohnson@rqn.com
Email: jshields@rqn.com
Email: dleigh@rqn.com
Email: anate@rqn.com

Gregg M. Galardi (admitted *pro hac vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com

Eric P. Schriesheim (admitted *pro hac vice*)
**ROPES & GRAY LLP**
191 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: eric.schriesheim@ropesgray.com

*Counsel to the Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**VOBEV, LLC**, a Utah limited liability company,<br><br>Debtor-in-Possession. | Bankruptcy Case No. 24-26346 (JTM)<br><br>Chapter 11<br><br>Honorable Joel T. Marker<br>[Filed Electronically] |

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND ORDER
CONFIRMING THE FIRST AMENDED COMBINED DISCLOSURE
STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF VOBEV, LLC**

The above-captioned debtor and debtor in possession (the "Debtor") having filed (a) the *Debtor's Motion for Order (I) Approving Adequacy of Disclosures in Combined Disclosure Statement and Plan on an Interim Basis, (II) Scheduling Confirmation Hearing and Objection Deadline, (III) Establishing Procedures for Solicitation, Voting, and Tabulation of Votes, (IV) Approving Form of Ballot and Solicitation Package, and (V) Approving Notice* [Docket No. 384] (the "Interim Approval and Procedures Motion"); (b) the *First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC* [Docket No. 477] (as subsequently revised or amended, the "Plan" or "Combined Disclosure Statement and Plan");[1] (c) the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC* [Docket No. 480] (the "Tabulation Declaration"); (d) the *Declaration of Alan Boyko, Chief Transformation Officer of the Debtor, in Support of Debtor's Chapter 11 Petition and First Day Motions* [Docket No. 23] (the "First Day Declaration"); (e) the *Declaration of Alan Boyko, Chief Transformation Officer of the Debtor, in Support of Confirmation of the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC* [Docket No. 482] (the "Boyko Declaration"); (f) the *Declaration of Alan J. Carr, Sole Manager of the Debtor, in Support of Confirmation of the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC*

---

[1] Capitalized terms not otherwise herein shall have the meanings ascribed to such terms in the Interim Approval and Procedures Motion or the Combined Disclosure Statement and Plan, as applicable.

[Docket No. 481] (the "Carr Declaration" and, together with the Boyko Declaration, the "Confirmation Declarations"); and (g) the *Debtor's Memorandum of Law in Support of Entry of an Order Confirming the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC* [Docket No. 483] (the "Confirmation Memorandum"); and the Court having entered the *Order (I) Conditionally Approving Combined Disclosure Statement and Plan for Solicitation Purposes Only, (II) Establishing Procedures for Solicitation, Voting, and Tabulation of Votes to Accept or Reject Combined Disclosure Statement and Plan, (III) Approving the Form of Ballot and Solicitation Materials, (IV) Establishing Voting Record Date, (V) Fixing the Date, Time and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto, and (VI) Approving Related Shortened Notice Procedures* [Docket No. 425] (the "Interim Approval and Procedures Order"), approving, among other things, the Combined Disclosure Statement and Plan on an interim basis, the contents of the Solicitation Package, and the solicitation procedures and tabulation procedures; and the Court having conducted an evidentiary hearing to consider confirmation of the Combined Disclosure Statement and Plan on April 23, 2025  (the "Confirmation Hearing"); and any responses or objections to confirmation of the Combined Disclosure Statement and Plan raised at or prior to the Confirmation Hearing (collectively, the "Objections") having been resolved, overruled, or withdrawn prior to or during the Confirmation Hearing; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor, the Court hereby finds and determines that:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.    *Findings and Conclusions.*   The findings and conclusions set forth herein and on the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by

Bankruptcy Rules 7052 and 9014.   To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    *Jurisdiction, Venue, Core Proceeding*.   The Court has jurisdiction over the Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Utah.   Approval of the disclosures in and confirmation of the Combined Disclosure Statement and Plan are core proceedings pursuant to 28 U.S.C. § 157(b), and this Court has jurisdiction to enter a final order with respect thereto.   The Debtor is an eligible debtor under Bankruptcy Code Section 109.   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   The Debtor is the plan proponent in accordance with Bankruptcy Code section 1121(a).

C.    *The Committee*.   On December 19, 2024, the Office of the United States Trustee for the District of Utah (the "U.S. Trustee") appointed an official committee of unsecured creditors in this Chapter 11 Case (the "Committee").   *See Notice of Appointment of Unsecured Creditors Committee* [Docket No. 105].   No trustee or examiner has been appointed in this Chapter 11 Case.

D.    *Judicial Notice*.   The Court takes judicial notice of the docket in this Chapter 11 Case maintained by the Clerk of the Bankruptcy Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of this Chapter 11 Case.

E.    *Adequate Information*.   The Combined Disclosure Statement and Plan contains adequate information within the meaning of Bankruptcy Code section 1125(a).

F.    *Interim Approval and Procedures Order Compliance*.   The Debtor has complied with the Interim Approval and Procedures Order, including the solicitation process, in all respects.

G.    *Burden of Proof.*    The Debtor has the burden of proving the elements of Bankruptcy Code sections 1125 and 1129(a) and (b) by a preponderance of the evidence.    The Debtor has met its burden and has proven each element of Bankruptcy Code sections 1125 and 1129.

H.    *Voting.*    As evidenced by the Tabulation Declaration, votes to accept or reject the Combined Disclosure Statement and Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code and the Bankruptcy Rules, the solicitation process set forth in the Interim Approval and Procedures Order, and applicable non-bankruptcy law.

I.    *Solicitation.*    The Solicitation Packages were transmitted and served in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, and the Interim Approval and Procedures Order.    The Form of Ballots adequately addressed the particular needs of this Chapter 11 Case and are appropriate to the Holders of Claims in the Voting Classes, which are impaired under the Combined Disclosure Statement and Plan and may receive a distribution under the Combined Disclosure Statement and Plan, and whose votes were, therefore, solicited.

(1)    The period during which the Debtor solicited acceptances of the Combined Disclosure Statement and Plan was reasonable and sufficient under the circumstances of this Chapter 11 Case and enabled voting creditors to make an informed decision to accept or reject the Combined Disclosure Statement and Plan.

(2)    The Debtor was not required to solicit the votes from the Holders of Claims from the following Classes (the "Deemed to Accept Classes") as each such Class is unimpaired under the Combined Disclosure Statement and Plan and conclusively presumed to have accepted it: Class 1 (Other Secured Claims), and Class 2 (Other Priority Claims).

(3)    As described in the Tabulation Declaration and the Confirmation Declarations, the transmittal and service of the Solicitation Packages was timely, adequate, and sufficient under the circumstances.    The solicitation

5

of votes on the Combined Disclosure Statement and Plan complied with the Interim Approval and Procedures Order, was appropriate and satisfactory based upon the circumstances of this Chapter 11 Case and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and other applicable rules, laws, and regulations. In connection therewith, the Debtor, and its employees, attorneys, advisors and professionals in this Chapter 11 Case, are entitled to the protection of Bankruptcy Code section 1125(e).

J.    *Good Faith*.  The Combined Disclosure Statement and Plan was negotiated in good faith and at arm's length, and the Debtor has not engaged in any collusive or unfair conduct in connection with the Combined Disclosure Statement and Plan.

K.    *Notice*.  As evidenced by the Tabulation Declaration and the Confirmation Declarations, the transmittal and service of the Solicitation Packages were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to confirmation of the Combined Disclosure Statement and Plan) have been given due, proper, timely, and adequate notice in accordance with the Interim Approval and Procedures Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto.  No other or further notice is required.

L.    *Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))*.  The Combined Disclosure Statement and Plan complies with the applicable provisions of the Bankruptcy Code and, as required by Bankruptcy Rule 3016, the Combined Disclosure Statement and Plan is dated and identifies the Debtor as the plan proponent, thereby satisfying Bankruptcy Code Section 1129(a)(1).

M.    *The Debtor's Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))*.  The Debtor has complied with all the applicable provisions of the Bankruptcy Code, satisfying the

requirements of Bankruptcy Code section 1129(a)(2).

N.    *Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).*    The Combined Disclosure Statement and Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying the requirements of Bankruptcy Code section 1129(a)(3).

O.    *Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).*    Any payment made or to be made by the Debtor, or by any person issuing securities or acquiring property under the Combined Disclosure Statement and Plan, for services or for costs and expenses in or in connection with this Chapter 11 Case, or in connection with the Combined Disclosure Statement and Plan and incident to this Chapter 11 Case, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying the requirements of Bankruptcy Code section 1129(a)(4).

P.    *Liquidating Trustee, Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).* The Debtor has complied with Bankruptcy Code section 1129(a)(5).    The Debtor is liquidating and, therefore, Bankruptcy Code section 1129(a)(5)(B) is not applicable.

Q.    *No Rate Changes (11 U.S.C. § 1129(a)(6)).*    After confirmation of the Combined Disclosure Statement and Plan, the Debtor's business will not involve rates established or approved by, or otherwise subject to, any governmental regulatory commission.    Therefore, Bankruptcy Code section 1129(a)(6) is not applicable.

R.    *Best Interest of Creditors (11 U.S.C. § 1129(a)(7)).*    The Combined Disclosure Statement and Plan satisfies Bankruptcy Code section 1129(a)(7).    The Liquidation Analysis attached to the Combined Disclosure Statement and Plan, and other evidence proffered or adduced at the Confirmation Hearing (i) is persuasive and credible, (ii) has not been controverted by other evidence, and (iii) establishes that each Holder of an impaired Claim or Equity Interest either has

accepted the Combined Disclosure Statement and Plan or will receive or retain under the

Combined Disclosure Statement and Plan, on account of such Claim or Equity Interest, property

of a value, as of the Effective Date, that is not less than the amount that such Holder would receive

or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

S.      *Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).*   Holders of Claims in

Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are unimpaired and deemed

to accept the Combined Disclosure Statement and Plan.   Holders of Claims in Class 3 (Prepetition

Lenders' Deficiency Claims) have voted, as a class, such that the foregoing class has accepted the

Combined Disclosure Statement and Plan in accordance with Bankruptcy Code section 1126(c).

T.      *Treatment of Administrative Expense Claims and Priority Tax Claims (11 U.S.C. §*

*1129(a)(9)).*   The treatment of Allowed Administrative Expense Claims under the Combined

Disclosure Statement and Plan, as consented to by holders of Professional Fee Claims, satisfies

Bankruptcy Code section 1129(a)(9)(A).   The treatment of Allowed Priority Tax Claims under the

Combined Disclosure Statement and Plan satisfies the requirements of Bankruptcy Code section

1129(a)(9)(C).

U.      *Acceptance by an Impaired Class (11 U.S.C. § 1129(a)(10)).*   One Class of Claims

that is impaired under the Combined Disclosure Statement and Plan has accepted the Combined

Disclosure Statement and Plan, determined without including any acceptance of the Combined

Disclosure Statement and Plan by an insider, thereby satisfying the requirements of Bankruptcy

Code section 1129(a)(10).

V.      *Feasibility (11 U.S.C. § 1129(a)(11)).*   Confirmation of the Combined Disclosure

Statement and Plan is not likely to be followed by the liquidation of the Debtor other than as set

forth in the Combined Disclosure Statement and Plan itself, thereby satisfying Bankruptcy Code

section 1129(a)(11).

W.    *Payment of Fees (11 U.S.C. § 1129(a)(12)).*    The Combined Disclosure Statement and Plan provides that all fees due and payable pursuant to 28 U.S.C. § 1930 shall by payable by the Debtor prior to the Effective Date.

X.    *Inapplicable Provisions (11 U.S.C. § 1129(a)(13)-(16)).*    The Debtor (i) does not maintain retiree benefits as defined in Bankruptcy Code section 1114, (ii) does not have domestic support obligations, (iii) is not an individual, and (iv) is a moneyed, business, or commercial entity; accordingly, Bankruptcy Code Sections 1129(a)(13)-(16) are not applicable to the Combined Disclosure Statement and Plan.

Y.    *Fair and Equitable, No Unfair Discrimination (11 U.S.C. § 1129(b)).*    Based upon the evidence proffered, adduced, and presented by the Debtor at the Confirmation Hearing, the Combined Disclosure Statement and Plan does not discriminate unfairly against, and is fair and equitable with respect to all Classes as required by Bankruptcy Code section 1129(b)(1) and (b)(2).

Z.    *Only One Plan (11 U.S.C. § 1129(c).*    The Combined Disclosure Statement and Plan is the only plan filed in this Chapter 11 Case, and accordingly, Bankruptcy Code section 1129(c) is inapplicable in this Chapter 11 Case.

AA.    *Principal Purpose of the Plan (11 U.S.C. § 1129(d)).*    The principal purpose of the Combined Disclosure Statement and Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Combined Disclosure Statement and Plan on any such grounds.    Therefore, the Combined Disclosure Statement and Plan satisfies the requirements of Bankruptcy Code Section 1129(d).

BB.    *Good Faith Solicitation (11 U.S.C. § 1125(e)).*    Based upon the record before the

Court, the Debtor, the Committee, Ares, and their respective employees, attorneys, advisors and professionals in this Chapter 11 Case acted in "good faith" within the meaning of Bankruptcy Code section 1125(e) in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation of the Combined Disclosure Statement and Plan and/or their participation in the activities described in Bankruptcy Code section 1125, and, therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation or participation therein of the Combined Disclosure Statement and Plan and are entitled to the protections afforded by Bankruptcy Code Section 1125(e) and, to the extent such parties are listed therein, the exculpation provisions found in Article X.B of the Combined Disclosure Statement and Plan.

CC.    *Implementation*.    All documents necessary to implement the Combined Disclosure Statement and Plan, and all other relevant and necessary documents, have been developed and negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, and subject to the occurrence of the Effective Date, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

DD.    *Releases*.    The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Utah to approve the releases set forth in Article X.C and X.D of the Combined Disclosure Statement and Plan.    Pursuant to Bankruptcy Code section 105(a), approval of the releases contained in the Combined Disclosure Statement and Plan is warranted, as established by the record in this Chapter 11 Case, because such provisions: (i) are essential to the formulation and

10

implementation of the Combined Disclosure Statement and Plan, (ii) confer substantial benefits on the Debtor's Estate, (iii) are fair, equitable, and reasonable, and (iv) are in the best interests of the Debtor and its Estate.   The releases set forth in the Combined Disclosure Statement and Plan are (A) in exchange for good and valuable consideration to the extent necessary; (B) a good faith settlement and compromise of the Claims released; (C) in the best interests of the Debtor, the Estate, and all holders of Claims and Equity Interests; (D) fair, equitable, and reasonable; (E) given and made after due notice and opportunity for hearing; and (F) a bar to the assertion of any Claim or Cause of Action so released, and are approved pursuant to Bankruptcy Rule 9019.   For the avoidance of doubt, the full preservation of rights of Belvac Production Machinery, Inc. ("Belvac"), as set forth in paragraph 52 of the Sale Order, shall continue in full force and effect notwithstanding the releases set forth in Article X.C and X.D of the Combined Disclosure Statement and Plan.   For the avoidance of doubt, nothing in this Confirmation Order or the Combined Disclosure Statement and Plan shall release, impair, impede, bar, enjoin, waive, or in any way prejudice Belvac's rights in Case No. 1:25-cv-00166-JLH, currently pending before the United States District Court for the District of Delaware or any appeal taken therefrom.

EE.    *Exculpation and Injunction*.  Pursuant to Bankruptcy Code section 1123(b)(3) and Bankruptcy Rule 9019(a), the exculpation provisions set forth in Article X.B of the Combined Disclosure Statement and Plan and implemented by this Confirmation Order are fair, equitable, reasonable, and in the best interests of the Debtor, and the Estate, Creditors, and equity holders.  The record of the Confirmation Hearing is sufficient to support the exculpation provision set forth in Article X.B and the related injunction in Article X.A of the Combined Disclosure Statement and Plan.  Accordingly, based on the representations of the parties, and the evidence proffered, adduced, and presented at the Confirmation Hearing, this Court finds that the exculpation provision

set forth in Article X.B, and the related injunction in Article X.A of the Combined Disclosure Statement and Plan, are consistent with the Bankruptcy Code and applicable law.

FF.    *Plan Settlements.*  The Committee Plan Settlement, which will be implemented in accordance with and upon confirmation of the Combined Disclosure Statement and Plan, is fair, equitable, and supported by meaningful consideration to the Debtor and the Estate.    The Committee Plan Settlement represents a reasonable compromise that facilitates the potential recovery and distribution of cash to creditors holding allowed claims that are GUC Trust Beneficiaries.   The Committee Plan Settlement is in the best interest of the Debtor and its Estate and is consistent with the Bankruptcy Code and applicable law.

GG.    Based on the foregoing, the Combined Disclosure Statement and Plan satisfies the requirements for confirmation set forth in Bankruptcy Code section 1129.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    *Findings of Fact and Conclusion of Law*.  The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein.

2.    *Notice of Confirmation Hearing*.   Notice of the Confirmation Hearing complied with the terms of the Interim Approval and Procedures Order, was appropriate and satisfactory based upon the circumstances of this Chapter 11 Case and was in compliance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

3.    *Adequate Information*.  The disclosures contained in the Combined Disclosure Statement and Plan are approved on a final basis as containing adequate information within the meaning of Bankruptcy Code section 1125, and any objections to the adequacy of the information contained in the Combined Disclosure Statement and Plan not otherwise consensually resolved are overruled in their entirety.

4.    *Solicitation*.  The solicitation of votes on the Combined Disclosure Statement and Plan complied with the Interim Approval and Procedures Order, was appropriate and satisfactory based upon the circumstances of this Chapter 11 Case and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law.

5.    *Ballots*.  The form of Ballot attached as Exhibit 1 to the Interim Approval and Procedures Order is in compliance with Bankruptcy Rule 3018(c), and substantially conforms to Official Form Number 14, and is approved in all respects.

6.    *Confirmation of the Combined Disclosure Statement and Plan*.  The Combined Disclosure Statement and Plan, attached hereto as **Exhibit A**, the agreements, instruments, and other applicable documents contained in the Plan Supplement, and all exhibits and schedules to each of the foregoing are approved in all respects.    The terms of the Combined Disclosure Statement and Plan and the Plan Supplement are an integral part of this Confirmation Order.

7.    *Objections Resolved or Overruled*.    All objections, responses, statements, and comments in opposition to the Combined Disclosure Statement and Plan, other than those withdrawn with prejudice, waived, or settled prior to, or on the record at, the Confirmation Hearing, shall be, and hereby are, overruled in their entirety.

8.    *Binding Effect*.    On the date of and following entry of this Confirmation Order and subject to the occurrence of the Effective Date, the provisions of the Combined Disclosure Statement and Plan shall be binding on the Debtor, the Estate, all Holders of Claims and Equity Interests (irrespective of whether such Claims or Equity Interests are impaired under the Combined Disclosure Statement and Plan or whether the Holders of such Claims or Equity Interests have accepted the Combined Disclosure Statement and Plan), any and all non-Debtor parties to executory contracts and unexpired leases with the Debtor, any other parties in interest in this

13

Chapter 11 Case, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.  For the avoidance of doubt, the Debtor's classification as a disregarded entity for tax purposes may not be modified without the approval by final order of the Bankruptcy Court on a motion brought by the Debtor or GUC Trustee.

9.      *Vesting of Assets*.    As of the Effective Date, pursuant to Bankruptcy Code section 1141(b) and (c), the Debtor's assets shall automatically vest in the GUC Trust free and clear of all Claims, liens, encumbrances, charges, membership interests, and other interests, subject to the terms and conditions of the Combined Disclosure Statement and Plan and this Confirmation Order, except as otherwise provided in the Combined Disclosure Statement and Plan or this Confirmation Order.  The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive right to administer the GUC Trust Assets in the GUC Trustee's sole discretion and without further court approval, subject to the terms of the GUC Trust Agreement and Plan.

10.      *Implementation of the Combined Disclosure Statement and Plan*.    The Debtor is hereby authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and take such other actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.

11.      *Rejection of Executory Contracts*.    Except as set forth in the Combined Disclosure Statement and Plan, as of the Effective Date, each Executory Contract and Unexpired Lease to which the Debtor is a party is hereby rejected as of the Effective Date unless (i) previously assumed and/or assigned, (ii) subject to a pending motion to assume and/or assign, or (iii) rejected before the Effective Date.

14

12.     *Conditions to Effectiveness*.   The Combined Disclosure Statement and Plan shall not become effective unless the conditions set forth in Article IX of the Combined Disclosure Statement and Plan have been satisfied or waived.

13.     *Professional Compensation*.   All Professionals shall file with the Court final applications for compensation for services rendered and reimbursement of expenses incurred within sixty (60) days after the Effective Date.   Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to, or action, order, or approval of, the Court.

14.     *Binding Exculpation Provision*.   All exculpation provisions contained herein and/or in the Combined Disclosure Statement and Plan, including, but not limited to those contained in Article X.B of the Combined Disclosure Statement and Plan, are approved and are effective and binding on all persons and entities, to the extent provided therein.

15.     *Binding Release Provisions*.   All release provisions contained herein and/or in the Combined Disclosure Statement and Plan, including, but not limited to those contained in Article X.C and X.D of the Combined Disclosure Statement and Plan, are approved and are effective and binding on all persons and entities, to the extent provided therein; *provided, however*, that no provision of the Combined Disclosure Statement and Plan or this Confirmation Order shall be construed to grant a discharge pursuant to Bankruptcy Code section 1141(d).

16.     *Full Preservation of Belvac's Intellectual Property Rights*.   Notwithstanding anything in this Confirmation Order or the Combined Disclosure Statement and Plan to the contrary, for the avoidance of doubt, the full preservation of rights of Belvac as set forth in

paragraph 52 of the Sale Order shall continue in full force and effect notwithstanding the releases

set forth in Article X.C and X.D of the Combined Disclosure Statement and Plan. Nothing in this

Confirmation Order, the Combined Disclosure Statement and Plan, nor any actions taken pursuant

to any of the foregoing, shall release, enjoin, impair, prejudice, waive, or otherwise affect any

rights of Belvac in its intellectual property and its right to bring in any court of competent

jurisdiction any claim for infringement thereof after closing of the Sale Transaction against

Purchaser and/or any of Purchaser's transferees, successors-in-interest, or assigns.   For the

avoidance of doubt, such claims of Belvac are preserved inviolate and wholly unprejudiced by this

Confirmation Order, the Combined Disclosure Statement and Plan, and the actions taken

hereunder.  For the further avoidance of doubt, nothing contained within this Confirmation Order

or the Combined Disclosure Statement and Plan shall release, impair, impede, bar, enjoin, waive,

or in any way prejudice Belvac's rights in Case No. 1:25-cv-00166-JLH, currently pending before

the United States District Court for the District of Delaware or any appeal taken therefrom.

17.    *Injunctions*.   Except as otherwise provided in the Combined Disclosure Statement

and Plan, this Confirmation Order, or a separate order of the Bankruptcy Court, pursuant to Article

X.A of the Combined Disclosure Statement and Plan, all entities who have held, hold, or may hold

Claims against or Equity Interests in the Debtor shall be permanently enjoined from taking any of

the following actions against any property that is to be distributed under the terms of the Combined

Disclosure Statement and Plan on account of any such Claims or Equity Interests: (a) commencing

or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing,

attaching, collecting, or recovering in any manner any judgment, award, decree, or order;

(c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff right not taken

pre-confirmation, or subrogation of any kind against any debt, liability, or obligation due to the

Debtor; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Combined Disclosure Statement and Plan; *provided, however*, that such entities shall not be precluded from exercising their rights pursuant to and consistent with the terms of the Combined Disclosure Statement and Plan or the Confirmation Order; *provided, further*, that the foregoing shall not apply to any acts, omissions, claims, causes of action or other obligations expressly set forth in and preserved by the Combined Disclosure Statement and Plan or any defenses thereto.

18.    *Committee Plan Settlement.*    The Committee Plan Settlement set forth in the Combined Disclosure Statement and Plan is approved.

19.    *Preservation of Causes of Action.*    On the Effective Date, the Retained Causes of Action shall be and are hereby preserved and transferred to the GUC Trust pursuant to the terms of the Combined Disclosure Statement and Plan.  The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive right to prosecute, compromise, settle, or otherwise pursue the Retained Causes of Action in the GUC Trustee's discretion and without further court approval, subject to the terms of the GUC Trust Agreement and Plan.

20.    *Reservation of Rights.*    Except as expressly set forth herein, Combined Disclosure Statement and Plan shall have no force or effect until the Effective Date.   None of the filing of the Combined Disclosure Statement and Plan, any statement or provision contained therein, or the taking of any action by the Debtor with respect to the Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor or any Holder of Claims or Equity Interests before the Effective Date.

21.    *Payment of Statutory Fees.*    The payment of Statutory Fees is approved as set forth in Article V.A.5 of the Combined Disclosure Statement and Plan.

22.   *Retention of Jurisdiction.*   On and after the Effective Date, the Court shall retain jurisdiction, to the fullest extent possible under law, over all matters arising in, arising under, and related to this Chapter 11 Case and the Combined Disclosure Statement and Plan for, among other things:

a.     to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

b.     to enter and implement such orders as may be appropriate in the event this Confirmation Order is for any reason stayed, revoked, modified, or vacated;

c.     to issue such orders in aid of execution and consummation of the Combined Disclosure Statement and Plan, to the extent authorized by Bankruptcy Code Section 1142;

d.     to consider any amendments to or modifications of the Combined Disclosure Statement and Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, this Confirmation Order;

e.     to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code Sections 330 or 503;

f.     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Combined Disclosure Statement and Plan;

g.     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code Sections 346, 505, and 1146;

h.     to enter a Final Decree in this Chapter 11 Case;

i.     to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Combined Disclosure Statement and Plan;

j.     to decide, resolve, or otherwise hear any motions, adversary proceedings, contested or litigated matters, and any other matters in the Chapter 11 Case whether filed or commenced before or after the Effective Date;

k.     to grant or deny any applications involving the Debtor that may be pending on the Effective Date;

l.     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any

Person or Entity with the occurrence of the Effective Date or enforcement of the Combined Disclosure Statement and Plan, except as otherwise provided herein;

m.    to determine any other matters that may arise in connection with, or that are related to, the Combined Disclosure Statement and Plan, this Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Combined Disclosure Statement and Plan;

n.    to determine any other matters that may arise in connection with or related to the Sale Order or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Sale Order;

o.    to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with this Chapter 11 Case;

p.    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

q.    to resolve any disputes concerning whether a Person or Entity had sufficient notice of this Chapter 11 Case, the Bar Date, or the Confirmation Hearing for the purpose of determining whether a Claim or Equity Interest is discharged hereunder, or for any other purpose; and

r.    to hear any other matter not inconsistent with the Bankruptcy Code.

23.    *Resignation of the Debtor's Managers and Officers.*  On the Effective Date, all of the Debtor's managers and officers shall be deemed to have resigned to the extent permissible under applicable law.

24.    *Provisions of the Combined Disclosure Statement and Plan and Confirmation Order Non-Severable and Mutually Dependent.*    The provisions of the Combined Disclosure Statement and Plan and this Confirmation Order, including the findings of fact and conclusions of law as set forth herein, are non-severable and mutually dependent.

25.    *Governing Law.*   Except to the extent that the Bankruptcy Code or federal law is applicable, the rights, duties, and obligations arising under the Combined Disclosure Statement

and Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Utah, without giving effect to the principles or conflicts of law thereof.

26.    *Applicable Non-Bankruptcy Law*.    Pursuant to Bankruptcy Code section 1123(a) and 1142(a), the provisions of this Confirmation Order, the Combined Disclosure Statement and Plan, and related documents (or any amendments or modifications thereto) shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

27.    *Documents and Instruments*.    Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized and directed to accept any and all documents and instruments necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Combined Disclosure Statement and Plan and this Confirmation Order.

28.    *Governmental Approvals Not Required*.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Combined Disclosure Statement and Plan, any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Combined Disclosure Statement and Plan.

29.    *Notice of Entry of Confirmation Order and Effective Date*.    The form of notice of Effective Date and entry of this Confirmation Order, attached hereto as **Exhibit B** (the "Effective Date Notice"), provides adequate and reasonable notice and is hereby approved.  On or within two (2) Business Days of the Effective Date, the Debtor shall file and serve the Effective Date Notice on the following parties: (i) all parties filing a notice of appearance and request for service pursuant to Bankruptcy Rule 2002 in this Chapter 11 Case; (ii) state and local taxing authorities in which the Debtor did business; (iii) the Internal Revenue Service; (iv) the Securities and Exchange

Commission; (v) the United States Attorney for the District of Utah; (vi) Holders of Claims or Equity Interests; (vii) all counterparties to executory contracts and unexpired leases with the Debtor that are assumed or rejected under the Combined Disclosure Statement and Plan; (viii) the U.S. Trustee; (ix) the Committee Professionals; (x) counsel for Ares; and (xi) all persons or entities listed on the Debtor's creditor mailing matrix.

30.     *Inconsistency*.  To the extent of any inconsistency between this Confirmation Order and the Combined Disclosure Statement and Plan, this Confirmation Order shall govern.

31.     *No Waiver*.  The failure to specifically include any particular provision of the Combined Disclosure Statement and Plan in this Confirmation Order shall not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Combined Disclosure Statement and Plan is confirmed in its entirety and incorporated herein by reference.

32.     *Modification of Stay to Permit D&O Payment.*  The automatic stay and Plan injunction do not apply, or, to the extent one or both apply, the automatic stay and Plan injunction are lifted and modified solely to the extent necessary to permit and authorize any insurance carriers under any D&O insurance polices owned or maintained by the Debtor to provide coverage and to make payments under those policies.   Nothing in this Confirmation Order shall constitute a finding that any proceeds of any D&O insurance policies are property of the Debtor or the Debtor's Estate.

-----------------------------------------**END OF DOCUMENT**-------------------------------------------

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF system, which sent notification of such filing to the Office of the United States Trustee and all other electronic filing users in this case.


*/s/ Michael R. Johnson*
Michael R. Johnson

## DESIGNATION OF PARTIES TO BE SERVED

Service of the foregoing ***Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC*** (the "Order") should be served on the persons in the manner designated below:

**By electronic service:** I certify that all CM/ECF electronic filing users in this case will be served notice of entry of the foregoing Order through the CM/ECF System.

**By the Claims and Noticing Agent**:  I certify that (a) the United States Trustee for the District of Utah; (b) the United States Attorney's Office for the District of Utah; (c) the state attorneys general for all states in which the Debtor conducts business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) counsel for the Official Committee of Unsecured Creditors; (g) counsel to the DIP Agent and DIP Lenders; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 will be served notice of entry of the foregoing Order by the Claims and Noticing Agent.

*/s/ Michael R. Johnson*
Michael R. Johnson

## EXHIBIT A

**Combined Disclosure Statement and Plan**

Michael R. Johnson (7070)
Jeffrey W. Shields (2948)
David H. Leigh (9433)
Austin C. Nate (17789)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah 84111
Tel: (801) 532-1500
Email: mjohnson@rqn.com
Email: jshields@rqn.com
Email: dleigh@rqn.com
Email: anate@rqn.com

Gregg M. Galardi (admitted *pro hac vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com

Eric P. Schriesheim (admitted *pro hac vice*)
**ROPES & GRAY LLP**
191 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: eric.schriesheim@ropesgray.com

*Counsel to the Debtor and Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF UTAH CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>**VOBEV, LLC**, a Utah limited liability company,<br><br>      Debtor-in-Possession. | Bankruptcy Case No. 24-26346 (JTM)<br><br>Chapter 11<br><br>Honorable Joel T. Marker<br>[Filed Electronically] |

**FIRST AMENDED COMBINED DISCLOSURE STATEMENT
AND CHAPTER 11 PLAN OF LIQUIDATION OF VOBEV, LLC**

# <u>TABLE OF CONTENTS</u>

I.    Introduction ............................................................................................................2

II.    Important Dates .....................................................................................................2

III.    Definitions and Construction of Terms .................................................................3

    A.    Definitions ...................................................................................................3

    B.    Interpretation; Application of Definitions and Rules of Construction ................17

IV.    Disclosures ...........................................................................................................18

    A.    General Background ....................................................................................18

        1.    Overview of Business Operations ...........................................................18

        2.    Debtor's Prepetition Capital Structure ......................................................18

        3.    Events Precipitating the Chapter 11 Filing ...............................................19

    B.    The Chapter 11 Case ...................................................................................19

        1.    First Day Orders .......................................................................................19

        2.    Retention of Professionals .........................................................................20

        3.    Appointment of the Committee ..................................................................20

        4.    The DIP Facility .......................................................................................20

        5.    Marketing and Sale of the Debtor's Assets ................................................21

        6.    Settlements ...............................................................................................22

        7.    Monthly Reporting, Schedules, and Meeting of Creditors ........................24

        8.    Claims Reconciliation Process and Bar Date .............................................25

    C.    Summary of Assets .....................................................................................25

    D.    Summary of Plan Treatment of Claims and Equity Interests ................................25

        1.    Summary of Treatment of Unclassified Claims ..........................................25

        2.    Summary of Treatment of Classified Claims and Equity Interests Under the Plan .................................................................................................26

E.    Potential Claims and Causes of Action..................................................27

F.    Certain Federal Income Tax Consequences...........................................27

    1.    Tax Consequences to the Debtor ................................................28

    2.    Tax Treatment of the GUC Trust and Tax Consequences for Holders of Claims ..........................................................................................29

G.    Certain Risk Factors to Be Considered .................................................31

H.    Feasibility..............................................................................................32

I.    Best Interests Test and Alternatives to the Combined Disclosure Statement and Plan ....................................................................................................33

J.    Releases by the Debtor..........................................................................34

V.    Plan treatment .................................................................................................34

A.    UNCLASSIFIED CLAIMS ...................................................................34

    1.    DIP Facility Claims....................................................................34

    2.    Administrative Expense Claims...................................................34

    3.    Professional Fee Claims .............................................................35

    4.    Priority Tax Claims ....................................................................37

    5.    Statutory Fees.............................................................................37

B.    CLASSIFIED CLAIMS AND INTERESTS ..........................................37

    1.    Class 1 – Other Secured Claims.................................................37

    2.    Class 2 – Other Priority Claims .................................................38

    3.    Class 3 – Prepetition Lenders' Deficiency Claims .....................38

    4.    Class 4 – General Unsecured Claims..........................................39

    5.    Class 5 - Subordinated Claims ...................................................39

    6.    Class 6 – Existing Equity Interests ............................................39

C.    Impaired Claims and Equity Interests....................................................40

D.    Cramdown and No Unfair Discrimination..............................................40

VI.    Confirmation Procedures .................................................................................40

    A.    Confirmation Procedures ....................................................................40

        1.    Combined Hearing ...............................................................40

        2.    Procedure for Objections ....................................................40

        3.    Requirements for Confirmation ..........................................41

    B.    Solicitation and Voting Procedures ....................................................41

        1.    Eligibility to Vote on the Plan ...........................................41

        2.    Solicitation Package............................................................41

        3.    Voting Procedures and Voting Deadline .............................41

        4.    Deemed Acceptance or Rejection .......................................43

        5.    Acceptance by Impaired Classes ........................................44

VII.    Implementation and Execution of the Plan ........................................................44

    A.    Effective Date .....................................................................................44

    B.    Closing of the Chapter 11 Case ..........................................................44

    C.    Records ...............................................................................................44

    D.    GUC Trustee .......................................................................................45

        1.    Establishment of the GUC Trust ........................................45

        2.    Transfer of GUC Trust Assets to GUC Trust ...........................45

        3.    Purpose of the GUC Trust...................................................45

        4.    Preservation of Rights.........................................................46

        5.    Continued Cooperation .......................................................47

        6.    GUC Trustee .......................................................................47

        7.    GUC Trust Expenses............................................................51

        8.    Privileges............................................................................51

        9.    Termination of GUC Trust...................................................51

E.    Provisions Governing Distributions Under the Plan..................................52

    1.    Distribution Date.....................................................................52

    2.    Method of Payment..................................................................52

    3.    Surrender of Instruments..........................................................53

    4.    Delivery of Distributions ..........................................................53

    5.    Objection to and Resolution of Claims........................................53

    6.    Preservation of Rights to Settle Claims .......................................54

    7.    Withholding, Payment and Reporting Requirements With Respect to
          Distribution ...........................................................................54

    8.    Miscellaneous Distribution Provisions .......................................55

VIII.    Executory Contracts and Unexpired Leases .........................................55

    A.    Background ....................................................................................55

    B.    Executory Contracts and Unexpired Leases .........................................55

    C.    Rejection Claims ............................................................................55

IX.    Conditions Precedent to Confirmation and the Effective Date....................56

    A.    Conditions Precedent to Confirmation.................................................56

    B.    Conditions Precedent to the Effective Date ..........................................56

    C.    Waiver of Conditions.......................................................................57

    D.    Effect of Nonoccurrence of Conditions ...............................................57

X.    Exculpation, Releases, and Injunctions ...............................................57

    A.    Injunction .....................................................................................57

    B.    Exculpation ...................................................................................58

    C.    Releases by the Debtor.....................................................................59

    D.    Releases by Holders of Claims ..........................................................60

XI.    Retention of Jurisdiction ................................................................61

XII.    Miscellaneous Provisions................................................................62

A.    Amendment or Modification of the Combined Disclosure Statement and Plan....62

B.    Exhibits/Schedules ...................................................................................63

C.    Plan Supplement ......................................................................................63

D.    Filing of Additional Documents ..............................................................63

E.    Binding Effect of Plan .............................................................................63

F.    Governing Law .........................................................................................63

G.    Time ..........................................................................................................63

H.    Severability ..............................................................................................63

I.    Revocation ................................................................................................63

J.    Dissolution of the Committee ..................................................................64

K.    Post-Effective Date Limitation of Notice ...............................................64

L.    Inconsistency............................................................................................64

M.    No Admissions..........................................................................................64

N.    Reservation of Rights...............................................................................64

XIII.    Recommendation ...............................................................................................65

**PLAN EXHIBITS**

Exhibit A:    Liquidation Analysis

Exhibit B:    Committee Resolution Term Sheet

Exhibit C:    Retained Causes of Action

## **NOTICE**

THIS COMBINED DISCLOSURE STATEMENT AND PLAN SETS FORTH THE COMMITTEE PLAN SETTLEMENT AS FINALIZED AMONG THE DEBTOR, COMMITTEE, AND CERTAIN OTHER PARTIES. THE DEBTOR RESERVES ALL RIGHTS TO FURTHER AMEND OR MODIFY THE PLAN (PURSUANT TO ARTICLE XII.A OF THE PLAN), CONSISTENT WITH SUCH SETTLEMENT AND APPLICABLE LAW.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

## I.    INTRODUCTION[1]

The Debtor proposes this Combined Disclosure Statement and Plan pursuant to Bankruptcy Code sections 1125 and 1129, and Local Rules 2002-1 and 3022-1.  The Debtor is the "proponent" of the Combined Disclosure Statement and Plan within the meaning of Bankruptcy Code section 1129.

The Combined Disclosure Statement and Plan reflects settlements reached after substantial negotiations among the Debtor, the Committee, Ares, and other parties in interest.

**Copies of this Combined Disclosure Statement and Plan and all other documents related to this Chapter 11 Case are available for review with charge on the bankruptcy case website at https://www.pacer.gov/, through Debtor's counsel by emailing MJohnson@rqn.com, or online for no charge at https://cases.ra.kroll.com/Vobev.**

The Combined Disclosure Statement and Plan describes and proposes a liquidating chapter 11 plan. If the Plan is confirmed by the Bankruptcy Court, then upon the Effective Date: the GUC Trust Assets will be transferred to the GUC Trust and the GUC Trustee shall administer the GUC Trust and monetize and distribute the value of the GUC Trust Assets to the GUC Trust Beneficiaries as soon as practicable pursuant to the terms of the Plan and the GUC Trust Agreement.

Each Holder of a Claim against the Debtor entitled to vote to accept or reject the Plan is encouraged to read the Combined Disclosure Statement and Plan in its entirety before voting.

Subject to the restrictions on modifications as set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and in this Combined Disclosure Statement and Plan, the Debtor expressly reserves the right to alter, amend, or modify the Combined Disclosure Statement and Plan one or more times before its substantial consummation.

## II.    IMPORTANT DATES

| DESCRIPTION | DEADLINE |
|---|---|
| Solicitation Motion Objection Deadline | March 17, 2025 |
| Voting Record Date | March 18, 2025 |
| Solicitation Motion Hearing | March 20, 2025, at 2:00 p.m. (MT) |
| Solicitation Commencement Date | Within two (2) business days after entry of the Interim Approval and Procedures Order or as soon as practicable thereafter |
| Solicitation Bar Date | April 4, 2025 |

---

[1]    All capitalized terms used but not defined in the Introduction shall have the meanings ascribed to them in Article II of the Combined Disclosure Statement and Plan.

| DESCRIPTION | DEADLINE |
|---|---|
| Publication Deadline | At least seven (7) days prior to the Confirmation Objection Deadline |
| Deadline for Plan Supplement | April 11, 2025 |
| Deadline for Creditors to File Rule 3018(a) Motions | April 14, 2025 |
| Combined Disclosure Statement and Plan Objection Deadline | April 18, 2025 |
| Voting Deadline for the Combined Disclosure Statement and Plan | April 18, 2025 |
| Deadline for Debtor to Respond to Rule 3018(a) Motions | April 21, 2025 |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Disclosure Statement and Plan | April 21, 2025 |
| Deadline for Reply to Objections to Combined Disclosure Statement and Plan | April 21, 2025 |
| Deadline to File Voting Tabulation Affidavit | April 22, 2025 |
| Combined Hearing | April 23, 2025, at 2:00 p.m. (MT) |

## III.   DEFINITIONS AND CONSTRUCTION OF TERMS

### A.   Definitions

"**Administrative Claims Bar Date**" means (i) the Initial Administrative Claims Bar Date and (ii) the Supplemental Administrative Claims Bar Date.

"**Administrative Expense Claim**" means any Claim for the costs and expenses of administration of the Chapter 11 Case pursuant to section 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor, other than Professional Fee Claims.

"**Administrative Expense Request**" means a request, filed with the Bankruptcy Court, for allowance and payment of an Administrative Expense Claim against the Debtor in accordance with the Bar Date Order or any other order of the Bankruptcy Court requiring the filing of an Administrative Expense Claim by a date certain, including an order of the Bankruptcy Court confirming the Plan.

3

"**Affiliate**" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

"**Allowed**" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor in their Schedules other than those scheduled as "disputed, contingent or unliquidated" (as such terms are defined in the Schedules); (b) a Proof of Claim that has been Filed and as to which the Debtor, the GUC Trustee, or any other applicable party-in-interest has not Filed an objection by the applicable Claims Objection Deadline; (c) a Proof of Claim that is neither Disputed nor has been Disallowed by a Final Order; (d) a Claim that is allowed pursuant to the terms of this Plan; or (e) a Claim that has been Allowed by a Final Order of the Bankruptcy Court, including the Final DIP Order.

"**Amended Schedules Bar Date**" means the later of (a) the General Bar Date, and (b) 5:00 p.m. (prevailing Mountain Time) on the date that is thirty (30) days following service of any notice of an amendment to a specific Schedule.

"**Ares**" means Ares Capital Corporation and, individually and collectively, in each case solely in their capacities as such, each and all of: (a) the DIP Lenders; (b) the DIP Agent; (c) the Prepetition Lenders; (d) the Prepetition Agents; and (e) the Purchaser, and any successors thereto.

"**Assets**" means any and all right, title, and interest of the Debtor in and to property of whatever type or nature, real or personal, tangible or intangible, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, works in progress, accounts, chattel paper, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, Causes of Action, Claims, other causes of action, and any general intangibles, but specifically excluding the Purchased Assets.

"**Avoidance Actions**" means any and all Causes of Action and rights to recover or avoid transfers or to avoid any lien under chapter 5 of the Bankruptcy Code or applicable state law or otherwise belonging to the Debtor that were not transferred to the Purchaser in connection with the Sale Transaction.

"**Ballot**" means the voting form distributed to each Holder of an Impaired Claim entitled to vote on the Plan, on which the Holder is to indicate acceptance or rejection of the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Utah, having jurisdiction over the Chapter 11 Case or, if such Court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over any matters related to the Chapter 11 Case.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

"**Bar Date**" means, as applicable, the General Bar Date, the Governmental Bar Date, the Rejection Dar Date, the Amended Schedules Bar Date, the Initial Administrative Claims Bar Date, the Supplemental Administrative Claims Bar Date, and any Supplemental Bar Date.

"**Bar Date Order**" means the *Order (I) Establishing Deadlines to File Proofs of Claim and Requests for Payment and Procedures Relating Thereto and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 374].

"**Bidding Procedures Motion**" means the *Debtor's Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for Entry of an Order (I) Approving the Bidding Procedures, Including the Debtor's Entry Into the Stalking Horse APA, the Sale Timeline, and the Form and Manner of Notice Thereof; (II) Approving the Debtor's (A) Sale of All or Substantially All of the Debtor's Assets Free and Clear of All Liens Other than Assumed Liabilities and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; and (III) Granting Related Relief* [Docket No. 58].

"**Bidding Procedures Order**" means the *Order (I)(A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Approving the Debtor's Entry into the Stalking Horse APA, (C) Approving the Form and Manner of Notice of the Sale Hearing; and (II) Granting Related Relief* [Docket No. 213].

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer, or any other customary payment method.

"**Causes of Action**" means any Claim, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Case**" means the chapter 11 case initiated by the Debtor's filing on the Petition Date of the voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, Case No. 24-26346 (JTM).

"**Claim**" means a "claim" as defined in Bankruptcy Code section 101(5), including any Administrative Expense Claim.

"**Claims and Balloting Agent**" means Kroll Restructuring Administration, LLC.

"**Claims Objection Deadline**" means the date by which the GUC Trustee must file and serve objections to Claims, which date shall be the later of (i) 180 days after the Effective Date and (ii) such later date as may be fixed by an order of the Bankruptcy Court after notice and opportunity to object.

"**Class**" means any group of substantially similar Claims or Equity Interests classified by the Combined Disclosure Statement and Plan pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**COD**" means cancellation of indebtedness.

"**Combined Disclosure Statement and Plan**" means this *First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC* including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Committee**" means the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case [Docket No. 105].

"**Committee Plan Settlement**" means the agreement among Ares, the Committee, and the Debtor as reflected in the Committee Resolution Term Sheet as supplemented herein.

"**Committee Resolution Term Sheet**" means that certain term sheet, agreed to among Ares, the Committee, and the Debtor attached to the Final DIP Order as Exhibit C, and attached hereto as **Exhibit B**.

"**Committee's Retained Professionals**" means Lowenstein Sandler LLP, Parsons Behle & Latimer, and Alvarez & Marsal North America, LLC.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Bankruptcy Court's Docket.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) Confirmation of the Plan pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

"**Confirmation**" means confirmation of the Plan pursuant to Bankruptcy Code section 1129.

"**Creditor**" means an "creditor" as defined in Bankruptcy Code section 101(10).

"**Critical Vendor Order**" means the *Final Order (i) Authorizing Debtor to (A) Pay Certain Prepetition Claims of Critical Vendors and Section 503(b)(9) Claimants, and (B) Follow Certain Procedures Related Thereto; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests; and (III) Granting Related Relief* [Docket No. 215].

"**D&O Insurance Coverage**" means any insurance coverage under which any of the Debtor or its respective officers or directors is entitled to coverage for actions taken in their capacity as such.

"**Debtor's Counsels**" means Ropes & Gray LLP and Ray Quinney & Nebeker P.C.

"**Debtor's Retained Professionals**" means Ropes & Gray LLP, Ray Quinney & Nebeker P.C., Houlihan Lokey Capital, Inc., FTI Consulting, Inc., and Kroll Restructuring Administration, LLC.

"**Debtor**" means Vobev, LLC.

"**DIP Agent**" means Ares Capital Corporation, as administrative agent and collateral agent under the DIP Facility.

"**DIP Budget**" means the 9-week budget approved by the DIP Lenders in accordance with the Final DIP Order setting forth projected cash receipts and cash disbursements of the Debtor.

"**DIP Term Sheet**" means that certain *Senior Secured Superpriority DIP Financing Term Sheet* (as the same may be amended, supplemented, restated or otherwise modified from time to time), attached as Exhibit A to the Final DIP Order, by and among the Debtor, the DIP Lenders from time to time party thereto, and the DIP Agent.

"**DIP Facility**" means the financing facility provided to the Debtor pursuant to the terms of the DIP Term Sheet and the Final DIP Order.

"**DIP Facility Claims**" means all Claims of the DIP Secured Parties against the Debtor, including, without limitation, principal, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise), all fees, expenses, and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, and related expenses and disbursements incurred by, or on behalf of, the DIP Secured Parties), indemnification obligations, all other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof.

"**DIP Lenders**" means the lenders from time-to-time party to the DIP Term Sheet.

"**DIP Orders**" means the First Interim DIP Order, the Second Interim DIP Order, the Third Interim DIP Order, and the Final DIP Order.

"**DIP Secured Parties**" means, collectively, the DIP Agent and the DIP Lenders.

"**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Disclosure Statement and Plan, the Bankruptcy Code, applicable law, or by Final Order.

"**Disclosure Statement**" means the disclosure statement portion of this Combined Disclosure Statement and Plan.

"**Disputed**" means, with respect to any Claim or Interest, except as otherwise provided herein, (i) a Claim or Interest that has not been Allowed or Disallowed or (ii) a Claim that is subject to an objection or a request for estimation by the applicable Claims Objection Deadline.

"**Distribution**" means any distribution to a Holder of an Allowed Claim pursuant to the terms of the Plan.

"**Distribution Date**" means, in accordance with the GUC Trustee's discretion, the date on which Distributions occur.

"**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

"**E-Ballot Portal**" means the electronic, online transmission portable accessible on the Debtor's case website maintained by the Claims and Balloting Agent.

"**Effective Date**" means the date on which the conditions specified in Article IX.B of this Combined Disclosure Statement and Plan have been met or satisfied.

"**Entity**" means an "entity" as defined in Bankruptcy Code section 101(15).

"**Equity Interests**" means all equity interests in the Debtor, including, but not limited to, all issued, unissued, authorized, or outstanding shares or membership interests together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"**Estate**" means the estate of the Debtor created upon the commencement of the Chapter 11 Case pursuant to Bankruptcy Code section 541.

"**Estate Causes of Action**" means all of the Debtor's Claims and Causes of Action that were not acquired by the Purchaser pursuant to the Sale Order. Notwithstanding anything to the contrary in this Plan, the Confirmation Order, or the Sale Order, the Estate Causes of Action include, but are not limited to, all claims and causes of action against the Debtor's insiders, shareholders, affiliates, directors, and officers; *provided*, *however*, the Estate Causes of Action do not include (i) causes of action or claims against (A) customers, suppliers, vendors, or contract counterparties of the Purchaser's post-closing business as of the Sale Closing Date or any time thereafter or (B) employees hired by the Purchaser, or (ii) causes of action or claims against Carlin Adrianopoli, Alan Carr, Alan Boyko, John Sacksteder, the Purchaser, the Prepetition Lenders, the DIP Lenders, Ares Capital Corporation, ACF Finco I LP, or any of Ares' Related Parties. To the extent there is any ambiguity regarding what causes of action constitute Estate Causes of Action, any corresponding litigation commenced by the GUC Trust shall be subject to Ares' reasonable consent.

"**Exculpated Parties**" means, individually and collectively, in each case solely in their capacities as such, each and all of: (a) the Debtor and the Debtor's Retained Professionals; (b) the Committee, the members of the Committee solely in their capacity as members of the Committee for actions taken in furtherance of their responsibilities as members of the Committee (and not in their individual capacities), and the Committee's Retained Professionals; and (c) the officers and directors of the Debtor, each only in their capacity as such, for the period from and after the Petition Date through and including the Effective Date.

"**Executory Contract**" means any executory contract as of the Petition Date between the Debtor and any other Entity or Entities, specifically excluding contracts and agreements entered into pursuant to this Combined Disclosure Statement and Plan.

"**File, Filed, or Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Case.

"**Final Decree**" means any order entered pursuant to Bankruptcy Code section 350, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Case.

"**Final DIP Order**" means the *Final Order (I) Authorizing the Debtor to Obtain Postpetition Senior Secured Financing, (II) Authorizing the Debtor to Use Cash Collateral on a Limited Basis, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 326].

"**Final Order**" means an order, ruling or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter: (a) which has not been reversed, stayed, modified, amended, or vacated as to which the time to appeal, petition for certiorari or move for a new trial, stay, reargument, reconsideration or rehearing has expired and no appeal, petition for certiorari or motion for new trial, stay, reargument, reconsideration or rehearing has been timely filed; or (b) as to which any appeal, petition for certiorari or motion for a new trial, stay, reargument, reconsideration or rehearing that has been or may timely be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, new trial, stay, reargument, reconsideration or rehearing was sought; provided, however, that, any motion for relief from an order, ruling or judgment shall not affect the finality or suspend the operation of such order, ruling or judgment.

"**First Day Declaration**" means the *Declaration of Alan Boyko, Chief Transformation Officer of the Debtor, in Support of Debtor's Chapter 11 Petition and First Day Motions* [Docket No. 23].

"**First Day Motions**" means the Debtor's motions filed upon the commencement of the Chapter 11 Case [Docket Nos. 4, 5, 6, 7, 8, 9, 10, 11, 12, and 15].

"**First Day Order**" means the Court's order entering relief related to the Debtor's motions filed upon the commencement of the Chapter 11 Case [Docket Nos. 66, 68, 69, 70, 71, 72, 73, 74, 75, 76, 214, 215, 216, 217, 218, 219, 220, 278 and 326].

"**First Interim DIP Order**" means that certain *Interim Order (I) Authorizing the Debtor to Obtain Postpetition Senior Secured Financing, (II) Authorizing the Debtor to Use Cash Collateral on a Limited Basis, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 72].

"**General Bar Date**" means April 14, 2025, as affirmed by the Bar Date Order.

"**General Unsecured Claims**" means any unsecured Claim against the Debtor which is not an Other Secured Claim, Other Priority Claim, Prepetition Secured Loan Claim, Prepetition Lenders' Deficiency Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, DIP Facility Claim, Subordinated Claim, or Existing Equity Interests and is not entitled to a priority under the Bankruptcy Code or any order of the Bankruptcy Court.

"**Governmental Bar Date**" means June 9, 2025, as affirmed by the Bar Date Order.

"**Governmental Unit**" means a "governmental unit" as defined in Bankruptcy Code section 101(27).

"**GUC Trust Agreement**" means the trust agreement that documents the powers, duties, and responsibilities of the GUC Trustee, and which agreement will be materially consistent with the Plan and Committee Resolution Term Sheet and otherwise reasonably acceptable to the Debtor, Ares and the Committee, in the final form agreed among the Debtor, Ares and the Committee prior to the Effective Date.

"**GUC Trust Assets**" means the Initial GUC Trust Funding Amount and the Retained Estate Causes of Action and the proceeds thereof.

"**GUC Trust**" means a trust to be established on the Effective Date pursuant to the terms of the GUC Trust Agreement and the Plan.

"**GUC Trust Beneficiaries**" means the Holders of Allowed Claims in Class 3 and Class 4 (and each Holder, a "<u>GUC Trust Beneficiary</u>").

"**GUC Trust Oversight Committee**" means the oversight committee, which is tasked with overseeing the GUC Trustee in accordance with the Plan and GUC Trust Agreement, the members of which shall be disclosed in the Plan Supplement and shall include at least one (1) designee of Ares.

"**GUC Trustee**" means the Entity selected by the Committee, which Entity shall be reasonably acceptable to Ares, to administer the GUC Trust under the GUC Trust Agreement and identified in the Plan Supplement.

"**Holder**" means the beneficial holder of any Claim or Interest.

"**Houlihan Lokey**" means Houlihan Lokey Capital, Inc.

"**Impaired**" means, with respect to any Class, a Class that is impaired within the meaning of Bankruptcy Code sections 1123(a)(4) and 1124.

"**Initial Administrative Claims Bar Date**" means April 14, 2025, with respect to any Administrative Expense Claim incurred on or after December 9, 2024 and before or on March 31, 2025.

"**Initial GUC Trust Funding Amount**" means the amount of cash transferred from or on behalf of Ares to the GUC Trust on the Effective Date consisting of the Wind-Down Amount and the Seed Funding.

"**Interest**" means any "equity security" in the Debtor as defined in section 101(16) of the Bankruptcy Code, including, without limitation, all issued, unissued, authorized or outstanding ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

"**Interim Approval and Procedures Order**" means the order of the Bankruptcy Court conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtor to solicit the Combined Disclosure Statement and Plan.

"**Litigation Claims**" shall have the meaning ascribed to such term in the Final DIP Order, as clarified in the Sale Order.

"**Local Rules**" means the Local Rules of Practice of the United States Bankruptcy Court for the District of Utah.

"**New Money DIP Loans**" means the $37,250,000 of new money term loans made available to the Debtor pursuant to the DIP Facility.

"**Notices of Non-Voting Status**" means the notices delivered to Holders of Claims or Interests in non-voting Classes attached to the Interim Approval and Procedures Order as Exhibit 4 and Exhibit 5, as applicable.

"**Mutual Released Party**" means each of the following, and in each case, solely in its capacity as such: (i) the Purchaser and its Related Parties, (ii) the Prepetition Lenders and their respective Related Parties, (iii) the DIP Lenders and their respective Related Parties, (iv) the Prepetition Agents and the DIP Agent and their Related Parties, (v) ACF Finco I LP, as revolving agent and collateral agent under the Prepetition Credit Agreement and its Related Parties, (vi) Carlin Adrianopoli, (vii) Alan Carr, (viii) John Sacksteder, and (ix) Alan Boyko.

"**Person**" means a "person" as defined in Bankruptcy Code section 101(41).

"**Petition Date**" means December 9, 2024, the date on which the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"**Plan**" means this Combined Disclosure Statement and Plan.

11

"**Plan Supplement**" means the appendix of schedules and exhibits to be Filed with the Bankruptcy Court on or before April 11, 2025.

"**Prepetition ABL Facility**" means the secured, superpriority asset-based revolving credit facility under the Prepetition Credit Agreement provided by the Prepetition ABL Lenders.

"**Prepetition ABL Lenders**" means those certain parties as lenders under the Prepetition ABL Facility.

"**Prepetition ABL Loans**" means revolving loans provided under the Prepetition ABL Facility.

"**Prepetition ABL Parties**" means the Prepetition ABL Lenders, the Prepetition Collateral Agent, and the Prepetition Revolving Agent.

"**Prepetition Administrative Agent**" means Ares Capital Corporation, as administrative agent under the Prepetition Credit Agreement.

"**Prepetition Agents**" means the Prepetition Administrative Agent, the Prepetition Collateral Agent, and the Prepetition Revolving Agent.

"**Prepetition Collateral Agent**" means ACF Finco I LP, as collateral agent under the Prepetition Credit Agreement.

"**Prepetition Credit Agreement**" means that certain Credit and Guaranty Agreement, dated as of April 20, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date), by and among Vobev Holdings LLC, the Debtor, certain subsidiaries of Vobev Holdings LLC from time to time party thereto as guarantors, the Prepetition Agents, and the Prepetition Lenders from time to time party thereto.

"**Prepetition Facilities**" means, collectively, the Prepetition ABL Facility and the Prepetition Term Loan Facility pursuant to the Prepetition Credit Agreement.

"**Prepetition Lenders**" means, collectively, the Prepetition ABL Lenders and the Prepetition Term Loan Lenders.

"**Prepetition Lenders' Deficiency Claims**" means approximately $308,712,776.45, the amount outstanding on the Prepetition Lenders' Prepetition Secured Loan Claims after the Sale Closing Date.

"**Prepetition Revolving Agent**" means ACF Finco I LP, as revolving agent under the Prepetition Credit Agreement.

"**Prepetition Secured Loan Claims**" means the Claims held by the Prepetition Lenders arising from or related to the Prepetition Credit Agreement on account of the Prepetition ABL Loans, the Prepetition Term Loans, and all other Prepetition Obligations (as defined in the Final DIP Order).

"**Prepetition Secured Parties**" means, collectively, the Prepetition Agents and the Prepetition Lenders.

"**Prepetition Term Loans**" means the initial term loans and the delayed draw term loans outstanding under the Prepetition Credit Agreement.

"**Prepetition Term Loan Facility**" means the facility under which the Prepetition Term Loan Lenders provided the Prepetition Term Loans pursuant to the Prepetition Credit Agreement.

"**Prepetition Term Loan Lenders**" means those certain parties as lenders under the Prepetition Term Loan Facility.

"**Prepetition Term Loan Parties**" means, collectively, the Prepetition Term Loan Lenders and the Prepetition Administrative Agent.

"**Priority Claims**" means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a), other than Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims.

"**Priority Tax Claims**" means any Claims of a Governmental Unit against the Debtor entitled to priority pursuant to Bankruptcy Code section 507(a)(8) or specified in section of Bankruptcy Code section 502(i).

"**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears in relation to the aggregate amount of Allowed Claims in the same Class.

"**Professional**" means any professional Person employed in the Chapter 11 Case pursuant to Bankruptcy Code section 327, 328, 363, or 1103 pursuant to an order of the Bankruptcy Court who is to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330, 331, or 363.

"**Professional Fee Amount**" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals that such Professionals estimate they have incurred or will incur in rendering services to the Debtor or the Committee through the Effective Date, subject to the DIP Budget.

"**Professional Fee Claims Bar Date**" means the date that is sixty (60) days after the Effective Date, which date shall be the deadline for all Professional Fee Claims to be Filed.

"**Professional Fee Claims**" means all Claims for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

"**Professional Fee Escrow Account**" means the escrow account established by the Debtor pursuant to the Final DIP Order, which account was funded by the Debtor with Cash on or prior to the Effective Date on account of Professional Fee Claims incurred between the Petition Date and Closing Date.

"**Professional Fee Reserve**" means a reserve to be established on the Effective Date consisting of the sum of (i) the balance, if any, of the Professional Fee Escrow Account, plus (ii) such additional Cash as is necessary to pay the accrued and unpaid Professional Fee Amount.

"**Proof of Claim**" means a proof of Claim Filed against the Debtor.

"**Purchased Assets**" means the Assets that the Debtor sold, conveyed, assigned, transferred, and delivered to the Purchaser, and that Purchaser purchased from the Debtor, in each case, free and clear of all Liens and other encumbrances in accordance with the terms of the Sale Order and the Stalking Horse APA. Any inconsistencies that arise under this definition shall be interpreted in favor of the definition of Purchased Assets in the Stalking Horse APA, as modified by the Sale Order.

"**Purchaser**" means Adonis Acquisition Holdings LLC.

"**Rejection Bar Date**" means the later of (a) the General Bar Date, and (b) any date the Court may fix in the applicable order authorizing rejection of an Executory Contract or Unexpired Lease and, if no such date is provided, the date that is thirty (30) days following entry of an order approving rejection of any Executory Contract or Unexpired Lease of the Debtor (including, as applicable, the Confirmation Order), as the deadline by which claimants asserting Claims resulting from the Debtor's rejection of an Executory Contract or Unexpired Lease must file Proofs of Claim for such Rejection Claims.

"**Rejection Claims**" means any Claim arising from, or relating to, the rejection of an Executory Contract or Unexpired Lease pursuant to section 365(a) of the Bankruptcy Code by the Debtor, as limited, in the case of a rejected Unexpired Lease, by Bankruptcy Code section 502(b)(6).

"**Related Parties**" means, with respect to any Mutual Released Party, such Mutual Released Party's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds or other entities, and investment advisors, sub-advisors, or managers, and with respect to each of the foregoing, such Mutual Released Party's respective current and former officers, directors, principals, equity holders, members, partners, controlling persons, managers, employees, agents, financial advisors, attorneys, representatives, and other professionals. "Related Parties" of Ares shall include each of the following entities: Ares Direct Finance I LP, Ares Capital Corporation, Ares Centre Street Partnership, L.P., Ares Commercial Finance LP, Ares European Credit Strategies Fund VIII (BUMA), L.P., Ares Strategic Income Fund, Cion Ares Diversified Credit Fund, Chimney Tops Loan Fund, LLC, Ares Jasper Fund, L.P., Ares ND Credit Strategies Fund LLC, AO Middle Market Credit L.P., Ares Credit Strategies Insurance Dedicated Fund Series Interests of the SALI Multi-Series Fund, L.P., Ares Senior Direct Lending Master Fund II Designated Activity Company, Ares Senior Direct Lending Parallel Fund (L) II, L.P., Ares Senior Direct Lending Parallel Fund (U) II, L.P., Ares SFERS Credit Strategies Fund LLC, and Ares Diversified Credit Strategies Fund (S), L.P.

"**Released Parties**" means, individually and collectively, in each case solely in their capacities as such, each and all of: (a) the Debtor; (b) the Debtor's Retained Professionals; (c) the

Mutual Released Parties, (d) the Committee and members of the Committee solely in their capacity as members of the Committee for actions taken in furtherance of their responsibilities as members of the Committee (and not in their individual capacities); and (e) the Committee's Retained Professionals; *provided that* Belvac Production Machinery, Inc. shall not be a "Released Party" in connection with any action taken (or not taken) in its individual capacity.

"**Releasing Parties**" means, individually and collectively, (a) each and all of the Released Parties, and (b) each holder of a Claim that (i) votes to accept the Plan and opts in to the releases contained in the Plan, (ii) votes to reject the Plan and opts in to the releases contained in the Plan, or (iii) is not entitled to vote or abstains from voting on the Plan and opts in to the releases contained in the Plan. For the avoidance of doubt, any holder of a Claim that is not entitled to vote because such holder is deemed to reject the Plan shall not be a Releasing Party.

"**Retained Causes of Action**" means all Estate Causes of Action other than any Estate Causes of Action that are released or waived pursuant to this Plan. All Retained Causes of Action are or otherwise shall be expressly preserved, retained, and assigned to the GUC Trust for the benefit of the GUC Trust Beneficiaries in accordance with this Plan. The Retained Causes of Action include, but are not limited to, the Estate Causes of Action identified in **Exhibit C** attached to this Plan. For the avoidance of doubt, the Retained Causes of Action do not include (a) any claims or Causes of Action being released by this Plan, (b) any claims or Causes of Action against any of the Mutual Released Parties, or (c) any claims or Causes of Action sold by the Debtor prior to the Effective Date, including all claims and Causes of Action sold pursuant to the Sale Order and Stalking Horse APA.

"**Rule 3018(a) Motion**" means a motion for temporary allowance of a claim for the purpose of voting on the Plan.

"**Rule 3018(a) Motion Deadline**" means April 14, 2025.

"**Sale Closing Date**" means February 7, 2025, the date upon which the Debtor and the Purchaser closed the transactions that transferred the Purchased Assets to the Purchaser pursuant to the Sale Order.

"**Sale Transaction**" means the sale and transfer of the Purchased Assets by the Debtor to the Purchaser pursuant to the Stalking Horse APA, as approved by the Sale Order.

"**Sale Order**" means the *Order (I) Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving the Debtor's Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 367].

"**Schedules**" means the *Debtor's Consolidated Corporate Ownership Statement and List of Equity Interest Holders Pursuant to Fed. R. Bankr. P. 1007(a)(1), 1007(a)(3), and 7007.1* [Docket No. 2], the schedule of assets and liabilities, and the statement of financial affairs, filed by the Debtor pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as amended, modified, or supplemented on or prior to the Effective Date.

"**Second Interim DIP Order**" means that certain *Second Interim Order (I) Authorizing the Debtor to Obtain Postpetition Senior Secured Financing, (II) Authorizing the Debtor to Use Cash Collateral on a Limited Basis, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 220].

"**Secured Claim**" means a Claim that is: (a) secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law, the amount of which Claim is equal to or less than the value of such collateral (i) as set forth in this Combined Disclosure Statement and Plan, (ii) as agreed to by the Holder of such Claim and the Debtor, or (iii) as determined by a Final Order in accordance with Bankruptcy Code section 506(a); or (b) subject to a valid right of setoff under Bankruptcy Code section 553.

"**Seed Funding**" means an aggregate amount equal to $1,000,000 for purposes of evaluating, investigating, and pursuing the Retained Causes of Action; *provided that* $500,000 of the Seed Funding shall constitute an unsecured, interest-free loan from Ares (the "**Trust Loan**").

"**Solicitation Motion**" means the *Debtor's Motion for Order (I) Approving Adequacy of Disclosures in Combined Disclosure Statement and Plan on an Interim Basis, (II) Scheduling Confirmation Hearing and Objection Deadline, (III) Establishing Procedures for Solicitation, Voting, and Tabulation of Votes, (IV) Approving Form of Ballot and Solicitation Package, and (VI) Approving Notice* [Docket No. 384].

"**Solicitation Package**" means the packages to be distributed to creditors for solicitation of votes on the Plan.

"**Stalking Horse APA**" means that certain *Asset Purchase Agreement*, dated as of January 6, 2025, by and between the Debtor and the Purchaser, as amended.

"**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, and any interest thereupon.

"**Supplemental Administrative Claims Bar Date**" means the deadline to file an Administrative Expense Request for Administrative Expense Claims arising after March 31, 2025 and prior to the Effective Date, which date shall be the date that is thirty (30) days following the Effective Date.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Third Interim DIP Order**" means that certain *Third Interim Order (I) Authorizing the Debtor to Obtain Postpetition Senior Secured Financing, (II) Authorizing the Debtor to Use Cash Collateral on a Limited Basis, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 278].

"**Treasury Regulations**" means the regulations, including temporary regulations or any successor regulations, promulgated under the Tax Code, as amended from time to time.

16

"**Trust Expenses**" means all actual, necessary and reasonable fees, costs, expenses and obligations incurred or owed by the GUC Trustee or his or her agents, employees, attorneys, advisors or other professionals in administering the Plan and the GUC Trust (including, without limitation, reasonable compensation for services rendered, and reimbursement for actual and necessary out-of-pocket expenses incurred by the GUC Trustee and his or her agents, employees and professionals) arising after the Effective Date through and including the date upon which the Bankruptcy Court enters a Final Decree closing the Chapter 11 Case, which expenses shall be payable solely from the GUC Trust Assets.

"**Unexpired Lease**" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Utah.

"**Voting Classes**" means Classes 3 and 4 of the Plan.

"**Voting Deadline**" means April 18, 2025, at 4:00 p.m. (MT).

"**Voting Record Date**" means March 18, 2025.

"**Wind-Down Activities**" means the activities necessary to orderly wind down the Debtor's Estate, including the liquidation and dissolution of the Debtor, as reasonably determined by the GUC Trustee in consultation with Ares. For the avoidance of doubt, the Wind-Down Activities shall not include the monetization of the GUC Trust Assets, investigating, prosecuting, collecting, or settling any of the Retained Causes of Action, or actions taken in connection with the reconciling, resolving, or making distributions on account of Claims.

"**Wind-Down Amount**" means an aggregate amount equal to $350,000 for the costs and expenses incurred in connection with the Wind-Down Activities.

## B.    Interpretation; Application of Definitions and Rules of Construction

The following rules of construction, interpretation, and application shall apply:

(1)    Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

(2)    Unless otherwise specified, each section, article, schedule, or exhibit reference in the Combined Disclosure Statement and Plan is to the respective section in, article of, schedule to, or exhibit to the Combined Disclosure Statement and Plan.

(3)    The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection, or clause contained in the Combined Disclosure Statement and Plan.

(4)     The rules of construction contained in Bankruptcy Code section 102 shall apply to the construction of the Combined Disclosure Statement and Plan.

(5)     A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

(6)     The headings in the Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Disclosure Statement and Plan.

(7)     Unless otherwise provided, any reference in the Combined Disclosure Statement and Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified.

(8)     In computing any period of time prescribed or allowed by the Combined Disclosure Statement and Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## IV.    DISCLOSURES

### A.    General Background

### 1.    Overview of Business Operations

The Debtor is an innovator in the beverage industry, offering integrated beverage can production, filling and warehouse capacity in a single location, which is the first of its kind. The Debtor's state-of-the art custom production and filling facility came online in 2022, and now produces and fills tens of millions of aluminum beverage cans per year for some of the most well-known beverage companies in the world. The Debtor also provides beverage formulation and mixing services. The Debtor's integration of can production, beverage formulation and can filling services eliminates customers' need to transport cans between production and filling sites, reducing freight costs. In addition, the Debtor operates two onsite warehouses for finished goods, cans and raw materials to provide warehousing logistics services for its customers.

### 2.    Debtor's Prepetition Capital Structure

On April 20, 2023, the Debtor, as borrower, entered into the Prepetition Credit Agreement, between and among the Borrower, non-debtor Vobev Holdings LLC, and certain subsidiaries thereof from time to time party thereto as guarantors, the Prepetition Agents, and the Prepetition Lenders.

As of the Petition Date, the Debtor was indebted and liable to the Prepetition Term Loan Parties on account of Prepetition Term Loans provided to the Debtor in an aggregate principal amount outstanding of not less than $361,141,252.14. Additionally, as of the Petition Date, the Debtor was indebted and liable to the Prepetition ABL Parties on account of Prepetition ABL Loans provided to the Debtor in an aggregate amount outstanding of not less than $40,877,477.92. Prior to the Petition Date, the Debtor granted to the Prepetition Collateral Agent for the benefit of the Prepetition Secured Parties and as security for the Prepetition Term Loan Facility and the

Prepetition ABL Facility a first priority security interest in and continuing lien on all the Debtor's right, title, and interest in substantially all of its assets.

**3.      Events Precipitating the Chapter 11 Filing**

In the years preceding the Petition Date, the Debtor had sought to proactively grow its business by constructing a new facility in Salt Lake City.  Unfortunately, the efforts were hampered by the pandemic's effects on the global supply chain, which delayed procuring equipment for the facility and resulted in cost overruns and delays in the Debtor's ability to ramp up production capabilities.  These issues led to the eventual exhaustion of the Debtor's initial funding.

Questions have also been raised regarding the conduct of the Debtor's former management.  Claims and Causes of Action arising from such conduct have been preserved and will be assigned to the GUC Trust pursuant to the Plan.

In April of 2023, the Debtor was able to refinance its existing debt, resulting in the Prepetition Facilities, which together provided much-needed additional capital for completion of the Salt Lake City facility buildout and working capital.  By October 2023, however, that additional funding had been used, the Debtor's production remained insufficient, and the Debtor required additional funding.  In November 2023, the Prepetition Lenders agreed to provide an additional $40 million in Prepetition Term Loans.  As required by the terms of that transaction, the Debtor hired an investment banking firm to commence a process to raise additional capital, added an independent manager, Mr. Alan Carr, to its board (he later became the Debtor's sole manager), and engaged a financial advisor to assist the Debtor with liquidity management and operational improvements.

The investment banking firm ran an initial process during the fourth quarter of 2023 and the first quarter of 2024, soliciting the interest of over 50 parties.  However, this process was unsuccessful.  Thereafter, in May of 2024, the Debtor hired Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to commence a process to raise additional capital or sell the Debtor's assets.  Throughout the past year, the Prepetition Lenders have continued to provide additional financial support and liquidity critical to maintain ongoing operations of the Debtor through additional Prepetition Term Loans in an amount totaling approximately $94 million.  The Debtor filed this Chapter 11 Case to continue its prepetition sale and marketing process and to effectuate a sale of substantially all of its assets to maximize value for all stakeholders.

**B.      The Chapter 11 Case**

**1.      First Day Orders**

On the Petition Date, the Debtor filed the First Day Motions to support the orderly transition into the Chapter 11 Case, stabilize operations, and preserve relationships with vendors, clients, and employees.

The First Day Motions requested relief from the Bankruptcy Court to, among other things: (a) maintain the Debtor's cash management system; (b) pay insurance, taxes and other amounts in the ordinary course; (c) provide adequate assurance to utility companies; (d) obtain postpetition

financing; and (e) pay certain customers and critical vendors. In support of the First Day Motions, the Debtor relied upon the First Day Declaration.

The Bankruptcy Court held a hearing on the First Day Motions on December 10, 2024, and granted certain relief sought in the First Day Motions on an interim basis and certain relief on a final basis. A final hearing on the First Day Motions (with the exception of the DIP Motion) was scheduled for January 9, 2025. On January 9, 2025, the Bankruptcy Court entered final orders on all First Day Motions other than the DIP Motion. The Bankruptcy Court entered the Second Interim DIP Order on January 9, 2025, and the Third Interim DIP Order on January 22, 2025. The Bankruptcy Court entered the Final DIP Order on January 29, 2025.

## 2.    Retention of Professionals

The Debtor, through various applications which were subsequently approved by the Bankruptcy Court, sought to employ certain professionals including: Ropes & Gray LLP as co-counsel to the Debtor [Docket No. 14]; Ray Quinney & Nebeker P.C. as co-counsel to the Debtor [Docket No. 34]; Houlihan Lokey as investment banker to the Debtor [Docket No. 36]; Kroll Restructuring Administration LLC as Claims and Balloting Agent to the Debtor [Docket No. 4]; and FTI Consulting, Inc., as financial advisor to the Debtor designating Alan Boyko as Chief Transformation Officer [Docket No. 24]. The Bankruptcy Court approved these retentions [Docket Nos. 290, 276, 221, 76, and 275].

## 3.    Appointment of the Committee

On December 19, 2024, the U.S. Trustee appointed the Committee [Docket No. 105], consisting of the following members: (1) Alden Group Environmental Solutions, LLC, (2) Belvac Production Machinery, Inc., (3) GSL Electric, (4) Les Olson Company, and (5) Woodbolt Distribution, LLC: Nutrabolt.

The Committee, through various applications that were subsequently approved by the Bankruptcy Court, employed the following professionals: Parsons Behle & Latimer as co-counsel [Docket No. 119]; Lowenstein Sandler LLP as co-counsel [Docket No. 126]; and Alvarez & Marsal North America, LLC as financial advisor [Docket No. 127]. The Bankruptcy Court later approved these retentions [Docket Nos. 259, 260, and 277].

## 4.    The DIP Facility

Upon the bankruptcy filing, the Debtor required immediate access to incremental liquidity in the form of postpetition financing to preserve the value of the Debtor's Estate, undertake the successful sale process, and maximize recoveries for all stakeholders. Accordingly, the Debtor sought authorization to enter into their proposed DIP Facility in an aggregate principal amount of up to $115,377,477.92, consisting of (a) New Money DIP Loans in the aggregate principal amount of up to $37,250,000, with up to $14,000,000 of such amount available upon approval of the First Interim DIP Order, and the remainder to be made available upon entry of the Final DIP Order, and (b) upon entry of the Final DIP Order, a "roll-up" on a dollar-for-dollar basis of (x) Prepetition ABL Loans in the amount of $40,877,477.92 plus (y) $37,250,000 of Prepetition Term Loans. On December 11, 2024, the Bankruptcy Court entered the First Interim DIP Order, making available $14,000,000 of New Money DIP Loans to the Debtor. On January 9, 2025, the Bankruptcy Court

entered the Second Interim DIP Order, increasing the aggregate amount of New Money DIP Loans available to the Debtor to $19,000,000. On January 22, 2025, the Bankruptcy Court entered the Third Interim DIP Order, increasing the aggregate amount of the New Money DIP Loans available to the Debtor to $24,000,000. On January 29, 2025, the Bankruptcy Court entered the Final DIP Order, approving the DIP Facility on a final basis.

**5.     Marketing and Sale of the Debtor's Assets**

On or about May 31, 2024, the Debtor engaged Houlihan Lokey to serve as its investment banker to raise additional capital or sell the Debtor's assets. Upon its retention, Houlihan Lokey immediately began conducting due diligence with respect to the Assets and the Debtor's operations. Subsequent to its initial assessment of alternatives and timing of a marketing process, Houlihan Lokey began marketing preparations, including determining market interest in (a) a potential sale of the Debtor's business or (b) a new debt financing deal that would be coupled with a restructuring of existing debt claims.

Beginning in early-June 2024, Houlihan began contacting potential bidders regarding the debt sale, and has provided a detailed teaser to one-hundred-sixty-two (162) potential strategic and financial sponsor parties. Of those parties, fifty-four (54) potential bidders executed non-disclosure agreements, after which Houlihan Lokey held numerous follow-up diligence calls for such parties' benefit. Houlihan Lokey requested that potential bidders submit non-binding indications of interest by July 17, 2024, and received five (5) such formal and informal bids by the initial bid deadline. Ultimately, Houlihan Lokey received seven (7) indications of interest. Houlihan Lokey continued to engage with potential bidders, advancing the potential bidders to a second round, where Houlihan Lokey responded to additional diligence requests from the potential bidders and uploaded more information to the virtual data room, and conducted extended market outreach. As the sale process continued, Houlihan Lokey and the Debtor hosted management presentations with the potential bidders during August 2024, and site visits to the Debtor's Salt Lake City, Utah facility in October and November of 2024.

Unfortunately, after further discussions, those bidders either withdrew their interest, were either unwilling or unable to advance to binding documentation or were not willing to raise their bids to value levels that were acceptable to the Debtor and the Prepetition Lenders. As Houlihan engaged with potential third-party bidders, they also engaged with the DIP Lenders to, through one or more affiliates or newly formed affiliate entities, serve as the stalking horse bidder for substantially all of the Debtor's Assets.

On December 10, 2024, the Debtor filed the Bidding Procedures Motion seeking approval of, among other things, (a) bidding procedures governing the potential auction and sale of the Debtor's Assets and (b) the Debtor's entry into the Stalking Horse APA. On January 9, 2025, the Bankruptcy Court entered the Bidding Procedures Order approving, *inter alia*, (i) procedures setting forth the process by which the Debtor was authorized to conduct a marketing and auction process for the sale of substantially all of the Debtor's Assets, (ii) the Debtor's entry into the Stalking Horse APA, and (iii) the scheduling a sale hearing to approve the sale of the Debtor's Assets. Other than the Stalking Horse APA, the Debtor did not receive any bids for its Assets. Accordingly, pursuant to the Bidding Procedures Order, by notice dated January 24, 2025 [Docket.

No. 298], the Stalking Horse APA was designated as the "Successful Bid" pursuant to the Bidding Procedures Order.

Prior to the hearing to approve the sale of the Debtor's Assets to the Purchaser, however, the Committee raised informal objections to, amongst other things, the sale and entry of the Final DIP Order. Working with the Committee and Ares, the Committee's objections were resolved through the Committee Resolution Term Sheet. On February 7, 2025, the Bankruptcy Court entered the Sale Order, and the Sale Transaction of the Debtor's Assets to the Purchaser closed and was consummated the same day.

## 6.    Settlements

Bankruptcy Code section 1123(b)(3) permits a plan to "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate." The Plan provides for the Committee Plan Settlement as described below. Confirmation of the Plan shall constitute Bankruptcy Court approval of the Committee Plan Settlement.

## a.    The Committee Resolution Term Sheet

**THE DEBTOR, ARES AND COMMITTEE HAVE FINALIZED THE COMMITTEE PLAN SETTLEMENT (AS SET FORTH IN THE PLAN AND DESCRIBED BELOW). THE DEBTOR RESERVES ALL RIGHTS TO AMEND OR MODIFY THE PLAN (PURSUANT TO ARTICLE XII.A OF THE PLAN) IN ACCORDANCE WITH SUCH SETTLEMENT AND APPLICABLE LAW.**

As noted above, the Debtor, the Committee and Ares resolved the Committee's objections with respect the Sale Transaction and the Final DIP Order and, on January 29, 2025, Ares, the Committee, and the Debtor entered into the Committee Resolution Term Sheet. The Committee Resolution Term Sheet also provides a path for a cost-effective resolution of the Chapter 11 Case pursuant to a consensual plan of liquidation that would provide unsecured creditors the opportunity for some recovery. As a result of arms' length negotiations, the Debtor, Ares and the Committee resolved their differences regarding numerous matters, which resolutions are embodied in this Combined Disclosure Statement and Plan and reflected in the provisions, among others, implementing the Committee Resolution Term Sheet, including by establishing the GUC Trust, providing funding to the GUC Trust, and permitting the Committee to select the GUC Trustee (subject to the reasonable consent of Ares). The Committee Resolution Term Sheet also contemplates the assignment of Estate Causes of Action that were not previously sold or otherwise resolved or released under the Plan to the GUC Trust (i.e., the Retained Causes of Action). The Committee supports the Plan.

A copy of the Committee Resolution Term Sheet is attached hereto as <u>Exhibit B</u>.[2] The Committee Resolution Term Sheet includes, among other things, the following terms and provisions:

---

[2] The summary of key terms of the Committee Resolution Term Sheet is included for informational purposes only, and is subject to the Committee Resolution Term Sheet, which should be reviewed for completeness. In the event of any inconsistency between the foregoing summary of key terms and Exhibit B or any other terms in this Plan,

(a)    *Professional Fees.*  An increase in the line item in the DIP Budget covering the fees of the Debtor's Counsels of $750,000 in the aggregate, and an increase in the line item in the DIP Budget covering the fees of the Committee's Retained Professionals of $500,000 in the aggregate.

(b)    *Litigation Trust.*  Upon the Effective Date of the Plan, a litigation trust (the "Litigation Trust") shall be formed for the benefit of unsecured creditors, including the unsecured deficiency claim held by Ares (collectively, the "Trust Beneficiaries").  The trustee shall be selected by the Committee and be reasonably acceptable to Ares.  Subject to the Vesting Procedures (as defined below), the Litigation Trust shall be vested with substantially all causes of action other than the Purchased Actions.[3]  Specifically, the Litigation Claims shall include, but shall not be limited to, all claims and causes of action against the Debtor's insiders, shareholders, affiliates, directors, and officers; *provided*, *however*, the Litigation Claims shall not include (i) causes of action or claims against (A) customers, suppliers, vendors, or contract counterparties of the Purchaser's post-closing business as of the Sale Closing Date or any time thereafter or (B) employees hired by the Purchaser, or (ii) causes of action or claims against Carlin Adrianopoli, Alan Carr, Alan Boyko, John Sacksteder, the Purchaser, the Prepetition Lenders, the DIP Lenders, Ares Capital Corporation, ACF Finco I LP, or any of Ares' Related Parties.  To the extent there is any ambiguity regarding what causes of action constitute Litigation Claims, any corresponding litigation commenced by the Litigation Trust shall be subject to Ares' reasonable consent.

The Stalking Horse APA was amended to include the following procedures (collectively, the "Vesting Procedures").  Upon the Closing of the Sale, the Litigation Claims were not assigned to the Purchaser.  The Plan provides that the Litigation Claims shall vest in the Litigation Trust upon the Effective Date; *provided*, *however*, if the Plan is not confirmed on or before the Outside Confirmation Date, then the Litigation Claims will be assigned to and shall otherwise vest in the Purchaser and become Purchased Assets under the Stalking Horse APA.  To the extent the Litigation Claims vest in the Purchaser, (i) Ares will receive 50% of the net recoveries on Litigation Claims and the other 50% will be distributed to the Debtor or the then-current representative of the Debtor's estate (including a chapter 7 trustee), free and clear of any claim by Ares or the Purchaser, and (ii) the Purchaser (or any assignee or transferee of the Purchaser) shall use its commercially reasonable efforts to prosecute the Litigation Claims and to consult with any creditor representative in connection with any settlement of the Litigation Claims.  On the Effective Date, Ares shall advance to the Litigation Trust (i) pursuant to the Stalking Horse APA, the Wind-Down Amount to first be used

---

the latter shall control.  The summary of key terms from the Committee Resolution Term Sheet and the attachment of the Committee Resolution Term Sheet hereto are for reference purposes only and do not modify the terms of the Plan or the Committee Plan Settlement.  Capitalized terms used in this Article 6.a. but not otherwise defined herein shall have the meanings given to such terms in the Committee Resolution Term Sheet.

[3]    For the avoidance of doubt, the GUC Trust established under this Plan will be deemed the Litigation Trust discussed in this summary.

for the costs and expenses incurred performing the Wind-Down Activities, and (ii) $1,000,000 for purposes of evaluating, investigating, and pursuing the Litigation Claims; *provided, that* $500,000 of such advance shall be deemed a loan from Ares (the "Trust Loan"). The Trust Loan will not bear interest and will be unsecured. The Trust Loan will be paid in full in cash from any net recoveries by the Litigation Trust prior to any distribution to the Trust Beneficiaries. Ares will receive 50% of the net recoveries on Litigation Claims. The other Trust Beneficiaries (i.e., excluding Ares) will receive the remaining 50% on a *pro rata* basis.

(c)     *Priority Claim Reserve*. The Purchaser shall fund the Excluded Cash pursuant to the Stalking Horse APA. In addition, upon Closing of the Sale, Ares shall either (i) fund the following into a priority claim reserve account (the "Priority Claim Reserve") or (ii) pay the Holders of such Claims as follows:

- Approximately $1,678,110.321 to satisfy certain ad valorem taxes owed to Salt Lake County;

- Up to $360,000 to satisfy certain construction and/or mechanic's lien claims, as other secured claims under the Plan, unless such claims must be paid to cure defaults under assumed real property leases, in which case they will be paid pursuant to the Sale Order; and

- Unspent amounts earmarked for critical vendors and 503(b)(9) claimants in the amounts set forth in the DIP Budget.

The Priority Claim Reserve will be used by the Debtor to pay critical vendors and 503(b)(9) claimants through the Effective Date of the Plan. Upon the Plan Effective Date, any remaining unspent funds earmarked for critical vendors, 503(b)(9) claimants, or ad valorem taxes owed to Salt Lake County shall be returned to Ares (or the Purchaser). Absent confirmation of the Plan by April 23, 2025, the Priority Claim Reserve will be released in its entirety to Ares, unless that date is extended by written agreement (email from counsel being sufficient) of each of Ares, the Debtor, and the Committee (such date, the "Outside Confirmation Date"). The foregoing is without duplication of any payments or other undertakings that have already been made or performed in respect of such obligations.

(d)     *Settlement*. In exchange for and consideration of the foregoing, the Committee consented to and supported the credit bid of the Purchaser, the Bidding Procedures Motion, the Sale, the entry of the Final DIP Order on January 29, 2025 (with all challenges waived) and the entry of the Sale Order.

(e)     Nothing herein is intended to or shall limit any other funding obligation of the Purchaser under the Stalking Horse APA and the Sale Order.

## 7.     Monthly Reporting, Schedules, and Meeting of Creditors

The Debtor has filed all monthly operating reports and timely filed its Schedules. The section 341 meeting of creditors was held on January 14, 2025.

24

**8.**      **Claims Reconciliation Process and Bar Date**

On February 3, 2025, the Debtor filed the Bar Date Motion.  On February 18, 2025, the Bankruptcy Court entered the Bar Date Order, which, among other things, affirmed April 14, 2025 as the General Bar Date and Initial Administrative Claims Bar Date, and June 9, 2025 as the Governmental Bar Date.

Except as expressly provided therein, pursuant to the Bar Date Order:

(a)      all creditors holding or wishing to assert unsecured, secured, priority, or nonpriority claims (as defined in Bankruptcy Code section 101(5)) against the Debtor or the Debtor's Estate, accruing prior to the Petition Date, including claims arising under Bankruptcy Code section 503(b)(9), will be required to file a separate, completed, and executed Proof of Claim Form on account of each such Claim, together with accompanying documentation by the General Bar Date;

(b)      all creditors asserting administrative expense priority claims accruing between the Petition Date and March 31, 2025 must file an Administrative Expense Request on account of such claims on or before the Initial Administrative Claims Bar Date; and

(c)      Governmental Units, as defined by section 101(27) of the Bankruptcy Code, must submit Proofs of Claim by the Governmental Bar Date.

The Debtor believes that after the reconciliation and Claims objection process is complete, the Debtor's total General Unsecured Claims liability should not be materially more than reported in its Schedules.  However, the Debtor's claims review is ongoing, and its assessments are subject to change.

**C.**      **Summary of Assets**

Following closing of the Sale Transaction, the Debtor has no remaining tangible Assets. The Debtor's other remaining Assets consist primarily of limited cash, which is being used to fund the wind-down and administration of the Chapter 11 Case, and the Estate Causes of Action, certain of which (*i.e.*, the Retained Causes of Action) are being transferred to the GUC Trust. Accordingly, if the Plan is confirmed, the GUC Trust shall initially be funded by the Initial GUC Trust Funding Amount.  The GUC Trust Assets will be the source of Distributions to Holders of Allowed Claims in Class 3 and Class 4.  No Distributions are expected to be made to Holders of Claims in Class 5 or Interests in Class 6.

**D.**      **Summary of Plan Treatment of Claims and Equity Interests**

**1.**      **Summary of Treatment of Unclassified Claims**

The following chart summarizes the treatment provided to Claims that are not classified under the Plan:

| Unclassified Claims | Estimated Claims[4] | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| DIP Facility Claims | $115,797,707.89 | Satisfied in full | 100% |
| Administrative Expense Claims | $0 | Paid or to be paid in full as set forth in Article V.B. below | 100% |
| Professional Fee Claims | $7,800,000–$8,000,000 | Paid or to be paid in full as set forth in Article V.C. below | 100% |
| Priority Tax Claims | $0–$250,000 | Paid in full as set forth in Article V.D. below | 100% |
| Statutory Fees | $290,000 | Paid in full as set forth in Article V.E. below | 100% |

## 2.    Summary of Treatment of Classified Claims and Equity Interests Under the Plan

The following chart summarizes the classification and treatment of the Classes:

| Class | Estimated Claims[5] | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims[6] |
|---|---|---|---|---|
| Class 1 – Other Secured Claims | $0 | Unimpaired | No. (Conclusively | 100% |

---

[4]   The Debtor has not completed its analysis of Claims in the Chapter 11 Case, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[5]   These amounts represent filed or scheduled Claims. The Debtor has not completed its analysis of Claims in the Chapter 11 Case, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[6]   The estimated percentage recovery is based upon, among other things, an estimate of potential Allowed Claims in the Chapter 11 Case and the settlements set forth in the Plan.  As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated.  In addition, the estimated recoveries indicated for Class 3 and Class 4 do not account for the value (if any) of the Retained Causes of Action. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court and, with respect to Class 3 and Class 4, the actual value (if any) of the Retained Causes of Action.

| Class | Estimated Claims[5] | Treatment | Entitled to Vote | Estimated Recovery to Holders of Allowed Claims[6] |
|---|---|---|---|---|
| | | | Presumed to Accept) | |
| Class 2 – Other Priority Claims | $0 | Unimpaired | No. (Conclusively Presumed to Accept) | 100% |
| Class 3 – Prepetition Lenders' Deficiency Claims | $308,712,776.45 | Impaired | Yes | 0%–0.2% |
| Class 4 – General Unsecured Claims | $31,942,746.31 | Impaired | Yes | 0%–0.8% |
| Class 5 – Subordinated Claims | $0 | Impaired | No. (Deemed Not to Accept) | 0% |
| Class 6 – Existing Equity Interests | $0 | Impaired | No. (Deemed Not to Accept) | 0% |

## E.    Potential Claims and Causes of Action

The Bankruptcy Code preserves the Debtor's rights to prosecute claims and causes of action that exist outside of bankruptcy and empowers the Debtor to prosecute certain claims that arise under the Bankruptcy Code, including claims to avoid and recover certain preferential transfers and fraudulent conveyances.  Subject to Section B.6 above, the Plan provides that the Debtor's rights with respect to the Retained Causes of Action will be transferred to the GUC Trust and the GUC Trustee will have the authority to investigate, prosecute, collect, or settle the Retained Causes of Action as the GUC Trustee deems appropriate for the benefit of the GUC Trust Beneficiaries.  Subjecting to the Vesting Procedures, the retention and preservation of known and unknown Retained Causes of Action and their prosecution and liquidation by the GUC Trustee, are an integral part of the Combined Disclosure Statement and Plan and the Committee Resolution Term Sheet.

As described in further detail in Article VII.D herein, from and after the Effective Date, the GUC Trustee, on behalf of the GUC Trust and subject to the terms of the Plan and the GUC Trust Agreement, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all Retained Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court.

## F.    Certain Federal Income Tax Consequences

The following discussion is a summary of certain U.S. federal income tax consequences of the Combined Disclosure Statement and Plan to the Debtor and to Holders of General Unsecured Claims. This discussion is based on the Tax Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, all as in effect on the date hereof.

Due to the complexity of certain aspects of the Combined Disclosure Statement and Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Combined Disclosure Statement and Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below.  Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the Holders of Claims.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or the Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments).  This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue.  No aspect of foreign, state, local, or estate and gift taxation is addressed.

**EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**1.     Tax Consequences to the Debtor**

**a.     Cancellation of Debt**

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD income to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below.  Generally, the amount of COD income, subject to certain statutory and judicial exceptions, is the excess of (a) the adjusted issue price of the discharged indebtedness less (b) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

28

The recognition of COD income may be treated differently in the context of a confirmed chapter 11 plan. For example, under the Tax Code, instead of recognizing COD income, the taxpayer is required, pursuant to section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD income. The tax attributes of the taxpayer generally are reduced in the following order: net operating losses, general business and minimum tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and, finally, foreign tax credit carry forwards. If the amount of COD income exceeds the amount of tax attributes available to be reduced, the excess still is excluded from income. Pursuant to section 108(b)(4)(A), the reduction of tax attributes does not occur until the end of the taxable year after such tax attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD income is realized. Section l08(e)(2) provides a further exception to the recognition of COD income upon the discharge of debt, providing that a taxpayer will not recognize COD income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.

**b.     Transfer of Assets to the GUC Trust**

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on the Effective Date, and thereafter if additional GUC Trust Assets become available, the Debtor shall be deemed, subject to the GUC Trust Agreement, to have automatically transferred to the GUC Trust all of their right, title and interest in and to all of the GUC Trust Assets, in accordance with section 1141 of the Bankruptcy Code. All such GUC Trust Assets shall automatically vest in the GUC Trust free and clear of all Claims, Liens, and other interests, subject to the Trust Loan advanced by Ares. Thereupon, the Debtor shall retain no interest in or with respect to the GUC Trust Assets. The Debtor will thereafter be dissolved in accordance with the Plan and GUC Trust Agreement.

For U.S. federal income tax purposes, the transfer of the liquidating trust assets to the liquidating trust generally is treated as equivalent to a sale of the assets at the then fair market value. *See* "Tax Treatment of the GUC Trust and Tax Consequences for Holders of Claims" below. As the Debtor is taxed as an entity disregarded from its sole owner for U.S. federal income tax purposes, the Debtor's tax owner may recognize taxable income in connection with the transfer of the GUC Trust Assets to the GUC Trust and their liquidation. If the Debtor's tax owner has sufficient available net operating losses and/or other tax attributes, they will avoid any meaningful U.S. federal, state, local or foreign income tax liability.

**2.     Tax Treatment of the GUC Trust and Tax Consequences for Holders of Claims**

The GUC Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes, treated as a "grantor" trust, meaning it is a pass-through entity. Under the Plan and Revenue Procedure 94-45, all parties shall treat the transfer of assets to the GUC Trust as a transfer directly to the GUC Trust Beneficiaries, who then transfer the assets to the GUC Trust in exchange for interests. The GUC Trust Beneficiaries are treated as the grantors and owners of their share of the trust assets for tax purposes. There can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust as a grantor trust. If the IRS were to challenge

29

successfully such classification, the U.S. federal income tax consequences to the GUC Trusts and the Holders of Claims could vary from those discussed herein.

The GUC Trustee shall comply with all tax reporting requirements, including, without limitation, filing returns for the GUC Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and the guidelines set forth for a "liquidating trust" in Revenue Procedure 94-95, except to the extent otherwise provided in the GUC Trust Agreement. In connection therewith, the GUC Trustee may require GUC Trust Beneficiaries to provide certain tax information as a condition to receipt of Distributions, including certification of the GUC Trust Beneficiary's Taxpayer or Employer Identification Number. In accordance with the provisions of section 6012(b)(3) of the Tax Code, the GUC Trustee shall cause to be prepared, at the cost and expense of the GUC Trust, the tax returns (federal, state and local) of the Debtor (to the extent such returns have not already been filed by the Effective Date) and of the GUC Trust that are required to be filed. The GUC Trustee shall timely file each such tax return with the appropriate taxing authority and shall pay out of the GUC Trust Assets all taxes due with respect to the period covered by each such tax return.

A transfer of assets to the GUC Trust is treated as a transfer to the GUC Trust Beneficiaries for all purposes of the Tax Code, including section 61 of the Tax Code. Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain, or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one (1) year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Combined Disclosure Statement and Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Combined Disclosure Statement and Plan on account of its Claim.

30

Amounts paid to Holders are subject to generally applicable withholding, information, and backup withholding rules. The Plan authorizes the Debtor and the GUC Trustee, as applicable, to withhold and report amounts required by law to be withheld and reported. Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of such Holder will be treated as amounts distributed to such Holder. Holders are required to provide the Debtor and the GUC Trustee, as applicable, with the information necessary to effect information reporting and withholding as required by law. Notwithstanding any other provision of the Plan, Holders of Claims that receive a Distribution pursuant to the Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the Distribution, and no Distribution shall be made until a Holder has made arrangements satisfactory to the Debtor or the GUC Trustee, as applicable, for the payment and satisfaction of such obligations.

Holders may be subject to backup withholding on payments pursuant to the Plan unless the Holder (A) is not a corporation and is not otherwise exempt from backup withholding and, when required, provides evidence establishing such status or (B) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of previous failure to report dividend and interest income. Amounts withheld due to backup withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and would require such disclosure.

## G.   Certain Risk Factors to Be Considered

<u>Effect of Failure to Confirm the Plan.</u>   If the Plan is not confirmed by the requisite majorities in number and amount as required by Bankruptcy Code section 1126, or if any of the other Confirmation requirements imposed by the Bankruptcy Code are not met, the Chapter 11 Case may not have sufficient funding to proceed, which may result in conversion to a case under chapter 7 of the Bankruptcy Code or dismissal.

"<u>Cramdown.</u>"   Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, that the plan has been accepted by at least one impaired class.   Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.   If any Impaired Class rejects the Plan, the Debtor reserves the right to, and will in fact, seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.   To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtor will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.   To the extent the Debtor is unable to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code, the Chapter 11 Case may

31

not have sufficient funding to proceed, which may result in conversion to a case under chapter 7 of the Bankruptcy Code or dismissal.

Claims Estimation.  While the Debtor has undertaken its best efforts to accurately estimate the amount of Claims in each Class, the actual amount of Allowed Claims may differ materially from the Debtor's estimates.

Retained Causes of Action.  Pursuant to the Combined Disclosure Statement and Plan, the GUC Trust Assets, including the Retained Causes of Action, will be transferred to the GUC Trust upon the establishment of the GUC Trust upon the Effective Date.  The Retained Causes of Action include all Causes of Action that are or were not released, waived, extinguished, sold or transferred pursuant to the Plan or Sale Order or otherwise in connection with the Sale Transaction.  There is no assurance that the GUC Trust will be successful in prosecuting any Retained Causes of Action or that such prosecution will generate sufficient proceeds from the Retained Causes of Action for Distribution.  To the extent Distributions are possible from the Retained Causes of Action, the timing of any such Distribution is uncertain.

Delays.  Any delay in Confirmation of the Plan or delay to the Effective Date could result in additional or increased Administrative Expense Claims.  This may result in there being insufficient funds to meet the requirements to confirm the Plan or for the Plan to go effective or result in less or no recovery for Holders of Unsecured Claims. The Debtor is seeking preliminary approval of the Combined Disclosure Statement and Plan for solicitation of votes on the Plan.  In the event that such preliminary approval is delayed or not obtained at all, the Debtor may withdraw the Plan or it may not be confirmed.  Any of the foregoing could alternatively result in a possible dismissal of the Debtor's Chapter 11 Case or conversion to a chapter 7 liquidation.

Plan Settlements.  In the event that the Plan settlement is not approved by the Bankruptcy Court, the Debtor may proceed to seek to confirm the Plan, or to withdraw or modify the Plan.

Sufficient Cash for GUC Trust Distributions.  The GUC Trustee will receive $350,000 (*i.e.*, the Wind-Down Amount) to first fund the Wind-Down Activities and $1,000,000 (*i.e.*, the Seed Funding, inclusive of the Trust Loan) to fund the monetization of the GUC Trust Assets (other than the Wind-Down Amount) pursuant to the Combined Disclosure Statement and Plan.

## H.    Feasibility

The Bankruptcy Code requires that for a plan to be confirmed, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or need for further reorganization of the debtor unless contemplated by the plan.

Here, the Plan provides for the liquidation and distribution of all of the Debtor's remaining assets.  The Plan provides for the GUC Trust to be funded initially by the Initial GUC Trust Funding Amount, which the GUC Trustee may use to evaluate, investigate, and pursue the Retained Causes of Action pursuant to the Plan and GUC Trust Agreement.  Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

I.      **Best Interests Test and Alternatives to the Combined Disclosure Statement and Plan**

The Bankruptcy Code requires that the Bankruptcy Court determine that a plan accepted by the requisite number of creditors in an impaired class provides each such member of each impaired class of claims and interests a recovery that has value, on the effective date, at least equal to the value of the recovery that each such creditor would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

The Bankruptcy Code further requires that the Bankruptcy Court determine that a plan is in the best interests of each holder of a claim or interest in any such impaired class which has not voted to accept the plan.  Thus, if an impaired class does not vote unanimously to confirm the plan, the best interests test requires that the Bankruptcy Court find that the plan provides to each member of such impaired class a recovery on account of the class member's Allowed Claim or Interest that has a value, on the effective date, at least equal to the value of the recovery that each such class member would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

Here, the Debtor believes the Plan satisfies the best interests test as the Liquidation Analysis, attached hereto as <u>Exhibit A</u>, demonstrates that the recoveries expected to be available to Holders of Allowed Claims and Equity Interests under the Plan will be at least the same or greater than the recoveries expected in a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the assets securing their liens.  If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses (including those incurred by a chapter 7 trustee) are next to receive payment.  Unsecured creditors are paid from any remaining proceeds, according to their respective priorities.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtor's Assets have already been sold and transferred to the Purchaser under the Sale Order.  While a liquidation under chapter 7 of the Bankruptcy Code would have the same goal, the Plan provides the best source of recovery for several reasons.  First, liquidation under chapter 7 of the Bankruptcy Code would not provide for a timely distribution. Second, Distributions would likely be smaller because of the fees and expenses incurred by a chapter 7 trustee in a liquidation under chapter 7 of the Bankruptcy Code.

At this time, there are no alternative plans available to the Debtor.  Following the closing of the Sale Transaction, the Debtor has few assets remaining, largely consisting of the Estate Causes of Action.  Therefore, the Debtor believes that the Plan provides the greatest possible value for creditors under the circumstances by providing for the potential monetization of Estate Causes of Action, and has the greatest chance of being confirmed and consummated.

**J.    Releases by the Debtor**

Article X of this Combined Disclosure Statement and Plan contains certain releases, exculpations, and injunction language.  Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Plan will affect any claim, interest, right, or action with regard to the Debtor and certain third parties.

Carlin Adrianopoli, Alan Carr, John Sacksteder, and Alan Boyko expressly reserve their rights to indemnification and advancement and to seek coverage and utilize any remaining proceeds of any D&O Insurance Coverage or any other insurance policy for future claims or litigation.

**IF THE TRANSACTIONS DESCRIBED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE CONSUMMATED ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR SHALL BE BOUND TO THE TERMS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RELEASE, EXCULPATION AND INJUNCTION PROVISIONS THEREOF, TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

Under the voting procedures described in Article VI and Article VII of this Combined Disclosure Statement and Plan, the Debtor believes that these releases, exculpations, and injunction language are considered consensual under applicable bankruptcy law.

**V.    PLAN TREATMENT**

**A.    UNCLASSIFIED CLAIMS**

**1.    DIP Facility Claims**

The DIP Facility Claims are deemed Allowed Claims.  Pursuant to the Stalking Horse APA and the Sale Order, the DIP Facility Claims were satisfied in full and released upon the closing of the transactions contemplated under the Stalking Horse APA.

**2.    Administrative Expense Claims**

Requests for payment of Administrative Expense Claims must be Filed no later than the applicable Administrative Claims Bar Date.  Holders of Administrative Expense Claims that do not File an Administrative Expense Request on or before the applicable Administrative Claims Bar Date shall forever be barred from asserting such Administrative Expense Claim against the Debtor or the GUC Trust.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment or has been paid by the Debtor or the Purchaser prior to the Effective Date, the Debtor, the GUC Trustee, or the Purchaser (solely to the extent such Allowed Administrative Expense Claim is an Assumed Liability (as defined in the Stalking Horse APA) under the Stalking Horse APA, subject to the limitations set forth therein)  as applicable, shall remit to each Holder of an Allowed Administrative Expense Claim the full unpaid amount of such

Allowed Administrative Expense Claim in Cash (a) on the Effective Date or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due or as soon thereafter as is reasonably practicable; (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is Allowed or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due; (c) at such time and upon such terms as set forth in an order of the Bankruptcy Court; or (d) at such time and upon such terms as agreed upon by a Holder of an Allowed Administrative Expense Claim and the GUC Trustee.

**3.     Professional Fee Claims**

(a)     Final Fee Application and Payment of Professional Fee Claims

All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered between the Petition Date and the Effective Date (including compensation requested by any Professional or other Entity for making a substantial contribution in the Chapter 11 Case) shall File an application for final allowance of compensation and reimbursement of expenses no later than the Professional Fee Claims Bar Date.

The final hearing to determine the allowance of Professional Fee Claims shall be held as soon as practicable after the Professional Fee Claims Bar Date. Debtor's counsel or the GUC Trustee's counsel shall File a notice of such hearing, which shall be served upon counsel for the Committee, all Professionals, counsel for Ares, the U.S. Trustee, and all parties on the Debtor's Bankruptcy Rule 2002 service list (as modified by Article XII.K hereof). The Debtor or GUC Trustee, as applicable, shall pay Professional Fee Claims when such Professional Fee Claims are Allowed or awarded by entry of an order of the Bankruptcy Court, in each case subject to the DIP Budget; *provided, that* to the extent that any Professional Fee Claims are awarded in excess of the applicable line item in the DIP Budget, such excess may be paid as an Allowed Administrative Expense Claim after the Effective Date solely from any proceeds recovered by the GUC Trust on account of Retained Causes of Action which proceeds are otherwise distributable to Holders of Allowed General Unsecured Claims pursuant to the Combined Disclosure Statement and Plan, as soon as reasonably practicable after such proceeds are recovered and after the Trust Loan has been repaid, in accordance with Article V.A.2. above.

(b)     Professional Fee Escrow Account; Professional Fee Reserve

Pursuant to Paragraph 35(ii) of the First Interim DIP Order, the Debtor established the Professional Fee Escrow Account and has funded the same with Cash on account of accruing Professional Fee Claims. Professional Fee Claims for the period from the Petition Date through the Closing Date shall be paid from the Professional Fee Account upon approval, in each case subject to the DIP Budget. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Debtor's Estate or the GUC Trust.

Prior to or on the Effective Date or as soon thereafter as practicable, the Debtor shall create the Professional Fee Reserve. The Professional Fee Reserve shall be utilized to pay Professional Fee Claims incurred from the Closing Date through the Effective Date, and shall be funded for

each Professional with (i) such Professional's remaining allocable portion of the Professional Fee Escrow Account, less such Professional's unused retainer, if any; and (ii) Cash on hand, in an aggregate amount equal to the Professional Fee Estimate (as defined below).  Professional Fee Claims for the period from the Closing Date through the Effective Date shall be paid from the Professional Fee Reserve upon approval, in each case subject to the DIP Budget; *provided, that* to the extent that any Professional Fee Claims are awarded in excess of the applicable line item in the DIP Budget, such excess may be paid as an Allowed Administrative Expense Claim after the Effective Date solely from any proceeds recovered by the GUC Trust on account of Retained Causes of Action which proceeds are otherwise distributable to Holders of Allowed General Unsecured Claims pursuant to the Combined Disclosure Statement and Plan, as soon as reasonably practicable after such proceeds are recovered and after the Trust Loan has been repaid, in accordance with Article V.A.2. above.  The Professional Fee Reserve shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estate of the Debtor or the GUC Trust.  Upon the final payment of all Allowed Professional Claims, any excess Cash remaining in the Professional Fee Reserve shall be utilized to pay the fees and expenses incurred by Professionals after the Effective Date, subject to the DIP Budget.  Any savings with respect to the Professional Fee Claims of the Debtor's Retained Professionals and the Committee's Retained Professionals included in the DIP Budget shall be distributed to the GUC Trust as soon as reasonably practicable after the Effective Date, subject to the DIP Budget.

(c)    Professional Fee Amount Estimates

Professional Fee Claims incurred from the Closing Date to the Effective Date shall, to the extent not billed or paid from the Professional Fee Escrow on or before the Effective Date, be estimated and such estimates shall be delivered to the Debtor by each Professional no later than two (2) business days prior to the Effective Date (the "Professional Fee Estimates"); *provided, however*, that Professional Fee Estimates shall not be considered an admission, cap or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the Professional Fee Estimates.  If a Professional does not provide an estimate, the Debtor may estimate the unpaid and unbilled fees and expenses of such Professional; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  Professional Fee Estimates shall be net of any unused retainer held as of the Effective Date.

(d)    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the GUC Trust shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation of the Plan incurred by the GUC Trust and its professionals following the Effective Date solely from the GUC Trust Assets (*provided*, *that* the Wind-Down Amount must first be used to fund Wind-Down Activities).  To the extent there is any residual Wind-Down Amount remaining after the payment of costs and expenses incurred performing the Wind-Down Activities, as determined by the GUC Trustee in the GUC Trustee's reasonable discretion, such residual amount may be treated as GUC Trust Assets that may be used in accordance with the Plan and GUC Trust Agreement.  On the Effective Date, any requirement that professionals comply with sections 327 through 331, 363, and 1103 of

36

the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the GUC Trust may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

**4.      Priority Tax Claims**

Except to the extent the Debtor, with the consent of the GUC Trustee, and the Holder of an Allowed Priority Tax Claim agree to a different and less favorable treatment, each holder of an Allowed Priority Tax Claim shall be paid Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of: (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable.

Any Claims asserted by a Governmental Unit on account of any penalties and assessments shall not be Priority Tax Claims and shall be subordinated to General Unsecured Claims. On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Entity.

The Debtor estimates that the aggregate amount of Allowed Priority Tax Claims does not exceed $250,000.

**5.      Statutory Fees**

All U.S. Trustee Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the GUC Trustee shall be liable to pay any and all U.S. Trustee Statutory Fees when due and payable. The Debtor shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the GUC Trustee shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The GUC Trust shall remain obligated to pay U.S. Trustee Statutory Fees on account of the Debtor's Chapter 11 Case until the earliest of the Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Proof of Claim for an Administrative Claim in the Chapter 11 Case and shall not be treated as providing any release in respect of any such Administrative Claim under the Plan.

**B.      CLASSIFIED CLAIMS AND INTERESTS**

The below categories of Claims and Equity Interests classify such Claims and Equity Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to Bankruptcy Code sections 1122 and 1123.

**1.      Class 1 – Other Secured Claims**

*Classification*: Class 1 consists of any Other Secured Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive:

(i)      payment in full in cash of its Allowed Other Secured Claim;

(ii)     the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or

(iii)    such other treatment rendering such Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

*Impairment and Voting*:  Class 1 is Unimpaired and is conclusively presumed to have accepted the Plan under Bankruptcy Code section 1129(f).

## 2.      Class 2 – Other Priority Claims

*Classification*:  Class 2 consists of all Other Priority Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

*Impairment and Voting*:  Class 2 is Unimpaired and is conclusively presumed to have accepted the Plan under Bankruptcy Code section 1129(f).

## 3.      Class 3 – Prepetition Lenders' Deficiency Claims

*Classification:*  Class 3 consists of all Prepetition Lenders' Deficiency Claims against the Debtor.

*Treatment*:  Each Holder of an Allowed Prepetition Lenders' Deficiency Claim shall receive its *pro rata* share of 50% of the aggregate distributions made by the GUC Trust to Holders of Allowed Claims that are GUC Trust Beneficiaries under the GUC Trust Agreement.  Such *pro rata* share shall be paid when the GUC Trust makes a corresponding distribution to Holders of Allowed General Unsecured Claims.  Distributions on account of Allowed Prepetition Lenders' Deficiency Claims may be delivered to Ares Capital Corporation for Ares Capital Corporation to distribute in its capacity as Prepetition Administrative Agent, with the GUC Trustee having no further obligation to provide such distributions to each Holder of an Allowed Prepetition Lenders' Deficiency Claim.  Notwithstanding anything herein to the contrary, the Trust Loan shall be paid in full in cash from any net recoveries by the GUC Trust prior to any distribution to any Holder of an Allowed Prepetition Lenders' Deficiency Claim from the GUC Trust.

Impairment and Voting:  Class 3 is Impaired and entitled to vote to accept or reject the Plan.

4.      **Class 4 – General Unsecured Claims**

*Classification*:  Class 4 consists of all General Unsecured Claims against the Debtor.

*Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Claim has not been paid by the Debtor prior to the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive such Holder's *pro rata* share of 50% of the aggregate distributions made by the GUC Trust to Holders of Allowed Claims that are GUC Trust Beneficiaries under the GUC Trust Agreement.  Notwithstanding anything herein to the contrary, the amount and timing of any distributions made to Holders of Allowed General Unsecured Claims shall be determined by the GUC Trustee in the GUC Trustee's sole discretion; *provided, that* the Trust Loan shall be paid in full in cash from any net recoveries by the GUC Trust prior to any distribution to any Holder of an Allowed General Unsecured Claim from the GUC Trust.

The Debtor estimates that the aggregate amount of Allowed General Unsecured Claims, taking into account the assumption of liabilities under the Stalking Horse APA and Sale Order, payments made under the Critical Vendor Order, the Debtor's Schedules, and Claims asserted against the Estate, will be approximately $31,942,746.31.  For the avoidance of doubt, the amount of the Prepetition Lenders' Deficiency Claims is not included in the approximately $$31,942,746.31 estimated for General Unsecured Claims.

*Impairment and Voting*:  Class 4 is Impaired and entitled to vote to accept or reject the Plan.

5.      **Class 5 - Subordinated Claims**

*Classification:*  Class 5 consists of all Claims against the Debtor that are subordinated to Claims in Class 4 pursuant to Bankruptcy Code section 510 or otherwise.

*Treatment:*  On the Effective Date, the Holders of Class 5 Claims against the Debtor shall be entitled to receive no recovery under the Plan.

*Impairment and Voting:*  Class 5 is Impaired under the Plan.  Holders of Claims in Class 5 are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject Plan, and the votes of such Holders will not be solicited with respect to such Claims.

6.      **Class 6 – Existing Equity Interests**

*Classification*:  Class 6 consists of all Equity Interests in the Debtor.

*Treatment*: On the Effective Date, all Equity Interests in the Debtor shall be cancelled, released, and extinguished.

*Impairment and Voting*:  Class 6 is Impaired under the Plan.  Holders of Equity Interests in Class 6 are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy

39

Code.  Therefore, such Holders are not entitled to vote to accept or reject Plan, and the votes of such Holders will not be solicited with respect to such Equity Interests.

## C.    Impaired Claims and Equity Interests

Under the Combined Disclosure Statement and Plan, Holders of Claims in Classes 3, 4, 5, and 6 are Impaired Classes of Claims or Equity Interests pursuant to section 1124 of the Bankruptcy Code because the Combined Disclosure Statement and Plan alters the legal, equitable, or contractual rights of the Holders of such Claims or Equity Interests treated in such Class.

## D.    Cramdown and No Unfair Discrimination

The Debtor will seek Confirmation pursuant to Bankruptcy Code section 1129(b).  This provision allows the Bankruptcy Court to confirm a plan accepted by at least one impaired class so long as it does not unfairly discriminate and is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.  Colloquially, this mechanism is known as a "cramdown."

The Debtor believes the treatment of Claims and Equity Interests described in this Combined Disclosure Statement and Plan is fair and equitable and does not discriminate unfairly. The proposed treatment of Claims and Equity Interests provides that each Holder of such Claim or Equity Interest will be treated identically within its respective class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Equity Interest.

## VI.    CONFIRMATION PROCEDURES

## A.    Confirmation Procedures

## 1.    Combined Hearing

The Confirmation Hearing before the Bankruptcy Court has been scheduled for **April 23, 2025, at 2:00 p.m. (MT)** at the United States Bankruptcy Court, 350 S Main Street, Salt Lake City, Utah 84101 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) Confirmation of the Plan pursuant to Bankruptcy Code section 1129.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

## 2.    Procedure for Objections

Any objection to approval or Confirmation of the Plan or approval of the Disclosure Statement on a final basis must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be Filed by **April 18, 2025, at 4:00 p.m. (MT)** with the Bankruptcy Court and served on the Debtor's counsel, the Committee's counsel, Ares' counsel, the U.S. Trustee, and all parties who have Filed a request for notice in this Chapter 11 Case.  Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court.

40

3.      **Requirements for Confirmation**

The Bankruptcy Court will confirm the Plan only if the requirements of Bankruptcy Code section 1129 are met.  As set forth in this Combined Disclosure Statement and Plan, the Debtor believes that the Plan: (a) meets the cramdown requirements; (b) meets the feasibility requirements; (c) is in the best interests of creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code.

Additionally, pursuant to section 1126 of the Bankruptcy Code, under the Plan, only Holders of Claims in Impaired Classes are entitled to vote.

**B.      Solicitation and Voting Procedures**

**1.      Eligibility to Vote on the Plan**

Except as otherwise ordered by the Bankruptcy Court, Holders of Claims in Class 3 and Class 4 may vote on the Plan pursuant to Bankruptcy Code section 1126.  To vote on the Plan, a Holder must hold a Claim in Class 3 or Class 4 that is Allowed, or hold a Claim that has been temporarily Allowed for voting purposes under Bankruptcy Rule 3018(a) despite any pending objection to such Claim.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 AND 4.**

**2.      Solicitation Package**

Accompanying the Combined Disclosure Statement and Plan for the purposes of soliciting votes on the Plan are Solicitation Packages, which contain copies of: (a) the notice of the Confirmation Hearing; (b) the Interim Approval and Procedures Order, excluding the exhibits annexed thereto; (c) a Ballot, including voting instructions and a pre-addressed, postage prepaid return envelope; and (d) such other documents the Bankruptcy Court may direct or approve or that the Debtor deems appropriate following consultation with the Committee.

Holders of Claims and Interests in non-voting classes will receive packages consisting of: (a) the notice of the Confirmation Hearing; and (b) a Notice of Non-Voting Status.

**3.      Voting Procedures and Voting Deadline**

The Voting Record Date for determining which Holders of Claims in Class 3 and Class 4 may vote on the Plan is March 18, 2025.  Because the March 18, 2025 Voting Record Date precedes the April 14, 2025 General Bar Date, Holders of Claims that timely file Proofs of Claim after the Voting Record Date risk being disenfranchised from voting.  To address such potential disenfranchisement, the Debtor will supplement the initial solicitation mailing and serve Solicitation Packages with Ballots or Notices of Non-Voting Status (as applicable) to any Holders who validly file a Claim after the Voting Record Date but before 11:59 p.m. (prevailing Mountain

Time) on April 4, 2025 (the "Solicitation Bar Date").[7]  In addition, any Holder of a Claim that timely files a Proof of Claim after the Solicitation Bar Date but on or before the General Bar Date may contact the Debtor's Claims and Balloting Agent via e-mail by no later than one (1) business day after the General Bar Date, pursuant to the instructions set forth in paragraph 22 of the Interim Approval and Procedures Order, in order to receive a Solicitation Package electronically from the Claims and Balloting Agent.

Notwithstanding the foregoing, if the Claims and Balloting Agent previously provided a Holder with a Ballot or Notice of Non-Voting Status on account of a scheduled Claim or previously filed Proof of Claim, the Claims and Balloting Agent will update the Holder's voting amount based on the amended Proof of Claim, as filed, but will not be obligated to send another Solicitation Package and new Ballot or Notice of Non-Voting Status (as applicable) to such Holder.

The Voting Deadline by which the Claims and Balloting Agent must *ACTUALLY RECEIVE* original Ballots by mail, overnight delivery, hand delivery or electronic Ballots via online submission through the E-Ballot Portal at https://cases.ra.kroll.com/Vobev is **April 18 2025**.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed.  Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of the Plan; and (b) signing and returning the Ballot to the Debtor.

If you are a member of the Voting Classes and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, contact (a) Kroll Restructuring Administration LLC, the Debtor's Claims and Balloting Agent, by (i) calling (833) 570-5418 (U.S./Canada, Toll-Free) or +1 (646) 650-5705 (International, Toll), or (ii) emailing VobevInfo@ra.kroll.com (with "Vobev Solicitation Inquiry" in the subject line) or (b) Debtor's counsel at:

| RAY QUINNEY & NEBEKER P.C. | ROPES & GRAY LLP |
|---|---|
| Re: Vobev LLC | Re: Vobev LLC. |
| Michael Johnson | Gregg M. Galardi |
| Jeffrey Shields | 1211 Avenue of the Americas |
| 36 South State Street Suite 1400 | New York, New York 10036 |
| Salt Lake City, Utah 84111 | Telephone: (212) 596-9000 |
| Telephone: (801) 532-1500 | Facsimile: (212) 596-9090 |
| mjohnson@rqn.com | gregg.galardi@ropesgray.com |
| jshields@rqn.com | |
| | and |
| | Eric Schriesheim |
| | 191 N. Wacker Drive, 32nd Floor |
| | Chicago, Illinois 60606 |

---

[7]    The Debtor set the April 4, 2025 Solicitation Bar Date ten days before the April 14, 2025 General Bar Date to ensure the Claims and Balloting Agent has sufficient time to receive and process Claims as well as to generate and mail a customized Ballot or Notice of Non-Voting Status (as applicable) based on such Claim as well as to provide the Holder a practical opportunity to review and submit a Ballot or Notice of Non-Voting Status before the Voting Deadline.

| | Telephone: (312) 845-1208 |
| | eric.schriesheim@ropesgray.com |

The following Ballots will not be counted or considered:

(1)     any Ballot received after the Voting Deadline, unless the Debtor or the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot;

(2)     any Ballot that is illegible or contains insufficient information to identify the Holder of the Claim;

(3)     any Ballot cast by a Person or Entity that does not hold a Claim in the Voting Classes as of the Voting Record Date, or, in the case of Class 4, did not file a Proof of Claim by the General Bar Date that is entitled to vote to accept or reject the Combined Disclosure Statement and Plan;

(4)     any Ballot cast for a Claim subject to a pending objection and for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline that is subsequently granted by the Court, or for which no Rule 3018(a) Motion has been granted by the Court to temporarily allow such Claim for voting purposes;

(5)     any Ballot for a Claim listed in the Schedules as contingent, disputed, or unliquidated and for which no Proof of Claim has been timely filed on or before the General Bar Date;

(6)     any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Combined Disclosure Statement and Plan or that indicates both acceptance and rejection of the Combined Disclosure Statement and Plan;

(7)     simultaneous duplicative Ballots voted inconsistently;

(8)     Ballots partially rejecting and partially accepting the Combined Disclosure Statement and Plan;

(9)     any Ballot received other than the official form sent by the Claims and Balloting Agent;

(10)    any unsigned Ballot; or

(11)    any Ballot that is submitted by facsimile, email or other means of electronic transmission outside of the E-Ballot Portal.

**4.      Deemed Acceptance or Rejection**

Holders of Claims in Class 1 and Class 2 are Unimpaired, and thus under Bankruptcy Code section 1126(f), Holders of such Claims are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote and will not be solicited to vote.

Holders of Claims in Class 3 and Class 4 are Impaired and entitled to vote to accept or reject the Plan.

Holders of Class 5 Subordinated Claims and Class 6 Existing Equity Interests are not entitled to receive any distribution under the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, Class 5 Subordinated Claims and Class 6 Existing Equity Interests are conclusively deemed not to accept the Plan, and, therefore, are not entitled to vote and shall not be solicited.

**5.      Acceptance by Impaired Classes**

The Plan would be accepted by an Impaired Class of Claims, if holders of at least two thirds in amount and more than one-half in number of the Claims of those who voted in such class have accepted the Plan, excluding the votes of insiders.  To be confirmed, at least one (1) Impaired Class must accept the Plan.  The Debtor urges that you vote to accept the Plan, and encourages you to complete, date, sign, and promptly mail the ballot attached to the notice.  Please be sure to complete the ballot properly and legibly identify the exact amount of your claim and the name of the creditor.

## VII.    IMPLEMENTATION AND EXECUTION OF THE PLAN

**A.      Effective Date**

The Effective Date shall not occur until the conditions for the Effective Date set forth in Article IX.B herein are satisfied or otherwise waived in accordance with the terms of the Plan.  On or as soon as practicable after the Effective Date, the Debtor shall File a notice of the occurrence of the Effective Date.

**B.      Closing of the Chapter 11 Case**

On and after the Effective Date, the GUC Trustee shall be permitted in the GUC Trustee's sole discretion to close the Chapter 11 Case of the Debtor in accordance with Bankruptcy Rule 3022, and, subject to the filing of a motion requesting appropriate authority, all contested matters relating to the Debtor, including objections to Claims or Equity Interests and any adversary proceedings, may be administered by the GUC Trustee and heard in the Chapter 11 Case, irrespective of whether such Claims or Equity Interests were Filed or such adversary proceeding was commenced after the Chapter 11 Case is closed.  Furthermore, the Claims and Balloting Agent is authorized to destroy all paper and hardcopy records related to this matter one (1) year after the Effective Date has occurred.

**C.      Records**

On the Effective Date, the GUC Trustee shall provide for the retention and storage of the Debtor's books, records, and files (that were not otherwise transferred to the Purchaser pursuant to the Stalking Horse APA) that shall have been delivered by the Debtor to the GUC Trustee in a form and manner acceptable to both the Debtor and the GUC Trustee.  After receipt of such documents, the GUC Trustee shall be authorized to destroy any documents he or she deems necessary or appropriate in his or her reasonable judgment and in accordance with applicable law;

*provided*, *however*, that the GUC Trustee shall not destroy any documents, including but not limited to tax documents, that the GUC Trust is required to retain under applicable law.

**D.    GUC Trustee**

**1.    Establishment of the GUC Trust**

On the Effective Date, the GUC Trust will be established pursuant to the Plan and GUC Trust Agreement, the latter of which will be filed with the Bankruptcy Court in the Plan Supplement, and all GUC Trust Assets shall be deemed transferred to the GUC Trust without any further action of the Debtor, or any employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtor.  The GUC Trustee may elect for the GUC Trust, or certain of the GUC Trust Assets, to be treated as a partnership or a Disputed Ownership Fund as described in Treasury Regulation section 1.468B-9 for tax purposes only, if the GUC Trustee may determine, in his or her reasonable discretion and based on applicable tax law, that such election would be in the best interests of the GUC Trust Beneficiaries.

The Debtor shall have the power and authority to enter into the GUC Trust Agreement on the Effective Date.  Prior to the Confirmation Date, the Committee, in consultation with the Debtor, shall designate a Person to serve as the GUC Trustee, which Person shall be reasonably acceptable to Ares, and such designation shall be disclosed in the Plan Supplement.

**2.    Transfer of GUC Trust Assets to GUC Trust**

Pursuant to section 1141 of the Bankruptcy Code, all transfers and contributions made pursuant to this Article VII shall be made free and clear of all Claims, liens, encumbrances, charges, and other interests including, for the avoidance of doubt, those held by the Prepetition Secured Parties and the DIP Lenders, subject to the Trust Loan advanced by Ares.  Upon completion of the transfer of the GUC Trust Assets to the GUC Trust, the Debtor will have no further interest in, or with respect to, the GUC Trust Assets or the GUC Trust.  For all federal income tax purposes, all parties (including, without limitation, the Debtor, the GUC Trustee, and the GUC Trust Beneficiaries) will treat the transfer of the GUC Trust Assets to the GUC Trust in accordance with the terms of the Plan, as a transfer to the GUC Trust Beneficiaries, followed by a transfer by such GUC Trust Beneficiaries to the GUC Trust, and the GUC Trust Beneficiaries will be treated as the grantors and owners thereof.  Pursuant to Bankruptcy Code section 1146, the making or delivery of an instrument of transfer under or pursuant to the Plan shall not be taxed under any law imposing a stamp tax or similar tax.

**3.    Purpose of the GUC Trust**

The GUC Trust shall be established for the purpose of liquidating the GUC Trust Assets, prosecuting the Retained Causes of Action transferred to the GUC Trust to maximize recoveries for the benefit of the GUC Trust Beneficiaries, and making Distributions in accordance with the Plan to the GUC Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business in accordance with Treasury Regulation section 301.7701-4(d) except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust.  The GUC Trust is intended to qualify as a "grantor trust" for federal income tax purposes and, to the

extent permitted by applicable law, for state and local income tax purposes, with the GUC Trust Beneficiaries treated as grantors and owners of the trust.

**4.      Preservation of Rights**

Under the Combined Disclosure Statement and Plan, but subject in all respects to the Sale Order and the Stalking Horse APA, the GUC Trustee retains any and all rights of, and on behalf of, the Debtor, the Estate, and the GUC Trust to commence and pursue any and all Retained Causes of Action, including, without limitation, setoff, offset, and recoupment rights, regardless of whether or not such rights are specifically enumerated in the Combined Disclosure Statement and Plan, Plan Supplement, or elsewhere, and all such rights shall not be deemed modified, waived, or released in any manner, nor shall Confirmation of the Plan or entry of the Confirmation Order act as *res judicata* or limit any of such rights of the GUC Trustee to commence and pursue any and all Retained Causes of Action, including, without limitation, setoff, offset, and recoupment rights, to the extent the GUC Trustee deems appropriate.  Any and all Retained Causes of Action, including, without limitation, setoff, offset, and recoupment rights, may, but need not, be pursued by the GUC Trustee after the Effective Date, to the extent warranted.  Notwithstanding anything herein or in the GUG Trust Agreement to the contrary, to the extent there is any ambiguity regarding what causes of action constitute Retained Causes of Action, any corresponding litigation commenced by the GUC Trustee or the GUC Trust shall be subject to Ares' reasonable consent.

Unless a Retained Cause of Action against a Person or other Entity is expressly waived, relinquished, released, compromised, or settled through the Plan or any Final Order, including the Sale Order, the Debtor expressly reserves any and all Retained Causes of Action, including, without limitation, setoff, offset, and recoupment rights, for later enforcement and prosecution by the GUC Trustee (including, without limitation, any Retained Causes of Action set forth in **Exhibit C** hereto, or not specifically identified herein or otherwise, or which the Debtor may presently be unaware of, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time, or facts or circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches shall apply to any of the Retained Causes of Action, including, without limitation, setoff, offset, and recoupment rights, upon or after entry of the Confirmation Order and consummation of the Plan.

The Debtor and the GUC Trustee do not intend, and it should not be assumed (nor shall it be deemed) that because any existing or potential Retained Causes of Action, including, without limitation, setoff, offset, and recoupment rights, have not yet been pursued by the Debtor or are not set forth herein or otherwise, that any such Retained Causes of Action, including, without limitation, setoff, offset, and recoupment rights, have been waived, released, or expunged.

Except as otherwise provided in the Combined Disclosure Statement and Plan, all Retained Causes of Action against any Person or Entity shall, on the Effective Date, automatically vest in the GUC Trust free and clear of liens, claims, encumbrances and interests (subject to the Trust Loan) and no Retained Causes of Action shall be deemed released or discharged by the Plan.  The GUC Trustee, on behalf of the GUC Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Retained Causes of Action

without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein or in the GUC Trust Agreement.  From and after the Effective Date, the GUC Trustee, in accordance with Section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Trust, shall serve as a representative of the Debtor's Estate and shall retain and possess the sole and exclusive right to commence, pursue, settle, compromise or abandon, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal.  The Debtor and, after the Effective Date, the GUC Trustee, on behalf of the GUC Trust, reserve all rights to pursue any and all Retained Causes of Action; *provided, however,* that notwithstanding anything to the contrary herein or in the Confirmation Order, the GUC Trustee, on behalf of the GUC Trust, shall waive and release all Retained Causes of Action arising under section 547 of the Bankruptcy Code against Persons and Entities that are not (i) current or former insiders, shareholders, affiliates, directors, or officers of the Debtor, including, but not limited to, BVO Holdings Corporation, Vobev Holdings LLC, and William Vogel, or (ii) any insiders, shareholders, affiliates, directors, and officers of the Persons and Entities identified in the immediately preceding clause (i).

To the extent the Plan is not confirmed on or before the Outside Confirmation Date (as defined in the Final DIP Order), then the Litigation Claims will be assigned to and shall otherwise vest in the Purchaser and shall become Purchased Assets under the Stalking Horse APA.  To the extent the Litigation Claims vest in the Purchaser pursuant to the immediately preceding sentence, (i) Ares will receive 50% of the net recoveries on Litigation Claims and the other 50% will be distributed to the Debtor or the then-current representative of the Debtor's Estate (including a chapter 7 trustee), free and clear of any claim by Ares or the Purchaser, and (ii) the Purchaser (or any assignee or transferee of the Purchaser) shall use its commercially reasonable efforts to prosecute the Litigation Claims and to consult with any creditor representative in connection with any settlement of the Litigation Claims.

**5.     Continued Cooperation**

On and after the Effective Date, the GUC Trustee and Purchaser shall provide reasonable and timely cooperation to effectuate the provisions of the Plan as the GUC Trustee or the Debtor might reasonably request, including, but not limited to, executing such documents as necessary to carry out the terms of the Plan and administer the GUC Trust.

**6.     GUC Trustee**

Appointment of GUC Trustee. The GUC Trustee will be a disinterested Person selected by the Committee, which Person shall be reasonably acceptable to Ares, and whose identity shall be disclosed in the Plan Supplement.  The GUC Trustee shall carry out the duties as set forth in this section and in the GUC Trust Agreement.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, the GUC Trustee shall be deemed the appointed representative to, and may pursue, litigate, and compromise and settle any such rights, claims, and Retained Causes of Action in accordance with the best interests of and for the benefit of the GUC Trust Beneficiaries. In the event that the GUC Trustee resigns, is removed, terminated, or otherwise unable to serve as the GUC Trustee, then a successor shall be appointed as set forth in the GUC Trust Agreement.  Any successor GUC Trustee appointed shall be bound by and comply with the terms of the Combined Disclosure Statement and Plan, the Confirmation Order, and the GUC Trust Agreement.

Responsibilities, Powers, and Authority of GUC Trustee. As of the Effective Date, the GUC Trustee shall take possession and charge of the GUC Trust Assets and, subject to the provisions herein and the GUC Trust Agreement, shall have full right, power and discretion to manage the affairs of the GUC Trust, subject to the oversight of the GUC Trust Oversight Committee, as further set forth in the GUC Trust Agreement.  Except as otherwise provided herein or in the GUC Trust Agreement, the GUC Trustee shall have the right and power to enter into any covenants or agreements binding the GUC Trust and in furtherance of the purpose of this Combined Disclosure Statement and Plan and the GUC Trust Agreement and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the GUC Trustee to be consistent with and advisable in connection with the performance of the GUC Trustee's duties. On and after the Effective Date, the GUC Trustee shall have the power and responsibility to do all acts contemplated by the Plan and GUC Trust Agreement to be done by the GUC Trustee and all other acts that may be necessary or appropriate in connection with the disposition of the GUC Trust Assets and the distribution of the proceeds thereof, as contemplated herein, including, without limitation:

(a)     To exercise all power and authority that may be or could have been exercised and take all actions that may be or could have been taken by the Debtor with like effect as if authorized, exercised and taken by unanimous action of the Debtor's partners, members, officers, directors and equity holders; including, without limitation, amendment of the certificates of incorporation and by-laws of the Debtor, the dissolution of the Debtor and the assertion or waiver of the Transferred Privileges (defined below);

(b)     To open and maintain bank and other deposit accounts, escrows and other accounts, calculate and implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Combined Disclosure Statement and Plan and take other actions consistent with the Combined Disclosure Statement and Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate reserves in accordance with the Combined Disclosure Statement and Plan and the GUC Trust Agreement, in the name of the Debtor or the GUC Trustee, even in the event of the dissolution of the Debtor;

(c)     To make a good faith valuation of the GUC Trust Assets, as soon as possible after the Effective Date;

(d)     To collect and liquidate all GUC Trust Assets, including the sale of any GUC Trust Assets;

(e)     To object to any Claims (Disputed or otherwise) including, without limitation, the power to subordinate and recharacterize Claims by objection, motion, or adversary proceeding, and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Bankruptcy Court, *provided that* the GUC Trustee may seek Bankruptcy Court approval for any Claims settlement to the extent thought appropriate by the GUC Trustee or to the extent such approval is required by prior order of the Bankruptcy Court;

(f)     To make decisions without further Bankruptcy Court approval regarding the retention or engagement of professionals, employees and consultants by the GUC Trust and to pay, from the GUC Trust Assets (in accordance with this Plan), the charges incurred by the GUC Trust

48

on or after the Effective Date for services of professionals, disbursements, expenses or related support services relating to the winding up of the Debtor and implementation of the Combined Disclosure Statement and Plan, without application to the Bankruptcy Court;

(g)      To cause, on behalf of the GUC Trust, the Debtor, and its Estate all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared or filed timely;

(h)      To invest Cash in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and as deemed appropriate by the GUC Trustee in accordance with the GUC Trust Agreement;

(i)      To enter into any agreement or execute any document required by or consistent with the Combined Disclosure Statement and Plan and perform all of the obligations of the GUC Trustee thereunder;

(j)      Upon Bankruptcy Court approval, to abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization any assets that the GUC Trustee concludes are of no benefit to the GUC Trust Beneficiaries or too impractical to distribute;

(k)      To investigate (including pursuant to Bankruptcy Rule 2004), prosecute and/or settle any Retained Causes of Action, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate or settle such Retained Causes of Action on behalf of the GUC Trust and pursue to settlement or judgment such actions;

(l)      To enter into and consummate, without Bankruptcy Court approval, an agreement to settle any Retained Causes of Action for which the GUC Trustee has not initiated a proceeding before the Bankruptcy Court;

(m)      To use GUC Trust Assets to purchase or create and carry all appropriate insurance policies, bonds, or other means of assurance and protection of the GUC Trust Assets and pay all insurance premiums and other costs the GUC Trustee deems necessary or advisable (if any) to insure the acts and omissions of the GUC Trustee, and if appropriate, the GUC Trust Oversight Committee;

(n)      To maintain appropriate books and records (including financial books and records) to govern the liquidation and distribution of the GUC Trust Assets;

(o)      To pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the U.S. Trustee quarterly post-confirmation financial reports for the Debtor until such time as a Final Decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed;

(p)      To dissolve the GUC Trust if the GUC Trustee determines that the expenses of administering the GUC Trust so as to make a final Distribution are likely to exceed the value of the remaining GUC Trust Assets.

49

(q)     To provide the GUC Trust Oversight Committee, within thirty (30) days after the end of each calendar quarter occurring after the Effective Date, or such other period as subsequently agreed to between the GUC Trust Oversight Committee and the GUC Trustee, a report setting forth: (i) the receipt and disposition by the GUC Trustee of property during such period, including the amounts, recipients, and dates of any Distribution; (ii) any Disputed Claims resolved by the GUC Trustee; (iii) all known material non-Cash assets of the GUC Trust remaining to be disposed of; (iv) the status of all known Retained Causes of Action; (v) an itemization of all expenses the GUC Trustee anticipates will become due and payable within the subsequent quarter; and (vi) the GUC Trustee's forecast of Cash receipts and expenses for the subsequent quarter.  The GUC Trustee shall also provide information about the activities of the GUC Trust on an informal basis as the GUC Trust Oversight Committee (or the advisors to any member thereof) may reasonably request from time to time;

(r)     Incur any reasonable and necessary expenses in liquidating and converting the GUC Trust Assets to Cash;

(s)     To seek a Final Decree closing the Chapter 11 Case;

(t)     To be the representative of the Estate and successor of the Debtor for all purposes contemplated by the Plan and GUC Trust Agreement; and

(u)     To do all other acts or things consistent with the provisions of the Combined Disclosure Statement and Plan that the GUC Trustee deems reasonably necessary or desirable with respect to implementing the Combined Disclosure Statement and Plan.

Except as expressly set forth in the Combined Disclosure Statement and Plan and in the GUC Trust Agreement, the GUC Trustee, on behalf of the GUC Trust, shall have absolute discretion to pursue or not to pursue any Retained Causes of Action as it determines is in the best interests of the GUC Trust Beneficiaries and consistent with the purposes of the GUC Trust.

Subject to the other terms and provisions of the Combined Disclosure Statement and Plan, the GUC Trustee shall be granted standing, authority, power, and right to assert, prosecute, and/or settle the Retained Causes of Action and/or make a claim under any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies based upon its powers as a Court-appointed representative of the Estate with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, or similar officials.

Enforcement of Retained Causes of Action. Pursuant to section 1123(b) of the Bankruptcy Code, the GUC Trustee, on behalf of and for the benefit of the GUC Trust Beneficiaries, shall be vested with and shall retain and may prosecute Retained Causes of Action transferred to the GUC Trust that were held by, through, or on behalf of, the Debtor and/or the Estate against any other Entity, arising before the Effective Date that have not been fully resolved or disposed of prior to the Effective Date, whether or not such Retained Causes of Action are specifically identified in the Combined Disclosure Statement and Plan and whether or not litigation with respect to same has been commenced prior to the Effective Date.  The recoveries from any Retained Causes of Action transferred to the GUC Trust will be deposited into the GUC Trust and distributed in

50

accordance with the Committee Resolution Term Sheet, the GUC Trust Agreement and the Combined Disclosure Statement and Plan.

Compensation of GUC Trustee. The GUC Trustee shall be compensated from the GUC Trust Assets as set forth in the GUC Trust Agreement. The GUC Trustee shall fully comply with the terms, conditions, and rights set forth in the Plan, the Confirmation Order and the GUC Trust Agreement. The GUC Trustee shall not be required to file a fee application to receive compensation.

Indemnification of GUC Trustee. The GUC Trust shall indemnify the GUC Trustee and his or her professionals against any losses, liabilities, reasonable expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the GUC Trustee or his or her professionals may incur or sustain by reason of being or having been a GUC Trustee or professionals of the GUC Trustee for performing any functions incidental to such service; *provided*, *however*, the foregoing shall not require indemnification of the GUC Trustee or his or her professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing or malpractice.

**7.      GUC Trust Expenses**

The GUC Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid reasonable expenses of the GUC Trust, including but not limited to reasonable attorneys' and other professionals' fees. All such expenses shall be charged against and paid solely from the GUC Trust Assets.

**8.      Privileges**

The transfer, assignment, or vesting (if any) of the Debtor's privileges (each a "Privilege"), including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections, will be governed by the final version of the GUC Trust Agreement, but any such transfer, assignment or vesting shall not result in a waiver of any Privilege.

**9.      Termination of GUC Trust**

The GUC Trust shall be dissolved upon the earlier of the distribution of all of its assets to the GUC Trust Beneficiaries and the fifth anniversary of the creation of the GUC Trust, *provided that* the GUC Trustee shall, in its sole discretion, be authorized to extend the dissolution date with prior Bankruptcy Court approval, pursuant to the GUC Trust Agreement. If warranted by the facts and circumstances involved in resolving any Retained Causes of Action, upon application to, and if approved by, the Bankruptcy Court upon a finding that such further extension is necessary or otherwise appropriate for the purpose of resolving such Retained Causes of Action or distributing the proceeds to GUC Trust Beneficiaries, the term of the GUC Trust may be further extended by the GUC Trustee for a specified, finite term. In the event a motion to extend the term of the GUC Trust is filed, the term shall be automatically extended pending the disposition of such motion.

**E.      Provisions Governing Distributions Under the Plan**

**1.      Distribution Date**

At the discretion of the GUC Trustee, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtor or the GUC Trustee, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests.  The Debtor or the GUC Trustee shall have no obligation to recognize any ownership transfer of the Claims or Equity Interests.  The Debtor, the GUC Trustee, or any party responsible for making Distributions shall be authorized and entitled, but not required, to recognize and deal for all purposes under the Combined Disclosure Statement and Plan only with (i) those record Holders stated on the transfer ledgers as of the close of business on the Effective Date and (ii) any Holders who timely file a Claim before any Bar Date arising after the Effective Date.

**2.      Method of Payment**

Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed as of the Effective Date shall be made on the Effective Date or as soon thereafter as is reasonably practicable.  Except as otherwise provided herein, any Distributions and deliveries to be made hereunder with respect to Claims that are Allowed after the Effective Date shall be made, within the GUC Trustee's discretion, on subsequent distribution dates as set by the GUC Trustee.  Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Combined Disclosure Statement and Plan, no interest shall accrue or be payable with respect to such Claims or any distribution related thereto.  In the event that any payment or act under the Combined Disclosure Statement and Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

All Distributions hereunder shall be made by the GUC Trustee, or its named successor or assign, as "Disbursing Agent," on or after the Effective Date in the GUC Trustee's discretion or as otherwise provided herein.  For the avoidance of doubt, the GUC Trustee, or such other Entity designated by the GUC Trustee, shall act as Disbursing Agent with respect to all Distributions to Holders of Allowed General Unsecured Claims and Holders of Allowed Prepetition Lenders' Deficiency Claims.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

Unless otherwise expressly agreed in writing, all cash payments to be made pursuant to the Combined Disclosure Statement and Plan shall be made by check drawn on a domestic bank or an electronic wire.

3.      **Surrender of Instruments**

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each Holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee.  Any Holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the third anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution hereunder.

4.      **Delivery of Distributions**

Except as otherwise provided herein, Distributions to Holders of Allowed Claims shall be made: (a) at the addresses set forth on the respective Proofs of Claim Filed by such Holders; (b) at the addresses set forth in any written notice of address changes delivered to the GUC Trustee after the date of any related Proof of Claim; or (c) at the address reflected in the Schedules if no Proof of Claim is filed and the GUC Trustee has not received a written notice of a change of address.

If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the GUC Trustee shall use reasonable efforts to determine such Holder's then-current address, at which time a Distribution shall be made to such Holder without interest.  If the GUC Trustee cannot determine, or is not notified of, a Holder's then-current address within ninety (90) days after the original Distribution date for such Holder, such Distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b).  After such date, all unclaimed property or interest in property shall revert to the GUC Trust to be distributed in accordance with the terms of the GUC Trust Agreement and the Combined Disclosure Statement and Plan.

5.      **Objection to and Resolution of Claims**

Except as expressly provided herein, or in any order entered in the Chapter 11 Case prior to the Effective Date, including the Confirmation Order, no Claim or Equity Interest shall be deemed Allowed unless and until such Claim or Equity Interest is deemed Allowed under the Combined Disclosure Statement and Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order and the Final DIP Order, in the Chapter 11 Case allowing such Claim or Interest.  On or after the Effective Date, the GUC Trust shall be vested with any and all rights and defenses each Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date.

On and after the Effective Date, the GUC Trustee, with respect to all Claims and Equity Interests, shall be entitled to file objections to all Claims and Equity Interests that are otherwise not deemed Allowed Claims or Equity Interests, including Claims listed on the Debtor's Schedules, under the Combined Disclosure Statement and Plan, or otherwise.  Any objections to Claims shall be served and filed on or before the Claims Objection Deadline.  For the avoidance of doubt, the Court may extend the Claims Objection Deadline on a motion (with notice provided pursuant to Article VII.E.5 hereof) filed before the expiration of the then-current Claims Objection

Deadline. In the event a motion to extend the Claims Objection Deadline is filed, the Claims Objection Deadline shall be automatically extended pending the disposition of such motion.

**6.      Preservation of Rights to Settle Claims**

Except as otherwise expressly provided herein, nothing contained in the Combined Disclosure Statement and Plan, the Plan Supplement, or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or GUC Causes of Action that the Debtor may have or which the GUC Trustee may choose to assert on behalf of the Estate or the GUC Trust, as applicable, under any provision of the Bankruptcy Code or any applicable nonbankruptcy law or rule, common law, equitable principle, or other source of right or obligation, including, without limitation, (i) any and all claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or claim for setoff that seeks affirmative relief against the Debtor, its officers, directors, or representatives, and (ii) the turnover of all property of the Estate. This Section shall not apply to any claims sold, released, waived, relinquished, exculpated, compromised, or settled under the Combined Disclosure Statement and Plan or pursuant to a Final Order, expressly including the Sale Order. Except as expressly provided in the Combined Disclosure Statement and Plan, nothing contained in the Combined Disclosure Statement and Plan, the Plan Supplement, or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense. No Entity may rely on the absence of a specific reference in the Combined Disclosure Statement and Plan, the Plan Supplement, or the Confirmation Order to any cause of action against it as any indication that the Debtor or the GUC Trustee, as applicable, will not pursue any and all available causes of action against them. The Debtor and the GUC Trustee expressly reserve all rights to prosecute any and all causes of action against any Person or Entity, except as otherwise expressly provided in the Plan.

**7.      Withholding, Payment and Reporting Requirements With Respect to Distribution**

All Distributions under the Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements. Notwithstanding any provision in the Plan or GUC Trust Agreement to the contrary, the Debtor and the GUC Trustee (as applicable) shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements, including liquidating a portion of the distribution to be made under the Plan or GUC Trust Agreement to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The GUC Trustee may require, in the GUC Trustee's sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim complete and return to the GUC Trust the appropriate Form W-8 or Form W-9, as applicable, to each Holder. Notwithstanding any other provision of the Plan, Confirmation Order, or GUC Trust Agreement, each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim,

any tax obligation that would be imposed upon the GUC Trust in connection with such Distribution.

## 8. Miscellaneous Distribution Provisions

Disputed Claims. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim or Interest until all such disputes in connection with such Disputed Claim or Interest have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim or Interest shall not receive any Distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged. Any dividends or other Distributions arising from property distributed to Holders of Allowed Claims or Interests, as applicable, in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims or Interests in such Class

Setoff. The Debtor or GUC Trustee, as applicable, retains the right to reduce any Claim by way of setoff in accordance with the Debtor's books and records and in accordance with the Bankruptcy Code.

Minimum Distributions. Notwithstanding anything herein to the contrary, the GUC Trustee shall not be required to make any Distribution to any GUC Trust Beneficiary to the extent that such Distribution will be less than $100 in the aggregate to such GUC Trust Beneficiary.

## VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Background

The Bidding Procedures Order and the Sale Order contemplate the treatment of Executory Contracts and Unexpired Leases. Nothing in this Combined Disclosure Statement and Plan shall be deemed to supersede the Bidding Procedures Order or the Sale Order.

### B. Executory Contracts and Unexpired Leases

All Executory Contracts and Unexpired Leases of the Debtor that have not been assumed, assigned, or rejected, prior to the Effective Date shall be deemed rejected on the Effective Date.

### C. Rejection Claims

In the event that the rejection of an Executory Contract or Unexpired Lease by the Debtor pursuant to the Combined Disclosure Statement and Plan results in a Rejection Claim in favor of a counterparty to such Executory Contract or Unexpired Lease, such Rejection Claim, if not heretofore evidenced by a properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor or the GUC Trust, or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy

Court and served upon counsel for the Debtor and the GUC Trustee on or before the date that is 30 days after the Effective Date.  All Allowed Rejection Claims shall be treated as General Unsecured Claims pursuant to the terms of the Combined Disclosure Statement and Plan.

To the extent that any of the Debtor's insurance policies that were not assumed and assigned to the Purchaser pursuant to the Stalking Horse APA and Sale Order, including any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies, are considered executory contracts, then notwithstanding anything contained in the Combined Disclosure Statement and Plan to the contrary, such insurance policies, shall be deemed assumed and assigned to the GUC Trust. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such policy.  For the avoidance of any doubt, all rights under any insurance policy that is not an executory contract and was not assumed and assigned to the Purchaser pursuant to the Stalking Horse APA and the Sale Order, and all rights under any other insurance policies that were not assumed and assigned to Purchaser pursuant to the Stalking Horse APA and the Sale Order and under which the Debtor may be a beneficiary, shall be preserved and shall vest with the GUC Trust and shall remain in full force and effect after the Effective Date for the term thereof; and nothing herein shall alter or adversely affect the rights of any non-Debtor beneficiaries of or covered Persons or Entities under such insurance policies. Further, for the avoidance of any doubt, the GUC Trustee may bring or assert Retained Causes of Action under any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies, as insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, or similar officials, as those terms are used in the policies.

## IX.    CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

### A.    Conditions Precedent to Confirmation

The following is the list of conditions precedent to Confirmation:

(1)    the Plan Supplement is Filed;

(2)    the Confirmation Order shall be in form and substance reasonably acceptable to the Debtor, Ares and the Committee;

(3)    the form of GUC Trust Agreement shall be agreed upon by the Debtor, Ares and the Committee, and the proposed GUC Trustee identified and disclosed; and

(4)    the Combined Disclosure Statement and Plan shall not have been materially amended, altered, or modified from the Combined Disclosure Statement and Plan as approved by the Interim Approval and Procedures Order, unless such material amendment, alteration, or modification has been made in accordance with Article XII.A herein.

### B.    Conditions Precedent to the Effective Date

The following is the list of conditions precedent to the Effective Date:

(1)   The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order;

(2)   the GUC Trust Agreement shall be executed and the GUC Trustee shall have been appointed and accepted such appointment;

(3)   The Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount; and

(4)   the Combined Disclosure Statement and Plan shall not have been materially amended, altered, or modified from the Combined Disclosure Statement and Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with Article XII.A herein.

**C.   Waiver of Conditions**

The conditions precedent to Confirmation and conditions precedent to the Effective Date, other than those in paragraphs IX.B. (1) and (2) above, may be waived in whole or in part, in writing, by each of the Debtor, Ares and the Committee, without further order of the Bankruptcy Court.

**D.   Effect of Nonoccurrence of Conditions**

If the conditions precedent to the Effective Date are not satisfied or waived, the Debtor may, upon motion and notice to parties in interest, seek to vacate the Confirmation Order.

If the Confirmation Order is vacated: (i) the Plan is null and void in all respects; and (ii) nothing contained in the Combined Disclosure Statement and Plan shall (a) constitute a waiver or release of any Claims by or against the Debtor, or (b) prejudice, in any manner, the rights of the Debtor or any other party in interest.

**X.   EXCULPATION, RELEASES, AND INJUNCTIONS**

**A.   Injunction**

**All injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the later of (a) the Effective Date, or (b) the date indicated in the order providing for such injunction or stay. Notwithstanding the foregoing, nothing herein shall be otherwise deemed to modify, limit, amend, or supersede any injunctions, stays or other relief granted in the Sale Order.**

**Except as otherwise provided in the Plan or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor shall be permanently enjoined from taking any of the following actions against any property that is to be distributed under the terms of the Plan on account of any such Claims or Equity Interests: (a) commencing or continuing, in any manner or in**

any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff not asserted pre-confirmation, right or subrogation of any kind against any debt, liability, or obligation due to the Debtor; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided, however*, that such entities shall not be precluded from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order; *provided, further*, that the foregoing provisions of this provision shall not apply to any acts, omissions, claims, causes of action, or other obligations expressly set forth in and preserved by this Plan or any defenses thereto. Notwithstanding the foregoing, nothing herein shall be otherwise deemed to modify, limit, amend, or supersede any injunctions, stays or other relief granted in the Sale Order. Notwithstanding any other provision of the Plan to the contrary, pursuant to 1141(d)(3), the Debtor shall not receive a discharge.

B.    **Exculpation**

Except as otherwise specifically provided in the Plan, none of the Exculpated Parties shall have or incur any liability to any holder of a Claim or Equity Interest (including Retained Causes of Action) for any act or omission occurring on or after the Petition Date and on or before the Effective Date in connection with, related to, or arising out of the Chapter 11 Case, the Committee Resolution Term Sheet, the Combined Disclosure Statement and Plan, the pursuit of Confirmation, the consummation of the Plan, the administration of the Plan, the property to be liquidated and/or distributed under the Plan or any postpetition and pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of the liquidation of the Debtor, except for their fraud, willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction.

The foregoing paragraph shall apply to attorneys to the greatest extent permissible under applicable bar rules and case law.

**C.    Releases by the Debtor**

PURSUANT TO BANKRUPTCY CODE SECTION 1123(B), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE COMBINED DISCLOSURE STATEMENT AND PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED PARTIES (IN EACH CASE OTHER THAN THE DEBTOR), WHICH FOR CLARITY MEANS INDIVIDUALLY AND COLLECTIVELY, IN EACH CASE, SOLELY IN THEIR CAPACITIES AS SUCH, EACH AND ALL OF: (A) THE DEBTOR, (B) THE DEBTOR'S RETAINED PROFESSIONALS; (C) THE MUTUAL RELEASED PARTIES; (D) THE COMMITTEE AND MEMBERS OF THE COMMITTEE SOLELY IN THEIR CAPACITY AS MEMBERS OF THE COMMITTEE FOR ACTIONS TAKEN IN FURTHERANCE OF AND AS MEMBERS OF THE COMMITTEE; AND (E) THE COMMITTEE'S RETAINED PROFESSIONALS, SHALL BE DEEMED RELEASED BY THE DEBTOR AND ITS ESTATE, FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR THE ESTATE, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE (EXCEPT FOR ANY CLAIMS BASED UPON FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION) THAT THE DEBTOR, ITS ESTATE, OR THE GUC TRUSTEE, AS APPLICABLE, WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT, OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR EQUITY INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE CHAPTER 11 CASE, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTOR, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND EQUITY INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE COMMITTEE RESOLUTION TERM SHEET, THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE COMBINED DISCLOSURE STATEMENT AND PLAN, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTOR OR THE ESTATE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE DEBTOR IS NOT RELEASING ANY CLAIMS (I) OWNED BY A THIRD PARTY AGAINST THE RELEASED PARTIES OR (II) AGAINST BELVAC PRODUCTION MACHINERY, INC. IN ITS INDIVIDUAL CAPACITY.

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASE OF THE RELEASED PARTIES BY THE DEBTOR AND THE ESTATE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASE BY THE DEBTOR AND THE ESTATE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR; (C) IN THE BEST INTERESTS OF THE DEBTOR, THE ESTATE, AND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE DEBTOR, ITS ESTATE, OR THE GUC TRUST ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE RELEASE BY DEBTOR AND THE ESTATE.**

D.    **Releases by Holders of Claims**

**EXCEPT AS OTHERWISE PROVIDED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ON THE EFFECTIVE DATE AND AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASING PARTIES SHALL BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE EACH OF THE RELEASED PARTIES, FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, AND LIABILITIES WHATSOEVER IN CONNECTION WITH OR IN ANY WAY RELATING TO THE DEBTOR, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE CHAPTER 11 CASE, THE COMMITTEE RESOLUTION TERM SHEET, OR THE COMBINED DISCLOSURE STATEMENT AND PLAN (OTHER THAN THE RIGHTS OF THE DEBTOR, OR A CREDITOR HOLDING AN ALLOWED CLAIM, TO ENFORCE THE OBLIGATIONS UNDER THE CONFIRMATION ORDER AND COMBINED DISCLOSURE STATEMENT PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATION OF FEDERAL OR STATE SECURITIES LAW OR OTHERWISE, THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE; PROVIDED, HOWEVER, THAT NOTHING IN THIS ARTICLE X SHALL OPERATE AS A RELEASE, WAIVER OR DISCHARGE OF ANY CAUSES OF ACTION OR LIABILITIES ARISING OUT OF GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD OR CRIMINAL ACTS OF ANY SUCH RELEASED PARTY. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, BELVAC PRODUCTION MACHINERY, INC. SHALL NOT BE DEEMED A RELEASED PARTY,**

**AND SHALL NOT RECEIVE THE BENEFIT OF ANY RELEASE HEREUNDER, IN ITS INDIVIDUAL CAPACITY.**

## XI.    RETENTION OF JURISDICTION

Following the Confirmation Date and the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)    to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(2)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(3)    to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by Bankruptcy Code section 1142;

(4)    to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(5)    to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 330 or 503;

(6)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(7)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Sale Order, including in connection with any Purchased Contract (as defined in the Sale Order);

(8)    to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(9)    to hear any other matter not inconsistent with the Bankruptcy Code;

(10)    to enter the Final Decree;

(11)    to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(12)    to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(13)    to hear and determine any and all motions, adversary proceedings, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case, including the Retained Causes of Action;

(14)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or consummation of the Sale Transaction or the enforcement of the Plan, Sale Order, or the Confirmation Order, except as otherwise provided herein;

(15)    to determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Plan;

(16)    to determine any other matters that may arise in connection with or related to the Sale Order or any contract, instrument, lease, release, indenture, or other agreement or document created, implemented, assigned, or transferred in connection with the Sale Order (whether or not the Chapter 11 Case has been closed);

(17)    to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

(18)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

(19)    to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the Bar Date, or the Confirmation Hearing, or for any other purpose.

## XII.    MISCELLANEOUS PROVISIONS

### A.    Amendment or Modification of the Combined Disclosure Statement and Plan

Alterations, amendments, or modifications of the Combined Disclosure Statement and Plan may be proposed in writing by the Debtor, but only with the prior written consent of Ares and the Committee, at any time before the Confirmation Date; provided that the Combined Disclosure Statement and Plan, as altered, amended, or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123 and the Debtor shall have complied with Bankruptcy Code sections 1125 and 1127. The Debtor, but only with the prior written consent of Ares and the Committee, may modify the Combined Disclosure Statement and Plan at any time after Confirmation and before substantial consummation, provided that this Combined Disclosure Statement and Plan, as modified, meets the requirements of Bankruptcy Code sections 1122, 1123 and 1127 and the circumstances warrant such modifications. A Holder of a Claim that has accepted the Combined Disclosure Statement and Plan shall be deemed to have accepted such Combined Disclosure Statement and Plan as modified if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

B.      **Exhibits/Schedules**

All exhibits and schedules to this Combined Disclosure Statement and Plan are incorporated into and are part of the Combined Disclosure Statement and Plan as if set forth in full herein.

C.      **Plan Supplement**

The Plan Supplement will contain, among other things: (a) the GUC Trust Agreement, (b) the identification of the GUC Trustee, and (c) the members of the GUC Trust Oversight Committee.

D.      **Filing of Additional Documents**

On or before substantial consummation of the Plan, the GUC Trustee shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

E.      **Binding Effect of Plan**

The Plan shall be binding upon and inure to the benefit of the Debtor, the Holders of Claims, the Holders of Equity Interests, and their respective successors and assigns. Notwithstanding anything to the contrary herein, nothing in the Plan modifies, alters, or amends the respective rights and obligations of the Debtor or Purchaser under the Sale Order, the Stalking Horse APA, or any other document governing the Sale Transaction.

F.      **Governing Law**

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Utah.

G.      **Time**

To the extent that any time for the occurrence or happening of an event as set forth in this Combined Disclosure Statement and Plan falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

H.      **Severability**

Should any provision of the Plan be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

I.      **Revocation**

The Debtor reserves the right to revoke and withdraw the Combined Disclosure Statement and Plan prior to the entry of the Confirmation Order. If the Debtor revokes or withdraws the

Combined Disclosure Statement and Plan, the Combined Disclosure Statement and Plan shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor, any other Person or Entity, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtor.

## J.    Dissolution of the Committee

On the Effective Date, the Committee shall dissolve and the members thereof and the professionals retained by the Committee shall be released and discharged from all continuing duties, responsibilities, and obligations in connection with the Chapter 11 Case or the Plan and its implementation; provided, however, that after the Effective Date, the Committee shall continue to exist and have standing and a right to be heard for the following limited purposes: (a) applications, and any relief related thereto, for payment of Professional Fee Claims and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, and (b) any appeals of the Confirmation Order or other appeal to which the Committee is a party.

## K.    Post-Effective Date Limitation of Notice

After the Effective Date, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, Persons and Entities must file with the Bankruptcy Court a renewed request to receive notice pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtor and GUC Trustee are authorized to limit the list of Persons and Entities receiving notice pursuant to Bankruptcy Rule 2002 to those Persons and Entities that have filed with the Bankruptcy Court such a renewed request.

## L.    Inconsistency

To the extent that the Disclosure Statement or any Plan Supplement document conflicts with or is inconsistent with the Plan, the terms of the Plan shall control. To the extent that the Plan conflicts with the Confirmation Order, the Confirmation Order shall control. For the avoidance of doubt, nothing in the Plan shall be deemed to supersede, amend, or modify the provisions of the Sale Order, Bidding Procedures Order, or the Stalking Horse APA.

## M.    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Combined Disclosure Statement and Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

## N.    Reservation of Rights

Except as expressly set forth herein, the Combined Disclosure Statement and Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to the Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims, or Holders of Equity Interests before the Effective Date.

## XIII.   RECOMMENDATION

In the opinion of the Debtor, the Combined Disclosure Statement and Plan is superior and preferable to any alternative described in this Combined Disclosure Statement and Plan. Accordingly, the Debtor recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation.

Dated:  April 21, 2025

*/s/ Alan Boyko*
Alan Boyko
Chief Transformation Officer of the Debtor and Debtor in Possession

## EXHIBIT A

**Liquidation Analysis**

# LIQUIDATION ANALYSIS[1]

## A. Introduction

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests of creditors test, the Debtor, with the assistance of its professional advisors, has prepared the hypothetical liquidation analysis set forth in this Exhibit B attached to the Combined Disclosure Statement and Chapter 11 Plan of Liquidation (the "Liquidation Analysis"). As set forth in this Liquidation Analysis, the Debtor believes that the Plan provides each Holder of an Impaired Claim with a recovery that is not less than the value such Holder would receive or retain in a chapter 7 liquidation.

The first step in determining whether the best interests test has been met is to determine the dollar amount that would be generated from the hypothetical orderly liquidation of the Debtor's assets in a chapter 7. Due to the sale of substantially all of the Debtor's Assets, the only remaining assets of the Debtor are cash provided to the Debtor pursuant to the Committee Plan Settlement and the Litigation Claims. Should the Plan not be confirmed, as detailed in the Committee Plan Settlement, those assets would be returned to the Prepetition Lenders. Thus, no dollars are generated in a chapter 7 liquidation.

A general summary of the assumptions used in preparing this Liquidation Analysis follows.

## B. Limitations and Key Assumptions

**THE ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES AND USE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AND DOES NOT REPRESENT OR CLAIM TO REPRESENT ANY ASSUMPTIONS OR COMPARISONS FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF THE DEBTOR FOR ANY PURPOSE.**

The Debtor prepared the illustrative Liquidation Analysis with the assistance of FTI Consulting, Inc. The Liquidation Analysis contains numerous estimates, including estimated Allowed Claims based upon a review of the Debtor's financial statements to account for estimated liabilities as necessary.

The Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. If such Chapter 11 Case is subsequently converted to a chapter 7, additional Claims may arise against the Debtor's Estate that are not currently fully reflected in the Liquidation Analysis but could significantly impact the conclusions set forth herein. The Debtor's estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and interests under the Plan. **THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC* (as may be amended, supplemented or modified from time to time, and including all exhibits and supplements thereto, the "Combined Disclosure Statement and Plan"), to which this Liquidation Analysis is attached as Exhibit B.

The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtor's management team and its advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor and its management team. The Liquidation Analysis should be read in conjunction with the Combined Disclosure Statement and the Plan in its entirety, as well as the notes and assumptions set forth below.

The Debtor recognizes that there are other potential alternatives that could occur in a hypothetical chapter 7 not presented in the Liquidation Analysis.

**THE DEBTOR RESERVES ITS RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.**

**C.  Distribution of Net Proceeds Under Absolute Priority**

Under a chapter 7 liquidation, all secured claims are required to be satisfied from the proceeds of the collateral securing such claims before any such proceeds would be distributed to any other creditors, subject to any agreed carve-out approved by the Court. This analysis assumes the application of the rule of absolute priority of distributions with respect to the remaining proceeds of the Debtor. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full. The costs, expenses, and fees associated with the liquidation would be paid in full from the liquidation proceeds before the balance of the proceeds would be made available to pay chapter 11 administrative claims, then to pay priority claims, and then to pay unsecured claims.

After consideration of the effects of a chapter 7 on the proceeds available for distribution to creditors, based on the terms of the Committee Plan Settlement, **THE DEBTOR HAS DETERMINED THAT CONFIRMATION OF THE PLAN WILL PROVIDE EACH CREDITOR WITH A RECOVERY THAT IS NOT LESS THAN SUCH CREDITOR WOULD RECEIVE PURSUANT TO A LIQUIDATION OF THE DEBTOR UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**.

**D.  Basis of Presentation**

The Liquidation Analysis represents an estimated recovery for all creditors of the Debtor based upon a confirmed Plan or a hypothetical conversion of the Debtor as if a chapter 7 trustee ("Trustee") was appointed by the Bankruptcy Court presiding over the Debtor's assets. The analysis assumes either a Plan Effective Date or conversion to a Chapter 7 on April 23, 2025 (the "Effective Date" or the "Conversion Date").

The Liquidation Analysis assumes the Debtor enters chapter 7 on the Conversion Date. The Debtor assumes a wind-down would be conducted pursuant to chapter 7 of the Bankruptcy Code, with a Trustee appointed to manage the Estate. The Trustee would be responsible for liquidating any remaining assets in a manner intended to maximize the recovery to creditors.

**The Liquidation Analysis is based upon a number of estimates and assumptions that are inherently subject to significant economic, business, governmental, regulatory, competitive uncertainties as well as other contingencies beyond the control of the Debtor or its management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. In addition, the Liquidation Analysis was completed before the General Bar Date, and the Debtor has therefore neither fully evaluated Claims filed against the Debtor or adjudicated such Claims before the Bankruptcy Court. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION**

**ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, ACTUAL RESULTS COULD VARY MATERIALLY AND ADVERSELY FROM THOSE CONTAINED HEREIN, AND THE AMOUNT OF FINAL ALLOWED CLAIMS AGAINST THE DEBTOR'S ESTATE MAY DIFFER FROM THE CLAIM AMOUNTS USED IN THIS LIQUIDATION ANALYSIS.**

**This Liquidation Analysis was developed solely for purposes of the Combined Disclosure Statement and Plan and to enable the Holders of Claims entitled to vote on the Plan to make an informed judgment about the Plan. It should not be used or relied on for any other purpose, including the purchase or sale of securities of, or claims or interests in, the Debtor.**

**Nothing contained in this hypothetical liquidation analysis is intended to be or constitutes an admission of the Debtor.**

**E. Detailed Assumptions**

[A] Cash & Cash Equivalents.

    a.  Pursuant to the Committee Plan Settlement, Seed Funding is provided to the Debtor in the form of $350,000 to fund Wind-Down activities, $1,000,000 for purposes of evaluating, investigating, and pursuing the Litigation Claims, and $4,636,155 on account of estimated 503(b)(9) claims. The estimated 503(b)(9) claims have been reduced by amounts projected to be paid before the Effective Date. Noted in further detail in the Committee Plan Settlement, $500,000 of the litigation funding is an unsecured, non-interest bearing loan from the Prepetition Lenders.

[B] Restricted Cash.

    a.  Restricted Cash consists of the projected cash balance in the Professional Fee Escrow Account as of the Conversion Date.

[C] Litigation Recoveries.

    a.  The Litigation Claims include, but are not limited to, all claims and causes of action against the Debtor's insiders, affiliates, directors, and officers. No assumptions are made regarding the potential Litigation Claims. It should be noted that, under a chapter 7, there would be no cash to fund the pursuit of these causes of action.

[D] Liquidation Expenses.

    a.  Under the Chapter 11 Plan, the Committee Plan Settlement provides for $350,000 of funding to cover all wind-down expenses and Trust professional fees.

    b.  The analysis assumes no fees due to a Chapter 7 trustee since cash that remains in the Estate, inclusive of the Priority Claim Reserve and the Litigation Trust Seed Funding, will be immediately returned to the Prepetition Lenders should the case convert to a chapter 7 liquidation.

[E] Secured Claims.

    a.  The value of the estimated Secured Claims consists of the Prepetition Lenders' funding pursuant to the Committee Plan Settlement, which remains the Prepetition Lenders' collateral up until the Conversion / Effective Date. See Note [A] above.

          i.  In the Chapter 11 scenario, the Prepetition Lenders' claims are assumed to be satisfied due to the Confirmation of the Plan and approval of the Committee Plan Settlement.

3

        ii.  In the chapter 7 scenario, the Prepetition Lenders will receive all remaining assets of the estate, exclusive of the carved out Professional Fees, pursuant to the Committee Plan Settlement.

  b.  All Construction Liens are assumed to be satisfied from amounts in the Priority Claim Reserve prior to the Effective Date.

[F] Professional Fees.

  a.  Unpaid Professional Fees include all estimated accrued, unpaid professional fees as of the Conversion Date.

  b.  For the avoidance of doubt, this amount also includes fees reserved for the United States Trustee according to 28 U.S.C § 1930(a)(6).

[G] 503(b)(9) Claims.

  a.  503(b)(9) claims are estimated to be the amount reserved in the Priority Claim Reserve on account of 503(b)(9) claims less amounts projected to be paid before the Effective date pursuant to the relief granted in the *Final Order (I) Authorizing Debtor to (A) Pay Certain Prepetition Claims of Critical Vendors and Section 503(B)(9) Claimants, and (B) Follow Certain Procedures Related Thereto: (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests; and (III) Granting Related Relief* [Docket No. 215].

  b.  For the avoidance of doubt, all other Administrative Claims are assumed to be satisfied prior to the Effective / Conversion Date through amounts in the Priority Claim Reserve.

[H] Priority Claims.

  a.  All Priority Claims are assumed to be satisfied prior to the Effective / Conversion Date through amounts in the Priority Claim Reserve.

[I] Prepetition Lenders' Deficiency Claim.

  a.  The Prepetition Lenders' Deficiency Claim is comprised of the Prepetition Secured Loans, less the "roll-up" amount of $78,127,478, less the value of the Purchaser's credit bid above the value of the DIP Facility.

  b.  Pursuant to the Committee Plan Settlement, the Trust Loan of $500,000 is to be paid in full to the Prepetition Lenders before any distributions to other Trust Beneficiaries. Proceeds that remain after the Trust Loan is paid in full, are distributed 50 / 50 between the Prepetition Lenders and other Trust Beneficiaries.

[J] General Unsecured Claims.

  a.  The estimated value of General Unsecured Claims reflects the amounts scheduled in *Schedule E/F, Part 2* in the *Amended Schedule of Assets and Liabilities for Vobev, LLC* [Docket No. 226], less estimated amounts paid pursuant to settlements, contract cures, 503(b)(9) claims, critical vendor agreements, and other First Day relief.

  b.  The Debtor has not estimated any potential Rejection Claims resulting from the rejection of any Executory Contracts or Unexpired Leases as of the Effective / Conversion Date.

[K] Subordinated Claims and Equity Interests

  a.  The Debtor does not believe there are any subordinated claims and has not performed an analysis on the value of any equity interests. There is no believed recovery to any such claims.

**F.  Conclusion**

4

Based on the assumptions outlined herein, the Debtor would receive no liquidation proceeds in a chapter 7 liquidation.   Conversion would result in $0 and 0% recovery to all claim classes. Due to the Committee Plan Settlement, confirmation of the Plan will result in recoveries that are not less than the chapter 7 amounts.

**Vobev**

Liquidation Analysis
Prepared as of 3/18/25

| ($ in 000's) | Notes | Claim Amount | Chapter 11 Plan of Liquidation | | Conversion to Chapter 7 | |
|---|---|---|---|---|---|---|
| **Sources** | | | | | | |
| Cash & Cash Equivalents | [A] | N/A | 4,757 | | 4,757 | |
| Restricted Cash | [B] | N/A | 2,030 | | 2,030 | |
| Litigation Recoveries | [C] | N/A | *TBD* | | - | |
| **Total Sources** | | N/A | **6,787** | | **6,787** | |
| | | | | | | |
| **Uses** | | | | | | |
| *Liquidation Expenses* | | | | | | |
| Wind-Down Costs | | N/A | 350 | | - | |
| Chapter 7 Trustee Fees | | N/A | - | | - | |
| **Total Liquidation Expenses** | [D] | N/A | **350** | | **-** | |
| **Remaining Proceeds** | | | **6,437** | | **6,787** | |
| | | | | | | |
| *Secured, Admin, and Priority Claims* | | | | | | |
| Secured Claims | [E] | 4,757 | - | *- %* | 4,757 | *100.0%* |
| Professional Fees | [F] | 2,030 | 2,030 | *100.0%* | 2,030 | *100.0%* |
| 503(b)(9) Claims | [G] | 3,407 | 3,407 | *100.0%* | - | *- %* |
| Priority Claims | [H] | - | - | *- %* | - | *- %* |
| **Total - Secured, Admin, and Priority Claims** | | **10,193** | **5,437** | *53.3%* | **6,787** | *66.6%* |
| **Remaining Proceeds** | | | **1,000** | | **-** | |
| | | | | | | |
| *Unsecured Claims* | | | | | | |
| Prepetition Lenders' Deficiency Claims | [I] | 308,713 | 750 | *0.2%* | - | *- %* |
| Other General Unsecured Claims | [J] | 31,943 | 250 | *0.8%* | - | *- %* |
| **Total - Unsecured Claims** | | **340,656** | **1,000** | *0.3%* | **-** | *- %* |
| | | | | | | |
| Subordinated Claims and Equity Interests | [K] | - | - | *- %* | - | *- %* |
| **Total Uses** | | | **6,787** | | **6,787** | |

## **EXHIBIT B**

**Committee Resolution Term Sheet**

## VOBEV, LLC

## UCC SETTLEMENT TERM SHEET

This term sheet (this "Term Sheet") summarizes the principal terms and conditions of a settlement by and among Ares Capital Corporation and certain of its affiliates (collectively, "Ares"), Vobev, LLC (the "Debtor"), and the Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of the Debtor.  This Term Sheet is subject to the negotiation and execution of definitive documentation, including a Plan (as defined below), in form and substance reasonably acceptable to each of Ares, the Debtor, and the Committee. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated January 6, 2025 (the "APA"), filed as Exhibit A to Docket No. 171 in Case No. 24-26346 (JTM) (Bankr. D. Utah).

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE LAW.

| Term | Description |
|------|-------------|
| Professional Fees | Debtor Professionals<br>The line item in the DIP Budget covering the fees of the Debtor's counsels shall be increased by $750,000 in the aggregate.<br><br>Committee Professionals<br>The line item in the DIP Budget covering the fees of the Committee's professionals shall be increased by $500,000 in the aggregate (and the aggregate line items for the Committee's professionals shall be combined and consolidated into a single line item in the DIP Budget).<br><br>Any savings with respect to the professional fees of the Debtor and the Committee included in the DIP Budget will be added to the Trust (as defined below) as soon as reasonably practicable after the effective date of the Plan (as defined below). |
| Litigation Trust | Overview<br>Upon the effective date of a mutually acceptable plan of liquidation (the "Plan") that reflects the terms set forth in this Term Sheet, a litigation trust (the "Trust") shall be formed for the benefit of unsecured creditors, including the unsecured deficiency claim held by Ares (collectively, the "Trust Beneficiaries"), with any distributions from the Trust limited as set forth below. |

Trustee
The trustee shall be selected by the Committee. The identity of the Trustee and the terms of his/her engagement shall be reasonably acceptable to Ares.

Assets
Subject to the Vesting Procedures, the Trust shall be vested with all causes of action other than the Purchased Actions (the "Litigation Claims"). Specifically, the Litigation Claims shall include, but shall not be limited to, all claims and causes of action against the Debtor's insiders, affiliates, directors, and officers; provided, however, the Litigation Claims shall not include (i) causes of action or claims against (A) customers, suppliers, vendors, or contract counterparties of the Purchaser's post-closing business or (B) employees hired by the Purchaser, or (ii) causes of action or claims against Carlin Adrianopoli, Alan Carr, Alan Boyko, John Sacksteder, the Purchaser, the Pre-Petition Secured Lenders, the DIP Lenders, Ares Capital Corporation, ACF Finco I LP, or any of Ares' Related Parties. To the extent there is any ambiguity regarding what causes of action constitute Litigation Claims, any corresponding litigation commenced by the Trust shall be subject to Ares' reasonable consent.

The APA will be amended to include the following procedures set forth in this paragraph (collectively, the "Vesting Procedures"). Upon the Closing of the Sale, the Litigation Claims will not be assigned to the Purchaser. The Plan shall provide that the Litigation Claims shall vest in the Trust upon the effective date; provided, however, if the Plan is not confirmed on or before the Outside Confirmation Date (as defined below), then the Litigation Claims will be assigned to and shall otherwise vest in the Purchaser and become Purchased Assets under the APA. To the extent the Litigation Claims vest in the Purchaser pursuant to the immediately preceding sentence, (i) Ares will receive 50% of the net recoveries on Litigation Claims and the other 50% will be distributed to the Debtor or the then-current representative of the Debtor's estate (including a chapter 7 trustee), free and clear of any claim by Ares or the Purchaser, and (ii) the Purchaser (or any assignee or transferee of the Purchaser) shall use its commercially reasonable efforts to prosecute the Litigation Claims and to consult with any creditor representative in connection with any settlement of the Litigation Claims.

Seed Funding
The Plan shall provide that on the effective date, Ares shall advance to the Trust (i) pursuant to the APA, the Wind-Down

| | |
|---|---|
| | Amount (*i.e.*, $350,000) for the costs and expenses incurred in connection with the Wind-Down Activities, and (ii) $1,000,000 for purposes of evaluating, investigating, and pursuing the Litigation Claims; <u>provided that</u> $500,000 of such advance shall be a loan from Ares (the "<u>Trust Loan</u>"). The Trust Loan will not bear interest and will be unsecured. The Trust Loan will be paid in full in cash from any net recoveries by the Trust prior to any distribution to the Trust Beneficiaries.<br><br><u>Litigation Claim Recoveries</u><br>Ares will receive 50% of the net recoveries on Litigation Claims.<br><br>The other Trust Beneficiaries (*i.e.*, excluding Ares) will receive the remaining 50% on a pro rata basis. |
| Priority Claim Reserve | The Purchaser shall fund the Excluded Cash and the Wind Down Amount (which shall first be used exclusively for wind down costs and expenses) pursuant to the APA. In addition, upon Closing of the Sale, Ares shall either (i) fund the following into a priority claim reserve account (the "<u>Priority Claim Reserve</u>") or (ii) pay the holders of such claims as follows:<br><br><ul><li>Approximately $1,678,110.32[1] to satisfy certain ad valorem taxes owed to Salt Lake County;</li><li>Up to $360,000 to satisfy certain construction and/or mechanic's lien claims, as other secured claims under the Plan, ***unless*** such claims must be paid to cure defaults under assumed real property leases, in which case they will be paid pursuant to the Sale Order; and</li><li>Unspent amounts earmarked for critical vendors and 503(b)(9) claimants in the amounts set forth in the DIP Budget.</li></ul>The Priority Claim Reserve shall be used by the Debtor to pay critical vendors and 503(b)(9) claimants through the effective date of the Plan. Upon the Plan effective date, any remaining unspent funds earmarked for critical vendors, 503(b)(9) claimants, or ad valorem taxes owed to Salt Lake County shall be returned to Ares (or the Purchaser). Absent confirmation of the Plan by April 23, 2025, the Priority Claim Reserve will be released in its entirety to Ares, unless that date is extended by written agreement (email from counsel being sufficient) of each of Ares, the Debtor, and the Committee (such date, the "<u>Outside Confirmation Date</u>"). |

---

[1]   Figure to be updated/finalized.

| Settlement | In exchange for and consideration of the foregoing, the Committee shall consent to and support the Credit Bid of the Purchaser, the Sale Motion, the Sale, the entry of the Final DIP Order on January 29, 2025 (with all challenges waived) and the entry of the Sale Order at the hearing currently schedule for February 5, 2025. |
|---|---|

## **EXHIBIT C**

## **Retained Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code,[1] the Debtor shall convey to the GUC Trust all rights in respect of all Estate Causes of Action, whether arising before or after the Petition Date. All Retained Causes of Action shall vest in the GUC Trust pursuant to the terms of the Combined Disclosure Statement and Plan. On behalf of the GUC Trust, the GUC Trustee may enforce all rights to commence, prosecute, or settle, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, and the GUC Trustee's rights to commence, prosecute, or settle such Retained of Action shall be preserved as of, and notwithstanding, the occurrence of the Effective Date.

The GUC Trustee may, in the GUC Trustee's reasonable business judgment, pursue any and all Retained Causes of Action as set forth in the Plan, the Confirmation Order, the GUC Trust Agreement, and this Exhibit. The GUC Trustee may retain and compensate professionals in connection with the analysis or pursuit of such Causes of Action to the extent the GUC Trustee deems appropriate, including on a contingency fee basis. No Persons or Entities may rely on the absence of a specific reference to any Cause of Action in the Combined Disclosure Statement and Plan, the Plan Supplement, the Confirmation Order, this Exhibit, or any other document as any indication that the Debtor or the GUC Trustee will not pursue any potential Retained Causes of Action or that any Retained Causes of Action have been released or otherwise waived.

The GUC Trustee expressly reserves all rights to prosecute any and all Retained Causes of Action against any Entity, except as otherwise expressly provided in the Combined Disclosure Statement and Plan, Confirmation Order, this Exhibit, the Final DIP Order or the Sale Order. Except as set forth in numbered paragraph 2 below, the GUC Trustee expressly reserves, on behalf of the GUC Trust, all Retained Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation Order. On behalf of the GUC Trust, the GUC Trustee reserves and shall retain the Retained Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Combined Disclosure Statement and Plan. The GUC Trustee shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action, or to decline to do any of the foregoing, or to take any action contemplated by the Combined Disclosure Statement and Plan, without the consent or approval of any third party or any further notice to, or action, order, or approval of, the Bankruptcy Court.

Without limiting the foregoing, the following is a non-exclusive list of potential claims and Causes of Action that are Retained Causes of Action being retained by the Debtor and assigned to the GUC Trust pursuant to the Plan and section 1123(b) of the Bankruptcy Code:

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Combined Disclosure Statement and Plan.

1.  The right to object to Claims and Interests.

2.  Any and all claims and Estate Causes of Action pursuant to chapter 5 of the Bankruptcy Code (including but not limited to any claim to avoid a transfer of property or an obligation incurred by the Debtor, including pursuant to sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code, or under similar or related state or federal statutes, common law and foreign law fraudulent transfer or similar claims); *provided, however,* that pursuant to the Plan and notwithstanding anything to the contrary herein, the GUC Trustee, on behalf of the GUC Trust, shall waive and release all Retained Causes of Action arising under section 547 of the Bankruptcy Code against Persons or Entities that are not set forth in numbered paragraph 5 below.

3.  Claims and Causes of Action against any and all present and former utility service providers holding pre- and post-petition deposits.

4.  Any and all rights and claims under contracts, leases, loan agreements or other agreements which are rejected, terminated, or cancelled pursuant to the Plan, including but not limited to collection actions and claims.

5.  Any and all claims and Causes of Action against (i) the Debtor's current and former insiders, shareholders, affiliates, directors, and officers, including, but not limited to, BVO Holdings Corporation, Vobev Holdings LLC, and William Vogel, and (ii) any insiders, shareholders, affiliates, directors, and officers of the foregoing.

6.  Any and all claims of setoff, offset, and recoupment rights in respect of, arising from, or otherwise relating to any and all Retained Causes of Action.

The Debtor reserves all rights to modify or otherwise update this Exhibit at any time before the Effective Date, with the written consent (email being sufficient) of each of the Committee and Ares.  For the avoidance of doubt, and notwithstanding anything to the contrary herein or in the GUC Trust Agreement, the Estate Causes of Action and, thus, the Retained Causes of Action do not include any claims or Causes of Action (i) sold or transferred by the Debtor pursuant to a Final Order entered before the Effective Date, including all Causes of Action sold or transferred pursuant to the Stalking Horse APA and Sale Order, (ii) against customers, suppliers, vendors, or contract counterparties of the Purchaser's post-closing business as of the Sale Closing Date or any time thereafter, (iii) against employees hired by the Purchaser, or (iv) against Carlin Adrianopoli, Alan Carr, Alan Boyko, John Sacksteder, the Purchaser, the Prepetition Lenders, the DIP Lenders, Ares Capital Corporation, ACF Finco I LP, or any of Ares' Related Parties.  Notwithstanding anything herein or in the GUC Trust Agreement to the contrary, to the extent there is any ambiguity regarding what causes of action constitute Retained Causes of Action, any corresponding litigation commenced by the GUC Trustee or the GUC Trust shall be subject to Ares' reasonable consent.

## **EXHIBIT B**

### **Notice of Effective Date**

Michael R. Johnson (7070)
Jeffrey W. Shields (2948)
David H. Leigh (9433)
Austin C. Nate (17789)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah 84111
Tel: (801) 532-1500
Email: mjohnson@rqn.com
Email: jshields@rqn.com
Email: dleigh@rqn.com
Email: anate@rqn.com

Gregg M. Galardi (admitted *pro hac vice*)
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com

Eric P. Schriesheim (admitted *pro hac vice*)
**ROPES & GRAY LLP**
191 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: eric.schriesheim@ropesgray.com

*Counsel to the Debtor and Debtor in
Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**VOBEV, LLC**, a Utah limited liability company,<br><br>    Debtor-in-Possession. | Bankruptcy Case No. 24-26346 (JTM)<br><br>Chapter 11<br><br>Honorable Joel T. Marker<br>[Filed Electronically] |

## NOTICE OF (I) ENTRY OF FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE FIRST AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF VOBEV, LLC AND (II) EFFECTIVE DATE

**PLEASE TAKE NOTICE** that an order (the "Confirmation Order") of the Honorable Joel T. Marker, United States Bankruptcy Judge for the District of Utah, confirming and approving the *First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Vobev, LLC* [Docket No. 477] (including all exhibits thereto and as the same may be amended, modified, or supplemented from time to time, the "Combined Disclosure Statement and Plan") was entered on April [●], 2025 [Docket No. ●].

**PLEASE TAKE FURTHER NOTICE** that, all conditions precedent to effectiveness pursuant to Article IX.B of the Combined Disclosure Statement and Plan have been satisfied or waived. Therefore, today, [●], 2025, is the Effective Date of the Combined Disclosure Statement and Plan.

**PLEASE TAKE FURTHER NOTICE** that the Combined Disclosure Statement and Plan and its provisions are binding on, among others, the Debtor, all Holders of Claims and Equity Interests (irrespective of whether such Claims or Equity Interests are impaired under the Combined Disclosure Statement and Plan or whether the Holders of such Claims or Equity Interests have voted to accept or reject the Combined Disclosure Statement and Plan), and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtor, as provided in the Combined Disclosure Statement and Plan.

**PLEASE TAKE FURTHER NOTICE** that all final requests for payment of Professional Fee Claims (the "Final Fee Applications") must be filed no later than [●], 2025 (*i.e.*, sixty (60) days after the Effective Date). The procedures for processing Final Fee Applications are set forth in the Combined Disclosure Statement and Plan. If a Professional does not timely submit a Final Fee Application, such Professional shall be forever barred from seeking payment of such Professional Fee Claim from the Debtor, its Estate, or the GUC Trust.

**PLEASE TAKE FURTHER NOTICE** that requests for payment of Administrative

Expense Claims (other than Professional Fee Claims) against the Debtor that arose, accrued or

otherwise became due and payable at any time after March 31, 2025 but before the Effective Date

(the "Administrative Expense Period") must be filed with the Bankruptcy Court and served on the

Debtor or the GUC Trustee, as applicable, no later than [●], 2025 (*i.e.*, thirty (30) days after the

Effective Date) (the "Administrative Expense Bar Date").    Holders of Administrative Expense

Claims that arose, accrued, or otherwise became due during the Administrative Expense Period

that do not file requests for the allowance and payment thereof on or before the Administrative

Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims

against the Debtor, its Estate, or the GUC Trust.    Unless the Debtor, the GUC Trustee on behalf

of the GUC Trust, or any other party in interest objects to an Administrative Expense Claim, such

Administrative Expense Claim shall be deemed Allowed in the amount requested.  In the event

that the Debtor, the GUC Trustee on behalf of the GUC Trust, or any other party in interest objects

to an Administrative Expense Claim, and the Administrative Expense Claim is not otherwise

resolved, the Bankruptcy Court shall determine the Allowed amount of such Administrative

Expense Claim.

**PLEASE TAKE FURTHER NOTICE** that as set forth in Article VIII of the Combined

Disclosure Statement and Plan, all Executory Contracts and Unexpired Leases that have not been

assumed are rejected as of the Effective Date.    If the rejection by the Debtor, pursuant to the

Combined Disclosure Statement and Plan, of an Executory Contract or Unexpired Leases gives

rise to a Claim, a Proof of Claim must be filed (x) by regular mail to Vobev, LLC Claims

Processing Center, c/o Kroll Restructuring Administration LLC, Grand Central Station, PO Box

4850, New York, NY 10163-4850, (y) by overnight mail, courier service, hand-delivery, or in

person to Vobev, LLC Claims Processing Center, c/o Kroll Restructuring Administration LLC,

850 3rd Avenue, Suite 412, Brooklyn, NY 11232, or (z) by completing an electronic Proof of Claim

Form (an "Electronic Proof of Claim"), available online at

https://cases.ra.kroll.com/Vobev/EPOC-Index, in each case no later than [•], 2025 (*i.e.*, thirty (30)

days after the Effective Date).   Please note that the Clerk's office is not permitted to give legal

advice.  Any proofs of claim not filed and ***actually received*** by such date will be forever barred

from assertion against the Debtor, the Estate, or the GUC Trust.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Bankruptcy Rule 2002, after the

Effective Date, to continue to receive notices pursuant to Bankruptcy Rule 2002, all Creditors and

other parties in interest must file a renewed notice of appearance with the Bankruptcy Court

requesting receipt of documents pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that copies of the Combined Disclosure Statement

and Plan are available for review without charge at the website maintained by Kroll Restructuring

Administration LLC, the Claims and Noticing Agent, https://cases.ra.kroll.com/Vobev/.

Dated: [●], 2025.                              Respectfully submitted,

**RAY QUINNEY & NEBEKER P.C.**


By: */s/ Michael R. Johnson*
Michael R. Johnson (7070)
Jeffrey W. Shields (2948)
David H. Leigh (9433)
Austin C. Nate (17789)
36 South State Street, 14th Floor
Salt Lake City, Utah 84111
Tel: (801) 532-1500
E-mail: mjohnson@rqn.com
          jshields@rqn.com
          dleigh@rqn.com
          anate@rqn.com

**ROPES & GRAY LLP**
Gregg M. Galardi (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com

**ROPES & GRAY LLP**
Eric P. Schriesheim (admitted *pro hac vice*)
191 North Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: eric.schriesheim@ropesgray.com

*Counsel to the Debtor and Debtor in
Possession*