BRIAN M. ROTHSCHILD (15316)
THOMAS R. BARTON (6827)
ANDREW J. SOMERS (19078)
ANNA M. PASEMAN (19039)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
BRothschild@parsonsbehle.com
TBarton@parsonsbehle.com
ASomers@parsonsbehle.com
APaseman@parsonsbehle.com
ECF@parsonsbehle.com

*Attorneys for the GUC Liquidating Trust*

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>VOBEV, LLC, a Utah limited liability company,<br><br>Debtor. | Chapter 11 Case No. 24-26346 (PH) |
| MATT MCKINLAY, solely in his capacity as Trustee of the GUC LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>vs.<br><br>TIMOTHY A. NETTESHEIM, an individual, and N2 ADVANTAGE LAW, LTD.,<br><br>Defendants. | Adv. Proc. No. 2:26-ap-_____-PH<br><br>**COMPLAINT FOR AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS, PREFERENCES, AND OTHER RELIEF**<br><br>Hon. Peggy Hunt |

Matt McKinlay, solely in his capacity as Trustee of the GUC Liquidating Trust (the "**Liquidating Trust**" or "**Plaintiff**"), post-confirmation successor of Vobev, LLC (the "**Debtor**")

in the above-captioned bankruptcy case, by and through its undersigned counsel, complains, alleges, and asserts as follows against Defendants Timothy A. Nettesheim ("**Nettesheim**") and N2 Advantage Law, LTD. ("**N2**" and together with Nettesheim, "**Defendants**").

**PARTIES, JURISDICTION, AND VENUE**

1. Debtor, a Utah limited liability company, was established in 2019 as a Utah-based aluminum can manufacturer and filler.

2. On June 20, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Utah (the "**Bankruptcy Court**").

3. On April 24, 2025, this Court entered its Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Plan of Liquidation and Disclosure Statement (the "**Plan**"), ECF 499.

4. Under the Plan, all equity interests in the Debtor were cancelled and the Liquidating Trust was established, with the Liquidating Trust becoming the estate's representative and successor for purposes of the Plan.

5. Defendant Nettesheim is a resident of the State of Wisconsin and a former manager of and general counsel to the Debtor. Nettesheim has had a professional relationship with the Debtor's principal, William Vogel, that pre-dates the Debtor.

6. Defendant N2 is a Wisconsin corporation that provided legal and financial services to the Debtor.

7. Nettesheim is or was at all times relevant a principal and officer of N2.

8. N2 billed the Debtor for the work of Nettesheim and other employees, including Jim Pellegrini ("**JP**"), Lori L. Waldron ("**LLW**"), and Dain L. Anderson ("**DLA**").

9. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b), and 1334(b).

10. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and (H).

11. Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a), in that this is a civil proceeding arising in and/or related to the Debtor's Chapter 11 Case, currently pending in the Bankruptcy Court.

12. The Court has personal jurisdiction over Defendants because Defendants received and benefitted from fraudulent transfers and preferences from the Debtor and entered into one or more agreements with the Debtor, which is the subject of a Chapter 11 case in this District.

13. N2 has also submitted to personal jurisdiction in this District by filing a proof of claim; N2 filed Proof of Claim #172 seeking payment of $564,397.84 in unsecured debts on May 19, 2025, more than a month after the claims bar date.

## GENERAL ALLEGATIONS

14. At all relevant times, Nettesheim was a manager of the Debtor as well as a shareholder and director of N2.

15. N2 received numerous payments from the Debtor during its incipient and actual insolvency.

16. Additionally, Nettesheim and N2 provided "general corporate legal and finance advisory services" to the Debtor at various times up until the Petition Date, including when the Debtor was insolvent.

17. By virtue of Nettesheim's role as the Debtor's manager and general counsel, Nettesheim is a statutory insider of the Debtor within the meaning of § 101(31) of the Bankruptcy Code and section 102(8) of Utah's Uniform Voidable Transactions Act (**"UVTA"**), Utah Code § 25-6-101 *et seq*.

18. Nettesheim is also a non-statutory insider of the Debtor because he had actual knowledge and insider information regarding the Debtor and its finances and operations as one of its managers and its general counsel, and because he had a close relationship with the Debtor, its other managers, and its sole member.

19. N2 is a non-statutory insider of the Debtor because N2 had actual knowledge and insider information regarding the Debtor and the Debtor's financials and operations, as well as a close relationship with the Debtor and its managers, including Nettesheim, who was both a principal and officer of N2 and a manager of and general counsel to the Debtor, and because a substantial portion of N2's revenue came from the Debtor.

20. N2's contracts and transactions with the Debtor were not conducted at arm's length; because of Nettesheim's role as a manager of the Debtor, N2 was able to overcharge the Debtor substantially for the services it provided.

**DEFENDANTS PROVIDED UNLICENSED LEGAL SERVICES TO THE DEBTOR SUBJECT TO CONFLICTS OF INTEREST**

21. Nettesheim was a manager of the Debtor as of December 2020.

22. Nettesheim was also a paid member of the board of directors of MSI General Corp. ("**MSI**").

23. Based at least in part on a contract executed in October 2020, MSI provided general contracting services to the Debtor potentially worth tens of millions of dollars.

24. N2 provided legal services to MSI.

25. N2 began providing services to the Debtor and billing the Debtor for them in November 2021, if not sooner. Such services included legal advice from Nettesheim and others at N2.

26. The Debtor began paying N2 for services rendered in December 2021, if not sooner.

27. The legal advice provided by Nettesheim and others at N2 related to issues governed by Utah law—including without limitation the Debtor's business activities in the State of Utah, employment issues, construction issues, and corporate issues.

28. On information and belief, Nettesheim is not licensed to practice law in Utah; nor are any of the other attorneys at N2 who provided legal advice to the Debtor.

29. Nothing in the record indicates that N2 associated with any attorneys licensed to practice law in Utah.

30. With regard to issues related to Utah law, N2 was not fully competent to provide the legal advice it provided to the Debtor.

31. There was a significant risk that Nettesheim and N2's legal advice to the Debtor was materially limited by Nettesheim's performance of managerial duties and tasks for the Debtor.

32. There was a significant risk that Nettesheim and N2's legal advice to the Debtor was materially limited by Nettesheim's role as a board member of MSI.

33. The interests of the Debtor and MSI were materially adverse and there was an actual conflict between them with regard to MSI's outstanding invoices.

34. When acting as a manager of the Debtor, Nettesheim had conflicts of interest.

35. In providing legal services to the Debtor, Nettesheim and N2 acted with conflicts of interest.

36. Records do not indicate that a written engagement letter between N2 and the Debtor existed during 2021 or 2022.

37. On or about January 1, 2023, the Debtor signed an engagement letter with N2.

38. Nettesheim and N2 did not inform or advise the Debtor in writing about the aforementioned conflicts of interest.

39. Nettesheim and N2 did not obtain written consents or waivers from the Debtor with regard to the aforementioned conflicts of interest.

**THE ORIGINS OF DEFENDANTS' IMPROPER AND FRAUDULENT BILLING PRACTICES**

40. While the Debtor was operating, Defendants substantially overbilled the Debtor for the value of services rendered.

41. On information and belief, Nettesheim reviewed, authorized, and/or was otherwise aware of each of the invoices (and their contents) sent by N2 to the Debtor.

42. Defendants' overbilling is evidenced in their irregular billing practices, including drastic, unexplained, and unwarranted increases in hourly rates charged, block billing, consistent failure to identify the billing professional or their hours worked, duplicative billing entries, inflated hours, unsubstantiated expenses, and double-billing for additional work while traveling.

43. N2's bills for late 2021 and most of 2022 generally reflected the name of billing professionals, the hours worked, and the rates charged, and do not appear to duplicate work or billing.

44. For example, N2's bills to the Debtor indicated that Nettesheim's rate was $600 per hour and JP's rate was $450 per hour in November and December of 2021.

45. Beginning in January of 2022, N2's bills to the Debtor indicated that Nettesheim's rate increased to $650 per hour, and JP's standard rate increased to $525 per hour; JP's rate increased to $550 per hour for any work billed to "General Corporate Consultation" on behalf of the Debtor.

46. However, beginning with Invoice #1847, which sought payment for work done in October and November 2022 as well as random dates in prior months, N2's bills failed to identify the billing professional or hours worked in relation to each billing entry.

47. Invoice #1847 included numerous block bills, including a $11,500 block bill dated August 31, 2022 for "Attend to financial analysis/valuation – research, analysis, modeling, creation of CIM;" an October 31, 2022, $8,250 block bill for "Create CIM template; perform research on lenders; update financial presentation; conferences [month];" and a November 30, 2022 block bill of $30,000 for "Create CIM for potential mezzanine funding; revise same; conferences regarding same; research; update term sheet forecast; financial advisory [month]."

48. Because of the absence of information regarding billing professionals and hours worked, it is difficult to determine what billable rates were charged by any given N2 employee beginning in approximately August of 2022.

49. The Debtor paid Invoice #1847 on December 23, 2022, in the amount of $174,747.25, an increase of roughly $42,000 from the prior invoice reflecting a similar timeframe.

**DEFENDANTS' IMPROPER AND FRAUDULENT BILLING PRACTICES PERSIST**

50. N2's omission of information regarding billing professionals and time billed continued through 2023 and early 2024.

51. On or about January 1, 2023, the Debtor signed an engagement letter with N2 providing that its "current billing rates . . . range[d] from $275 to $1,000."

52. An hourly rate of $1,000, or anything close to that much, was unreasonable given the prominence, locality, and, in this case, uncredentialed status of the professionals providing the services.

53. Upon information and belief, N2 charged unreasonable rates for work done by Nettesheim, JP, and LLW that were not in line with those charged by attorneys and professionals of comparable experience and skill in the Utah legal market.

54. Despite none of its professionals being licensed attorneys in the State of Utah, N2's small size and lack of experience in Utah, and N2's very short history as a business established

only six years earlier, N2 charged rates comparable to well-established, full-service, high-powered law firms from New York, Los Angeles, or Chicago with incomparable experience and skill.

55. In 2021 and 2022, Nettesheim's billable rate of between $600–650 per hour was comparable to or greater than the hourly rates charged by extremely experienced, specialized Utah counsel and approved by courts in Utah. Even in 2023, courts rarely approved higher rates. *See generally, e.g.*, *Martin v. SGT, Inc.*, No. 2:19-CV-00289-RJS, 2023 WL 3585326 (D. Utah May 22, 2023) ($695 per hour was reasonable for an attorney with more than twenty years of experience, admission in Utah and numerous courts of appeal, and a specialization in complex intellectual property litigation).

56. Despite N2 already charging excessive rates for its professionals, the hourly rates for all of N2's professionals increased substantially in 2023, with Nettesheim's rate climbing as high as $1000 per hour, far higher than charged by even experienced attorneys who *were* licensed in the State of Utah.

57. N2 also charged hourly rates for JP and LLW that were comparable to or greater than those appropriate for experienced, specialized, and licensed attorneys in the State of Utah.

58. Upon information and belief, despite N2 charging the Debtor for LLW's time as though she was an experienced attorney, she was not an attorney.

59. Upon information and belief, neither JP nor LLW were licensed practitioners in the State of Utah, and only JP carries a license to practice law in any state.

60. JP's hourly rate in 2023 rose as high as $750 per hour.

61. JP's hourly rate was also substantially higher than appropriate for attorneys of similar experience, specialization, and skill in Utah.

62. N2 and Nettesheim charged the Debtor millions of dollars for legal advice and services *in Utah* from professionals who never carried licenses to practice in Utah and who lacked experience in Utah.

63. The failure to include the identities of billing professionals and entries for time worked makes it difficult to determine what billable rates were charged by any given N2 employee.

64. Upon information and belief, the billed rates charged by N2's professionals substantially increased around the same time N2 stopped providing sufficient information to support its bills to the Debtor.

65. Invoice #1878, which primarily sought payment for work done in December of 2022, with several entries from January 2023, failed to identify billing professionals and time billed.

66. The Debtor paid Invoice #1878 via wire on April 21, 2023, in the amount of $179,257.68.

67. Invoice #1900, seeking payment for work done in January 2023 and February 2023, also failed to identify billing professionals and hours worked.

68. Invoice #1900 contained several block bills, including a January 31, 2023 bill of $44,625 for "Financial analysis; prepare capex schedule; prepare updates to financial schedules; update forecast; attend to diligence requests from lenders and EVC [month]," and a February 28, 2023 bill of $49,500 for identical work. There were additional time entries for work performed on specific days in January and February.

69. Invoice #1900 also failed to substantiate several reported expenses, including billing the Debtor several hundred dollars twice for "Hotel" on March 6, 2023.

70. The Debtor paid Invoice #1900 via wire on April 21, 2023, in the amount of $303,292.24, inclusive of $5,132.24 in expenses.

71. Despite Invoice #1900 covering a similar period to the previous invoices, this invoice nearly doubled the amount of time N2 billed to the Debtor in this timeframe.

72. Invoice #1923, seeking payment for work done in February and March of 2023, also failed to identify billing professionals and hours worked.

73. Invoice #1923 contained numerous block bills and duplicative billing entries, including a block bill dated February 28, 2023, of $57,000 for, again, "Financial Analysis; prepare capex schedule; prepare updates to financial schedules; update forecast; attend to diligence requests from lenders and EVC [month]."

74. This is an exact copy of an entry with the same date and description from Invoice #1900 seeking $49,500 from the Debtor the previous month.

75. Invoice #1923 contained entries dated March 1, 2023, reading "Prepare for and attend site visit, management meeting and follow up lunch with Arbour Lane" and "Prepare for and attend site visit and management meetings with BlackRock; follow up with Mr. B. Vogel;" upon information and belief, these entries double-billed the Debtor an amount of $6,200 for the same site visit.

76. Invoice #1923 failed to itemize its largest expenses, accumulating more than $8,000 in ambiguous expenses labeled "Vobev travel," "Dues and subscriptions," and "Travel Expense," among others.

77. The Debtor paid Invoice #1923 via wire on May 5, 2023, in the amount of $194,492.62, inclusive of $9,312.62 in expenses.

78. While this is a decrease from the previous invoice, it is still nearly $60,000 dollars more than the last N2 bill that identified billing professionals and hours worked.

79. Invoice #1955, seeking payment for work done in March and April of 2023, also failed to identify billing professionals and hours worked.

80. Invoice #1955 contained entries double or even triple-billing for work Nettesheim did on April 12, 2023, totaling $11,000; these entries included an entry seeking $3,800 for "Telephone conference with Mr. M. Czarnecki regarding BMO/Vobev Equipment Loan and Note issues; schedule all hands conference for 4/13/2023; forward information to Cravath team for review; follow up telephone conference with Evercore regarding same;" an entry seeking $4,200 for "Office conference regarding schedules and open diligence items; correspondence regarding Crown dispute and Systems Logistics open CapEx amounts; correspondence regarding overhead expenses for BVO and Vojet; review and revise Operating Agreements; telephone conference regarding open diligence items," an entry seeking $2,100 for "Review and forward BMO Equipment Loan documentation to Cravath team regarding not extending the Note and other implications to price and deal structure;" and an entry seeking an additional $900 for a conference with Evercore.

81. These descriptions substantially overlap, particularly with respect to conferences and communications involving the equipment loan and note as well as the conference with Evercore.

82. Invoice #1955 similarly double-billed for Nettesheim's attendance at conferences and other work on April 13, 2023, April 14, 2023, April 17, 2023, and April 18, 2023; Nettesheim appears to have billed upwards of eleven hours per day and to have double-billed attendance at conferences with Bill Vogel to numerous matters on behalf of Vobev at the same time.

83. Invoice #1955 also contains numerous block bills, including a March 31, 2023, bill seeking $74,250 for "Attend to capex schedule; update same; attend to financial analysis and updates to mode; conferences with Evercore and team regarding same; attend to due diligence [month]" and a similar entry dated April 28, 2023, seeking $70,500 for "Attend to financial

analysis; updates to model and capex schedule; attend to closing statement; attend to due diligence; conferences regarding same [month].”

84. Invoice #1955 was paid by the Debtor via wire on June 2, 2023, in the amount of $499,131.86, inclusive of $2,726.86 in expenses.

85. This is nearly four times the amount billed by N2 for the last invoice reflecting a similar time period for the billing professionals and their hours worked.

86. Through Invoices #1847, #1878, #1900, #1923, and #1955, spanning October of 2022 through April of 2023, N2 collectively sought and received $1,350,921.65 from the Debtor without ever identifying or recording the identities of N2's billing professionals or their hours worked.

87. Upon information and belief, throughout this entire period and in each of these invoices, Nettesheim charged the Debtor an hourly rate across all matters of $1,000 per hour—almost twice the hourly rate he was charging the Debtor as of December 2022.

88. Beginning in April of 2023, with Invoice #1996, N2 once again included the names of its billing professionals and their hours worked in bills to the Debtor.

89. Invoice #1996 spanned April of 2023 through September of 2023 and overlapped substantially with the following invoice.

90. As of April of 2023, Invoice #1996 indicated that Nettesheim's hourly rate fluctuated, seemingly at random, from $825 per hour to $1000 per hour; the invoice likewise indicated that JP's hourly rate had increased to $750 per hour and DLA's hourly rate (now listed on invoices as “DA”) increased to $375 per hour.

91. Upon information and belief, Nettesheim double-billed for work done while traveling on behalf of the Debtor during this period; for example, on June 20, 2023, N2 billed the Debtor $9,500 for Nettesheim to “Travel and attend meetings for Vobev; prepare for same” under

"General Corporate Consultation," but also billed $1,200 on the same date for other work done by Nettesheim in the "Project Slopes" matter.

92. On July 31, 2023, Nettesheim also billed the Debtor a total of $24,500, reflecting more than 24 hours of work in the day if charged at the maximum $1,000 per hour rate.

93. The same day included a time entry in which Nettesheim billed 1.9 hours of work at a rate of $10,000 per hour. This rate is per se unreasonable.

94. Even if erroneous, this amount was included in the invoice and was charged to and paid by the Debtor.

95. The Debtor paid Invoice #1996 via wire on December 5, 2023, in the amount of $340,230.61, inclusive of $7,745.61 in expenses.

96. Upon information and belief, as soon as N2 resumed substantiating its time entries, even if temporarily, the amounts it billed to the Debtor — even including the overbilling still present in Invoice #1996 — dropped back in line with the amounts previously charged in mid-2022.

97. Upon information and belief, there is no explanation for why these rates and billed amounts fell at this time.

98. Invoice #2017 covers additional time billed from May of 2023 through October of 2023, most of which is attributable to LLW.

99. Invoice #2017 indicates that the rates charged by N2 and its professionals fell across the board; Nettesheim's rate lowered to $850 per hour for "General Corporate Consultation," JP's rate fell to $720 per hour, and LLW's rate was established at $525 per hour.

100. The primary issue with Invoice #2017 is systemic double-billing by LLW and Nettesheim; there are duplicative, identical time entries on the following dates that account for $16,502.50 of the $61,322.50 billed to the Debtor under this invoice — more than a quarter of the

total: May 9, 2023, June 5, 2023, June 6, 2023, June 8, 2023, June 12, 2023, June 19, 2023, June 20, 2023, June 21, 2023, June 26, 2023, July 12, 2023, and July 18, 2023.

101. On June 12, 2023, and June 26, 2023, Nettesheim and LLW each billed for the same task, and on June 26, 2023, both Nettesheim and LLW billed for those same tasks twice over.

102. N2's Invoices indicate that the Debtor paid Invoice #2017 via wire on February 12, 2024 in the amount of $62,839.14, inclusive of $1,516.64 in expenses.

103. However, upon review of the Debtor's bank statements and payment records, it appears that the Debtor issued payment to N2 several days earlier, on February 9, 2024, in a much larger amount: $214,231.64. This was $151,392.50 more than the amount recognized in Invoice #2017.

104. This payment occurred within one year of the Petition Date.

105. On or about August of 2023, N2 again reverted to omitting time increments on its bills, only listing the name of the billing professional in Invoices #2046, #2069, #2083, and #2140.

106. Invoice #2046 covered August of 2023 through December of 2023, and the lack of time entries makes it difficult to determine the hourly rates charged by N2's professionals, including Nettesheim.

107. There are numerous block bills in this invoice, including an October 16, 2023 bill of $10,000 for Nettesheim to "Prepare for, travel to and attend Vobev-ATK meeting;" an October 19, 2023 block bill of $9,500 for Nettesheim to "Prepare for and attend several telephone conferences with FTI, Ares and Evercore regarding vendor payments and cash forecast and KYC documents; conferences regarding same; conference with Cravath regarding standby letters of credit; review 13 week update deck from Mr. J. Lydon;" and a November 13, 2023 block bill of $8,000 for Nettesheim to "Prepare for and attend diligence session with Evercore and Vobev teams."

108. Upon information and belief, Nettesheim double-billed for his travel time and conferences on October 24, 2023, seeking $11,000 for “Prepare for, travel to and attend in person meeting with Ares; prep and debrief meeting with Evercore team” and $3,200 for “Review and respond to e-mail correspondence regarding outstanding required KYC documentation needed and DDTL preparation; telephone conferences with Evercore and Cravath teams regarding same; conferences with Mr. B. Vogel regarding Absolute Technical Services and improvement of line performance.”

109. Upon information and belief, Nettesheim also double-billed for travel time on November 2, 2023, seeking $12,000 for “Travel to, prepare for and attend Manna meeting at Vobev” as well as another $1,100 in the same matter for “Correspondence regarding 3rd party expenses” and a further $675 in another matter for “Review and respond to e-mail from Mr. B. Belot regarding Aura Bora; review and respond to e-mail from Ms. D. Siggaard regarding PPG qualification.”

110. The Debtor paid Invoice #2046 via wire on January 22, 2024, in the amount of $278,258.85, inclusive of $3,108.35 in expenses.

111. Once again, when N2 did not properly substantiate its bills, the amount billed to the Debtor rose rapidly.

112. Invoice #2069 covered November of 2023 through February of 2024.

113. Invoice #2069 included numerous block bills in which Nettesheim, on information and belief, double-billed for his travel alongside other work for the Debtor on December 1, 2023, December 5, 2023, and December 6, 2023.

114. On December 1, 2023, Nettesheim billed $12,000 for “Travel to, prepare for and attend Manna meeting; travel back to Milwaukee; conferences with B. Vogel and Evercore for follow up” as well as an additional $1,072.50 for “Telephone conference with Mr. R. Bollow

regarding final revisions on Wingpointe lease; execute and forward to Mr. R. Bollow to send to landlord; send final revisions regarding same for Monday updates."

115. On December 5, 2023, Nettesheim billed $7,500 for "Travel to, prepare for and attend Manna meeting regarding Vobev financing options; follow-up telephone conferences with Evercore teams to debrief on discussions and terms" as well as $2,200 for "Telephone conference with Evercore team regarding latest e-mail from Manna debrief and next steps and BVO expenses; review process letter from Evercore," $1,600 for "Telephone conference with Mr. K. Attkisson regarding follow-up e-mail issues, concerns and potential next steps forward," and $3,000 for "Review and respond to e-mail correspondence from Evercore team regarding issues with Manna and potential deal terms and timing; follow-up telephone conference regarding same; conference with M. Czarnecki regarding updates on Wells Fargo letters of credit."

116. Collectively, these amounts reflect a 14.3 hour day assuming Nettesheim's maximum $1,000 per hour rate.

117. On December 6, 2023, Nettesheim billed $13,000 for "Travel to, prepare for and attend Niagara meeting regarding potential Vobev partnership; follow-up telephone conference with Evercore teams to debrief on discussions; travel back to Milwaukee from Salt Lake City" in addition to other entries for $600, $1,700, $2,600, and $2,200 on the same date, reflecting a total of 20.1 hours billed in a single day assuming Nettesheim's maximum $1,000 per hour rate.

118. Nettesheim also block billed the Debtor $8,000 to "Travel to, prepare for and attend Manna meeting; travel back to MKE" on December 20, 2023.

119. The Debtor partially paid Invoice #2069 by wire on April 29, 2024, in the amount of $100,000, with the remaining $279,705.14, inclusive of $3,094.14 in expenses, paid via a credit note N2 issued to the Debtor.

120. Ordinarily, credit notes are payment markdowns in invoices reflecting either previous payment by the recipient, erroneous or written-down bills, or work done on “credit” by the invoicing party expecting payment at a later date. Upon information and belief, all amounts designated paid via credit note by N2 in its invoices were not written down or considered paid because N2 later submitted a proof of claim in this case for all amounts designated paid via credit note.

121. Once again, N2’s bills substantially rose—totaling $379,705.14 on this invoice—when it did not provide any time entries.

122. Invoice #2083 covered January of 2024 through March of 2024 and was exclusively paid by credit note N2 issued to the Debtor.

123. Upon information and belief, Invoice #2083 includes numerous instances of double billing by Nettesheim.

124. On March 1, 2024, Nettesheim billed the debtor for $4,200, $2,800, and $5,500, and the larger two of these entries involved the same conference regarding a purchase agreement.

125. On March 11, 2024, Nettesheim likewise block billed the Debtor $12,000 for “Prepare for, travel to and attend Arizona Tea meeting” in addition to another $5,200 of work on the same day attributable to conferences with Bill Vogel and others.

126. Invoice #2083 totaled $265,307.27, inclusive of $12,372.27 in expenses.

127. Invoice #2140 covers March and April of 2024 and reflects a substantial decrease in amounts billed by N2.

128. Invoice #2140 totaled $19,385.43, inclusive of $532.93 in expenses; the invoice was exclusively paid by credit note.

129. The total amount billed to the Debtor by N2 through unsubstantiated invoices lacking a record of hours worked, the professional who did the work, or both, was $2,292,578.34, including $564,397.84 that the Debtor paid on credit with N2.

130. Upon information and belief, Nettesheim, N2, and N2's various professionals failed to accurately and contemporaneously track the time billed to the Debtor throughout their employment as the Debtor's counsel.

131. In addition, despite Nettesheim's role as a manager to the Debtor, Nettesheim (through N2) billed the Debtor hundreds of thousands of dollars for work that he otherwise owed the Debtor in his role as the Debtor's manager.

132. As a general business practice, no independent, qualified fiduciary of the Debtor would have caused the Debtor to pay amounts due to N2 without information to substantiate N2's invoices and services provided. Nettesheim was only able to dupe the Debtor based his role as manager to the Debtor.

133. In fact, in December 2023, the Debtor hired a qualified financial controller. One month later, in January 2024, this controller notified Nettesheim that N2's services were too expensive, and that the Debtor would no longer pay him.

**THE DEBTOR'S INSOLVENCY AND ARES' LOANS**

134. Upon information and belief, the Debtor was insolvent from inception and at all times in which N2 billed the Debtor for its services.

135. Beginning no later than 2023, the Debtor began to have issues paying its vendors and servicing its debts on time.

136. As the Debtor struggled to service its debts, the Debtor contacted numerous lenders, including Ares Capital Management LLC ("**Ares**"), to seek significant financing.

137. In April 2024, Ares issued an approximately $375 million loan to the Debtor and began closely scrutinizing its finances in an effort to turn the Debtor's business around.

138. Shortly thereafter, both because the new controller had communicated the Debtor would no longer pay N2's bills, and because Nettesheim and N2 were aware that a third-party may scrutinize their practices, their overbilling practices largely stopped.

139. Nettesheim himself did not do any legal work for the Debtor after March 29, 2024, and the total amount billed by N2 for services after Ares stepped in was less than $20,000.

140. By comparison, during the five months between November 2023 and March 2024 alone, N2 and Nettesheim billed the Debtor nearly a million dollars for their services, including entries billing tens of thousands of dollars per day for Nettesheim to travel on business with the Debtor.

141. N2 invoiced and credited the Debtor with paying $1,005,495.83 for its services within one year of the Petition Date, but received $592,490.49 in cash and $564,397.84 in credit notes from the Debtor during the same period, for a total of $1,156,888.33. These credit notes were the subject of N2's proof of claim.

142. In addition to N2's other billing misconduct, it has failed to recognize all amounts paid by the Debtor in its invoices and received a substantial cash benefit as a result.

143. In total, N2 billed the Debtor $4,518,112.01 for services between November 2021 and the Petition Date.

144. While the Debtor was behind on its bills with many of its other creditors, the Debtor paid N2 no less than $592,490.49 within one year of the Petition Date and provided N2 credit notes totaling $564,397.84.

145. The Debtor paid N2 for $3,429,128.49, within four years of the Petition Date, inclusive of the credit notes. Excluding the credit notes, the Debtor paid N2 $2,864,730.65 within four years of the Petition Date.

## FIRST CLAIM FOR RELIEF
**Avoidance of Fraudulent Transfers**

146. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

147. Under § 544(b)(1) of the Bankruptcy Code, "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim."

148. Accordingly, the Debtor may avoid any transfer that is voidable under any applicable state Uniform Voidable Transfers Act.

149. Under § 402 of Utah's UVTA, claims for relief under the UVTA are governed by "local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred."

150. Under § 402(1)(b) of Utah's UVTA, the Debtor is located in Utah, its place of business.

151. Under § 202(1) of Utah's UVTA, any transfer made or obligation incurred by a Debtor is "voidable as to a creditor . . . if the debtor made the transfer or incurred the obligation" (a) with "actual intent to hinder, delay, or defraud any creditor of the debtor," or (b) "without receiving a reasonably equivalent value" in exchange for the transfer while the Debtor was (i) engaged in or about to engage in a transaction for which the remaining assets of the debtor were "unreasonably small" in relation to the transaction, or (ii) while the debtor "intended to incur" or

believed and reasonably should have believed the debtor would incur debts "beyond the debtor's ability to pay" as they came due.

152. Under § 202(2) of Utah's UVTA, determining "actual intent" requires consideration of the following (collectively, the "**badges of fraud**"):

(a) the transfer or obligation was to an insider;

(b) the debtor retained possession or control of the property transferred after the transfer;

(c) the transfer or obligation was disclosed or concealed;

(d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) the transfer was of substantially all of the debtor's assets;

(f) the debtor absconded;

(g) the debtor removed or concealed assets;

(h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) the transfer occurred shortly before or shortly after a substantial debt was incurred;

(k) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

*See also In re Taylor*, 133 F.3d 1336, 1339 (10th Cir. 1998) (noting that "[w]hen one or more of these badges are present[,] fraudulent intent can be inferred" under the UVTA and 11 U.S.C. § 548(a)(1)).

153. On information and belief, the Debtor transferred to Defendants an amount up to $3,429,128.49 (inclusive of credit notes) over the course of several years of business with the Debtor and within four years of the Petition Date (the **"Transfers"**).

154. The Transfers were drawn on the Debtor's account and were the property of the Debtor.

155. The Transfers were made by and at the behest of the Debtor or Defendants for the benefit of the Defendants.

156. Defendants benefitted from the Transfers because they received $3,429,128.49 from the Debtor, including $2,864,730.65 in cash.

157. On information and belief, Defendants were aware that many of the Transfers were made on and after the dates on which the Debtor had incurred significant debts to its creditors, after the Debtor had unreasonably small operating capital and had incurred debts beyond its ability to pay and was indisputably insolvent on a balance sheet basis.

158. On information and belief, Defendants overbilled the Debtor for their services with the actual intent to hinder, delay, or defraud the Debtor's other creditors, which may be inferred from the multiple badges of fraud present at the time the Transfers were made.

(a) **Transfer made to an insider**: As set forth above, Nettesheim is a statutory and non-statutory insider of the Debtor, and N2 is a non-statutory insider.

(b) **Transfer or obligation was disclosed or concealed:** As set forth above, N2 appears to have chosen when to provide and not provide the identities of its professionals and their hours worked, concealing the true nature of the services they provided and the unreasonableness of N2's fees.

(c) **Lack of reasonably equivalent value:** As set forth above, Nettesheim and N2 substantially overbilled the Debtor and received payments greater than appropriate to provide reasonably equivalent value for the services provided to the Debtor, double-billing the Debtor for legal services, inflating Nettesheim's hourly rate as well as the rates charged by other N2 employees, and not substantiating several million dollars' worth of bills to the Debtor with record of the relevant billing professional and their hours worked.

(d) **Insolvency:** The Debtor was insolvent from inception, and Nettesheim as its manager, knew this or reasonably should have known. Even if it was not insolvent from inception, Nettesheim and N2's overbilling practices occurred immediately before and after the Debtor became prospectively

insolvent, as evidenced by the large amounts charged by Nettesheim and N2 for seeking debt financing on behalf of the Debtor.

(e) **Transfers made shortly before a substantial debt was incurred:** Nettesheim and N2 substantially overbilled the Debtor for their services immediately before the Debtor obtained substantial debt financing from Ares, billing the Debtor more than a million dollars in the months leading up to Ares' debt financing.

159. Each of the transfers from the Debtor to Defendants are avoidable within the meaning of § 202 of Utah's UVTA.

160. The Liquidating Trust is entitled to an order and judgment against Defendants for the avoidance of the Transfers under the UVTA.

## <u>SECOND CLAIM FOR RELIEF</u>
## Avoidance of Constructive Fraudulent Transfers

161. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

162. Under § 548(a)(1)(b) of the Bankruptcy Code and § 202(1)(b) of Utah's UVTA, the trustee may avoid any transfer made "without receiving a reasonably equivalent value in exchange for the transfer or obligation," when the Debtor—

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

163. Alternatively, under § 203(1) of Utah's UTVA,

A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:

(a) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(b) the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation.

164. The Debtor's creditors held undisputed antecedent debts against the Debtor before, during, and after each of the Transfers.

165. The Debtor received less than a reasonably equivalent value in exchange for the Transfers.

166. Many of the services for which Defendants billed the Debtor were unsubstantiated, duplicative, or provided at far higher rates than reasonable for the services rendered.

167. The Transfers were made (a) at a time when the Debtor was engaged or was about to engage in business and transactions for which the remaining assets of the Debtor were unreasonably small in relation to the business and transactions, (b) at a time when the Debtor intended to incur, or believed or should reasonably have believed that it would incur, debts beyond its ability to pay as they became due, (c) at a time when the Debtor was insolvent or (d) with the result that the Debtor became insolvent as a result of the Transfers.

168. After the Transfers, in April of 2024, the Debtor was left with unreasonably small capital while owing more than hundreds of millions to its various creditors, including Ares.

169. The Transfers are avoidable within the meaning of § 548 of the Bankruptcy Code and the UVTA.

170. The Liquidating Trust is entitled to an order and judgment against Defendants for the avoidance of the Transfers under § 548(a)(1)(B) of the Bankruptcy Code and § 202(1)(b) of Utah's UVTA.

## THIRD CLAIM FOR RELIEF
## Avoidance of Insider Transfer for Value

171. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

172. Under § 203(2) of Utah's UVTA,

> A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

(emphases added).

173. Within one year of the Petition Date, the Debtor paid $592,490.49, in addition to providing credit notes to N2 totaling $564,397.84 (the "**One Year Transfers**").

174. Under § 305 of Utah's UVTA, § 203(2) has a reach-back period of one year.

175. Accordingly, the One Year Transfers above are recoverable under § 203(2).

176. The One Year Transfers were made ostensibly on account of antecedent debt relating to services provided by N2 and Nettesheim to the Debtor.

177. As set forth above, Defendants are statutory and non-statutory insiders of the Debtor.

178. In Nettesheim's capacity as general counsel and manager of the Debtor, he received and was exposed to regular reports and information regarding the financial condition of the Debtor and therefore knew or reasonably should have known that the Debtor was insolvent or unreasonably undercapitalized at the time Defendants received the One Year Transfers.

179. In N2's capacity as provider of legal and other services to the Debtor, N2 was exposed to regular reports and information regarding the financial condition of the Debtor, and therefore knew or reasonably should have known that the Debtor was insolvent or unreasonably undercapitalized at the time Defendants received the One Year Transfers.

180. Defendants directly received and benefitted from the One Year Transfers.

181. The Liquidating Trust is entitled to an order and judgment against the Defendants for the avoidance of the One Year Transfers under § 203(2) of Utah's UVTA.

## FOURTH CLAIM FOR RELIEF
**Avoidance of Preference**

182. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

183. Under § 547(b) of the Bankruptcy Code, the Debtor may—

avoid any transfer of an interest of the debtor in property—

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
>> (A) on or within 90 days before the date of the filing of the petition; or
>>
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
>> (A) the case were a case under chapter 7 of this title;
>>
>> (B) the transfer had not been made; and
>>
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

184. The One Year Transfers were made by and at the behest of the Debtor and Defendants for the benefit of Defendants.

185. Defendants benefitted from the One Year Transfers because they received $592,490.49 in cash and $564,397.84 in credit notes from the Debtor within one year of the Petition Date, for a total of $1,156,888.33.

186. These One Year Transfers were made, ostensibly, on account of antecedent debts relating to services provided by N2 and Nettesheim to the Debtor.

187. As set forth above, at the time of the One Year Transfers, the Debtor was insolvent or was unreasonably undercapitalized.

188. As set forth above, Defendants are statutory and non-statutory insiders of the Debtor.

189. The One Year Transfers were made within 90 days and 1 year of the Petition Date.

190. The Liquidating Trust has taken into account the Defendants' potential defenses under § 547(c) of the Bankruptcy Code and believes that Defendants provided insufficient subsequent new value because they unreasonably overbilled for their services, the One Year Transfers were not intended to be nor were in fact contemporaneous exchanges for value, and the One Year Transfers were not in the ordinary course of business for the parties or as typical in the industry.

191. While Defendants may not have overbilled the Debtor for work referenced on Invoice No. 2140, dated August 12, 2024, they still failed to provide sufficient record of the hours worked and rates charged by N2 and its professionals in that invoice; additionally, Defendants substantially overbilled the Debtor for work referenced in the previous invoices paid during the preference period, including Invoice Nos. 2017, 2046, 2069, and 2083.

192. Ordinary business terms require attorneys to provide records of the time worked by employees, in reasonable time increments, the hourly rates charged, and the work done on behalf of the client; N2's invoices often failed to meet one or all of these requirements.

193. Accordingly, the defenses under section 547(c) of the Bankruptcy Code do not apply, and the One Year Transfers are avoidable.

194. The One Year Transfers allowed Defendants to receive more than they would have in a Chapter 7 liquidating proceeding; Defendants had $592,490.49 of their past-due bills paid in full and N2 received a credit note for the remaining balance while similarly situated unsecured creditors received much less.

195. Accordingly, the One Year Transfers are avoidable under § 547(b) of the Bankruptcy Code.

**FIFTH CLAIM FOR RELIEF**
**Recovery of Property**

196. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

197. Section 550 of the Bankruptcy Code allows the trustee to recover transferred property from an initial transferee that avoided transfers under §§ 544, 547, and 548 of the Bankruptcy Code.

198. Defendant N2 was the initial transferee of the Transfers.

199. The Liquidating Trust is entitled to avoid and recover the Transfers from Defendant N2 to Defendant Nettesheim as well as any other subsequent transfers under § 550 of the Bankruptcy Code.

200. The Liquidating Trust has not yet identified any mediate or intermediate transferees but will amend or seek to join them as defendants upon learning of their identities.

**SIXTH CLAIM FOR RELIEF**
**Disallowance of Claims**

201. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

202. Defendants are transferees of transfers avoidable under §§ 544, 547(b), and 548 of the Bankruptcy Code.

203. If, and to the extent Defendants have or may have prepetition claims against the Debtor, and Defendants have not returned the Transfers to the Debtor or the Liquidating Trust, all such purported claims against the Debtor's Chapter 11 estate must be disallowed until Defendant pays to the Liquidating Trust the amount of the Transfers.

204. Any proofs of claim filed by Defendants must be disallowed.

205. The Liquidating Trust is entitled to a judgment disallowing any potential claims by Defendants against the Debtor or the Liquidating Trust unless and until the Defendants pay back the Transfers.

## SEVENTH CLAIM FOR RELIEF
**Breaches of Fiduciary Duty Against Nettesheim as Manager of the Debtor**

206. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

207. As the Debtor's manager, Nettesheim owed the Debtor fiduciary duties of loyalty and care as well as duties of good faith and fair dealing.

208. These duties included a duty of disclosure by Nettesheim to the Debtor.

209. The Debtor's dealings with N2 for services rendered by N2 constituted self-interested transactions for Nettesheim in his role as manager of the Debtor.

210. The services rendered by Nettesheim and N2 to the Debtor were not consistent with industry standards; Nettesheim and N2 were not sufficiently qualified to perform them; the hourly rates were unreasonably high; time entries were duplicative, fraudulent, and unsubstantiated; hours were inflated; and the amounts charged were much higher than market value.

211. By egregiously overbilling the Debtor for N2's services—including his own legal services—Nettesheim derived substantial personal benefit from the Debtor's affairs to the detriment of the Debtor.

212. In addition, Nettesheim failed to disclose or correct N2's failure to credit the Debtor with payment of $214,231.64 in connection with Invoice #2017, an amount $151,392.50 higher than what N2 invoiced and listed as paid by the Debtor.

213. Nettesheim failed to adequately disclose the foregoing facts to the Debtor.

214. Upon information and belief, Nettesheim, through N2, billed the Debtor for corporate consultation work at inflated legal rates that he was otherwise under a duty to perform in his role as the Debtor's manager.

215. Upon information and belief, Nettesheim either played a role in approving his own invoices or used his position as a manager of the Debtor to avoid meaningful oversight from other employees of the Debtor who might have otherwise challenged his and N2's billing practices.

216. As a manager of the Debtor, Nettesheim also acted with conflicts of interest because he was concurrently a board member of MSI and an attorney for MSI, which was an adverse party to the Debtor.

217. On information and belief, Nettesheim did not adequately disclose these conflicts of interest to the Debtor.

218. The aforementioned conflicts continued until at least December 9, 2024 (if not afterwards), at which point the Debtor filed for bankruptcy.

219. All of the foregoing facts constituted breaches of Nettesheim's fiduciary duties to the Debtor as its manager.

220. Such breaches caused harm and damage to the Debtor—including, but not limited to, the amount of overbillings by N2, if not all of the amounts billed by N2; amounts inappropriately paid by N2 to Nettesheim as manager for compensation, reimbursement, or otherwise; and any overpayments by N2 to MSI.

221. Such harm was reasonably foreseeable.

222. As a result of Nettesheim's breaches of fiduciary duty as manager of the Debtor, the Liquidating Trust is entitled to damages in amounts to be determined at trial, including the Liquidating Trust's reasonable attorney fees.

223. Nettesheim's conduct in breaching the fiduciary duties he owed to the Debtor as its manager were willful and malicious, fraudulent, and manifested a knowing and reckless indifference towards the Debtor's rights.

224. Punitive damages are therefore warranted in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty Against Nettesheim and N2 as Attorneys for the Debtor**

225. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

226. As attorneys for the Debtor, Nettesheim and N2 owed fiduciary duties as pleaded above, including duties of disclosure.

227. In providing legal services to the Debtor, Nettesheim acted with conflicts of interest because he was also 1) a manager of the Debtor; 2) a member of the board of directors for MSI, an adverse party; and 3) an attorney for MSI, an adverse party.

228. All of these conflicts were imputed to N2.

229. In providing legal services to the Debtor, N2 acted with a conflict of interest in its own right because, on information and belief, it also represented MSI.

230. These conflicts were not adequately disclosed to the Debtor, they were not consented to by the Debtor, nor were they waived by the Debtor.

231. The aforementioned conflicts continued up until at least December 9, 2024 (if not afterwards), at which point the Debtor filed for bankruptcy.

232. The services rendered by Nettesheim and N2 to the Debtor were not consistent with industry standards; Nettesheim and N2 were not sufficiently qualified to perform them; the hourly rates were unreasonably high; time entries were duplicative, fraudulent, and unsubstantiated; hours were inflated; and the amounts charged were much higher than market value.

233. Nettesheim and N2 egregiously overbilled the Debtor for services and expenses and used N2 to siphon money from the Debtor.

234. Nettesheim and N2 failed to adequately disclose the foregoing facts to the Debtor.

235. Upon information and belief, Nettesheim, through N2, also billed the Debtor for corporate consultation work, at inflated legal rates, that he was otherwise under a duty to perform in his role as the Debtor's manager.

236. All of the foregoing facts constituted breaches of Nettesheim and N2's fiduciary duties to the Debtor as its attorneys.

237. In providing services to the Debtor through N2, Nettesheim was acting as an agent of N2 within the scope of his agency and N2 is therefore responsible for his breaches.

238. Such breaches were not limited to Nettesheim and N2's fraudulent billing activities, but also included billing at excessive rates, providing legal advice with conflicts of interest, and other conduct—all of which benefitted Nettesheim and N2 to the material detriment of the Debtor.

239. Such breaches caused harm and damage to the Debtor—including, but not limited to, the amount of overbillings by N2, if not all of the amounts billed by N2; and any amounts billed by N2 related to work done on matters related to MSI.

240. Such harm was reasonably foreseeable.

241. As a result of Nettesheim and N2's breaches of fiduciary duty as attorneys for the Debtor, the Liquidating Trust is entitled to damages in amounts to be determined at trial, including the Liquidating Trust's reasonable attorneys' fees.

242. Nettesheim and N2's conduct in breaching the fiduciary duties they owed to the Debtor as its attorneys were willful and malicious, fraudulent, and manifested a knowing and reckless indifference towards the Debtor's rights.

243. Punitive damages are therefore warranted in an amount to be determined at trial.

**NINTH CLAIM FOR RELIEF**
**Aiding and Abetting Breach of Fiduciary Duty Against Nettesheim and N2**

244. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

245. As outlined above, Nettesheim breached fiduciary duties owed to the Debtor in his capacities as manager of the Debtor and attorney for the Debtor. In addition, N2 breached fiduciary duties it owed to the Debtor as its attorney.

246. N2 knowingly participated and substantially assisted Nettesheim's breaches of fiduciary duty to the Debtor, both independently and in its capacity as an agent of the Debtor providing legal services, and by and through Nettesheim's own knowledge of the breaches.

247. N2's participation in Nettesheim's breaches of fiduciary duty, its actual overbilling of the Debtor, and its conflicts of interest directly damaged the Debtor.

248. Similarly, Nettesheim knowingly participated and substantially assisted N2's breaches of fiduciary duty to the Debtor in a number of ways—including but not limited to 1) independently as an attorney for the Debtor providing conflicted advice and fraudulent, overstated billings at unreasonably high rates; 2) in his capacity as an agent of N2 and authorizing all of its billings; 3) as a manager of the Debtor in approving and directing, on information and belief, the payment by the Debtor of N2's billings; and 4) through his own knowledge of these various breaches.

249. Nettesheim's participation in N2's breaches of fiduciary duty, his actual overbilling of the Debtor, his own conflicts of interest, and his actions as manager of the Debtor directly damaged the Debtor.

250. Thus, Nettesheim and N2 have each aided and abetted in the breaches of fiduciary duties by the other, and they and share liability and damages for the same.

**TENTH CLAIM FOR RELIEF**
**(Breach of Contract against N2)**

251. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

252. N2 had a contract with the Debtor to provide legal and other services.

253. The contract is evidenced by the engagement letter, dated on or about January 1, 2023, but a contractual relationship existed before that.

254. The contract between N2 and the Debtor required N2 to provide quality services consistent with industry standards at reasonable rates, and/or the rates identified in engagement letter.

255. N2 breached that contract through its practices of fraudulent billing, overbilling, charging unreasonable rates, and other conduct as described herein.

256. The services—including but not limited to legal advice—provided by N2 to the Debtor were not of sufficient quality or consistent with industry standards.

257. This also constituted a breach of contract.

258. The Debtor substantially performed its obligations under the contract, or such performance was excused as a result of N2's breaches and other factors.

259. N2's breaches caused harm to the Debtor, including but not limited to the amounts of fraudulent and overbilling at exorbitant rates.

260. N2's breaches have damaged the Debtor in amounts to be determined at trial.

**ELEVENTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

261. Plaintiff incorporates and reasserts the allegations set forth above as if fully set forth herein.

262. Plaintiff asserts this unjust enrichment claim in the alternative, in the event that its breach of contract, or portions of thereof, fail due to lack of an agreement.

263. The payments the Debtor made to N2 constituted a benefit to N2.

264. N2 was aware of this benefit and accepted it.

265. The services rendered by N2 to the Debtor were deficient and not worth the value of the payments made to by the Debtor to N2.

266. As a result, and for the other reasons stated herein, it would be unjust to allow N2 to retain the full value of the benefit conferred upon it by the Debtor through its payments.

267. Thus, N2 has been unjustly enriched by the Debtor.

268. The amount of such unjust enrichment to N2 will be determined at trial.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the entry of a judgment: (i) avoiding the Transfers under § 544(b)(1) of the Bankruptcy Code; (ii) avoiding the Transfers as constructively fraudulent transfers under § 548(a)(1)(B) of the Bankruptcy Code; (iii) avoiding the One Year Transfers to insiders of the Debtor under § 203(2) of Utah's UVTA; (iv) avoiding the One Year Transfers as preference payments under § 547(b) of the Bankruptcy Code; (v) allowing recovery of mediate and intermediate transfers under § 550 of the Bankruptcy Code; (vi) disallowing Defendants' claims under § 502(d) of the Bankruptcy Code; (vii) granting compensatory damages—including disgorgement of attorney fees paid—and punitive damages against Nettesheim for his breaches of fiduciary duty as manager of the Debtor; (viii) granting

compensatory damages—including disgorgement of attorney fees paid—and punitive damages against Nettesheim and N2 for their breaches of fiduciary duty as attorneys of the Debtor; (ix) to the extent not included in other awards of damages, compensatory damages and punitive damages from Nettesheim and N2 for aiding and abetting in the breaches of fiduciary duty of the other; (x) damages against N2 for breach of contract; (xi) damages against N2 in the amount that it was unjustly enriched through the payment of fees by the Debtor; (xii) awards of the Liquidating Trust's reasonable attorney fees on various causes of action as pleaded above; (xiii) appropriate awards of recoverable costs; (xiv) prejudgment and post judgment interest as allowable at law; and (xv) such other relief as the Court deems equitable and appropriate.

DATED this 18th day of November, 2026

**PARSONS BEHLE & LATIMER**

/s/ *Brian M. Rothschild*
BRIAN M. ROTHSCHILD
THOMAS R. BARTON
ANDREW J. SOMERS
ANNA PASEMAN

*Attorneys for the GUC Liquidating Trust*